DANIEL L. WARSHAW (Bar No. 185365)
  dwarshaw@pswplaw.com
**PEARSON, SIMON, WARSHAW & PENNY, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104

JAMES J. PIZZIRUSSO (admitted pro hac vice)
  jpizzirusso@hausfeldllp.com
**HAUSFELD, LLP**
1700 K Street NW
Washington, DC 20006
Telephone: (202) 540-7200
Facsimile:  (202) 540-7201

*[Additional Plaintiffs Counsel Listed on Signature Page]*
Attorneys for Plaintiffs and the Proposed Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| LORA WOLPH AND CLAY WOLPH, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>ACER AMERICA CORPORATION,<br><br>        Defendants. | CASE NO. CV-09-01314 JSW<br>(Assigned to the Honorable Jeffrey S. White)<br><br>**CLASS ACTION**<br><br>**DECLARATION OF JAMES J. PIZZIRUSSO IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**REDACTED VERSION**<br><br>[Complaint Filed: March 25, 2009]<br><br>Date:    March 18, 2011<br>Time:    9:00 a.m.<br>Crtrm.:  11 |

I, James J. Pizzirusso, declare as follows:

1.      I am a partner with Hausfeld LLP, counsel of record for Plaintiffs Lora and Clay Wolph.  I am a member in good standing of the bars of the State of Virginia and the District of Columbia and am admitted *pro hac vice* in this case.  I submit this declaration in support of Plaintiffs' Motion for Class Certification and for an order appointing Hausfeld LLP ("Hausfeld"), Pearson, Simon, Warshaw and Penny, LLP ("PSWP"), and Gary, Naegele & Theado, LLC ("GNT") as Co-Lead Class Counsel.  I have personal knowledge of the facts stated herein and, if called to do so, could and would testify competently thereto.

2.      Each of the firms representing Plaintiffs Lora and Clay Wolph are experienced in the prosecution of complex class actions, including consumer class actions.

3.      Hausfeld is an international law firm with offices in Washington, DC; San Francisco; Philadelphia; New York and London and affiliated offices in Europe and Asia.  Hausfeld's practice focuses primarily on complex and class action litigation involving antitrust, product liability, consumer, employment, financial, securities, environmental, and personal injury matters.  Attached hereto as Exhibit 21 is a true and correct copy of Hausfeld's current firm resumé, detailing some of the firm's experience in complex and class action litigation.  This resumé is not a complete listing of all cases in which attorneys at Hausfeld have been Class Counsel or otherwise counsel of record.

4.      I am the lead attorney from Hausfeld in the instant litigation, along with my partner Michael Lehmann.  I graduated from The George Washington University School of Law in Washington, DC in May 2001.  I have extensive experience litigating class actions on behalf of consumers and I have spent my entire legal career representing plaintiffs in class action cases.  In the past year and a half, I have served as one of the Co-Lead or Class Counsel in four major nationwide class actions that have settled involving approximately $75-$100 million in cash and other relief including: *In re Tyson Foods, Inc., Chicken Raised Without Antibiotics Consumer Litigation*, 1:08-md-01982-RDB (D. Md.) (MDL Court-appointed Co-Lead Counsel, nationwide settlement providing refunds approved May 11, 2010); *Ross v. Trex Co., Inc.*, No. 5:09-CV-00670 (N.D. Cal.) (Class Counsel, Nationwide settlement involving defective decking approved April 7,

1   2010); *Pelletz v. Weyerhaeuser Company*, No. C08-0334 JCC (W.D. Wash.) (Nationwide

2   settlement involving defective decking approved January 2009); *Radosti v. Envision, LLC*, (Court-

3   appointed Co-Lead Counsel, international settlement finally approved).  I am currently serving as

4   one of the Lead Class Counsel in another consumer class action pending in this district, *In re Sony*

5   *PS3 (other OS Litigation),* No. 10-cv-01811-RS (N.D. Cal.).

6          5.       The named Plaintiffs in this case, Lora and Clay Wolph, have no conflicts with the

7   class of which I am aware.  They have demonstrated their commitment to prosecuting this case on

8   behalf of the class by reviewing and commenting upon the pleadings, responding to requests for

9   written discovery, appearing for depositions, and participating in all aspects of the case.  I believe

10  that they are prepared to pursue this case to conclusion in the interests of the Class and have a

11  thorough understanding of the case and their fiduciary duties to the Class.

12         6.       Attached as Exhibit 1 of this declaration is a true and accurate copy of ███████

13  ████████████████████████████████ (Confidential).

14         7.       Attached as Exhibit 2 of this declaration is a true and accurate copy of ██████

15  ████████████████████████████████████

16  (Confidential).

17         8.       Attached as Exhibit 3 of this declaration is a true and accurate copy of ██████

18  ████████████████████ (Confidential).

19         9.       Attached as Exhibit 4 of this declaration is a true and accurate copy of Def's. Resp.

20  to Pltfs.' 3rd Req. for Prod. of Docs.

21         10.      Attached as Exhibit 5 of this declaration is a true and accurate copy of "Microsoft

22  Windows Vista: How much memory is enough?," PCstats.com, labeled as WOLPH000327 –

23  WOLPH000336.

24         11.      Attached as Exhibit 6 of this declaration is a true and accurate copy of Patrick

25  Thibodeau, "Buying a new PC? 'Windows Vista Capable' barely hits the mark: IBM'er says

26  Vista's RAM sweet spot is 4GB," *ComputerWorld*, http://www.computerworld.com (February 20,

27  2007), labeled as WOLPH000325 – WOLPH000326.

28

12.     Attached as Exhibit 7 of this declaration is a true and accurate copy of "Vista system may need more memory, Dell CEO says," October 27, 2006 (Bloomberg), <http://www.seattlepi.com/business/290154_msftvista27.html>.

13.     Attached as Exhibit 8 of this declaration is a true and accurate copy of Dell's FAQs for Microsoft Windows Vista: Hardware Requirements and Driver Availability, <http://www.dell.com/content/topics/global.aspx/solutions/en/winvista_faqs_rel>.

14.     Attached as Exhibit 9 of this declaration is a true and accurate copy of portions of Windows Logo Program 3.0: Windows Vista Logo Program Client System Requirements (Version 3.09) (December 22, 2006), MS-WOLPH 0001, 0025-26.

15.     Attached as Exhibit 10 of this declaration is a true and accurate copy of ██████ ████████████████████████████████████████████████████ (Confidential).

16.     Attached as Exhibit 11 of this declaration is a true and accurate copy of ███ █████████████████████████████████████████ (Confidential).

17.     Attached as Exhibit 12 of this declaration is a true and accurate copy of ███ ████████████████████████████████████████████ ████████████████ (Confidential).

18.     Attached as Exhibit 13 of this declaration is a true and accurate copy of ██████ █████████████████████████████ (Confidential).

19.     Attached as Exhibit 14 of this declaration is a true and accurate copy of ██████ ████████████████████████████████████ (Confidential).

20.     Attached as Exhibit 15 of this declaration is a true and accurate copy of █████ ███████████████████████████████████████ ████████████████ (Confidential).

21.     Attached as Exhibit 16 of this declaration is a true and accurate copy of ████ ██████████████████████████████████████ (Confidential).

1    22.    Attached as Exhibit 17 of this declaration is a true and accurate copy of ███

2    ████████████████████████████████████████ (Confidential).

3    23.    Attached as Exhibit 18 of this declaration is a true and accurate copy of the

4    Deposition of Lora Wolph, at 42:22-43:5 (April 7, 2010).

5    24.    Attached as Exhibit 19 of this declaration is a true and accurate copy of the

6    Declaration of Grant Girard (September 13, 2010).

7    25.    Attached as Exhibit 20 of this declaration is a true and accurate copy of the EMI

8    System Requirements, labeled as GG000001.

9    26.    Attached as Exhibit 21 of this declaration is a true and accurate copy of the

10    Hausfeld LLP firm resumé.

11    27.    Attached as Exhibit 22 of this declaration is a true and accurate copy of the

12    Declaration of Ronald S. Alepin in Support of Plaintiffs' Motion for Class Certification (partially

13    Confidential).

14    28.    Attached as Exhibit 23 of this declaration is a true and accurate copy of the

15    Declaration of Todd Stefan in Support of Motion for Class Certification.

16    29.    I hereby attest that I have on file all holograph signatures for any signatures

17    indicated by a "conformed" signature (/S/) within this efiled document.

18

19    I declare under the penalty of perjury under the laws of the United States that the foregoing

20    is true and correct.  Executed this 22nd day of November 2010 at Washington, DC.

21

22

23    /S/_____
      James J. Pizzirusso

24

25

26

27

28

# EXHIBIT 1

REDACTED DOCUMENT

# EXHIBIT 2

REDACTED DOCUMENT

# EXHIBIT 3

REDACTED DOCUMENT

# EXHIBIT 4

1  CHAD A. STEGEMAN (SBN 225745)
   (cstegeman@akingump.com)
2  **AKIN GUMP STRAUSS HAUER & FELD LLP**
   580 California Street, Suite 1500
3  San Francisco, California 94104
   Telephone:      (415) 765-9500
4  Facsimile:      (415) 765-9501

5  JAMES J. SCHESKE (*admitted pro hac vice*)
   (jscheske@akingump.com)
6  **AKIN GUMP STRAUSS HAUER & FELD LLP**
   5300 West 6th Street, Suite 2100
7  Austin, Texas 78701
   Telephone:      (512) 499-6200
8  Facsimile:      (512) 499-6290

9  Attorneys for Defendant Acer America Corporation

10              UNITED STATES DISTRICT COURT

11            NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13

14  LORA and CLAY WOLPH, on behalf of        Case No. CV 09 1314 JSW
    themselves and all others similarly situated,
15                                           Assigned to the Honorable Jeffrey W. White
                    Plaintiffs,
16                                           <u>CLASS ACTION</u>
          v.
17                                           **DEFENDANT ACER AMERICA**
    ACER AMERICA CORPORATION, a              **CORPORATION'S RESPONSES TO**
18  California corporation,                  **PLAINTIFF LORA WOLPH'S THIRD**
                                             **REQUEST FOR PRODUCTION OF**
                    Defendant.               **DOCUMENTS AND THINGS**
19
                                             [Complaint Filed:  March 25, 2009]
20
                                             Trial Date:      None
21

22  **PROPOUNDING PARTY: LORA WOLPH**

23  **RESPONDING PARTY:    ACER AMERICA CORPORATION**

24  **SET NUMBER:          THREE**

25

26

27
                                             1
28  **DEFENDANT ACER AMERICA CORPORATION'S RESPONSES TO**
    **PLAINTIFF LORA WOLPH'S THIRD REQUEST FOR PRODUCTION**
    **OF DOCUMENTS AND THINGS**                      CV-09-1314 JSW

**TO PLAINTIFFS LORA AND CLAY WOLPH AND THEIR ATTORNEYS OF RECORD**:

Pursuant to Federal Rule of Civil Procedure 34, Defendant Acer America Corporation ("Acer") responds as follows to the Third Set of Requests for Production of Documents and Things propounded by Plaintiff Lora Wolph ("Plaintiff").

**PRELIMINARY STATEMENT**

These responses reflect only the current status of Acer's knowledge, understanding and belief respecting the matters about which inquiry has been made. Discovery in this action is continuing and, consequently, Acer may not have yet identified all information responsive to the Request for Production of Documents and Things, Set Three ("Requests"). As discovery in this action proceeds, Acer anticipates that it may discover additional or different information or documents. Without in any way obligating itself to do so, Acer reserves the right to amend, modify, supplement, clarify or also explain these responses and objections at any time in the future.

Furthermore, these responses are without prejudice to the right of Acer to use or rely on at any time, any subsequently discovered information, or information omitted from these responses as a result of mistake, error, oversight or inadvertence. Acer also reserves the right to provide additional information and evidence at any time, and to object on appropriate grounds to the introduction of any portion of these responses into evidence.

Any inadvertent disclosure by Acer of documents protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege shall not constitute a waiver of that privilege or doctrine.

These responses are made solely for the purpose of and in relation to discovery conducted in this case. Each response is given subject to all appropriate objections (including but not limited to objections concerning competency, privacy, relevancy, specificity, overbreadth, undue burden, materiality, confidential proprietary or trade secret material, or admissibility), which would require the exclusion of any response contained herein. All such objections therefore are reserved and may be interposed at trial.

DEFENDANT ACER AMERICA CORPORATION'S RESPONSES TO
PLAINTIFF LORA WOLPH'S THIRD REQUEST FOR PRODUCTION
OF DOCUMENTS AND THINGS                    CV-09-1314 JSW

1    Acer responds to these Requests as it interprets and understands them.  If Plaintiff subsequently

2    asserts an interpretation of any Request that differs from Acer's understanding, Acer reserves its right

3    to supplement its objections and/or responses herein.

4    Acer states that, except for facts explicitly admitted herein, no admission of any nature

5    whatsoever is to be implied or inferred from these responses.  The fact that Acer has responded to a

6    Request should not be taken as an admission, or a concession of the existence, of any fact set forth or

7    assumed by such Request, or that such response constitutes evidence of any fact thus set forth or

8    assumed.

9    Acer fully disregards Plaintiff's "Instructions" except to the extent required by applicable law

10   or agreement between the parties.  Acer also disregards any "Definitions" to the extent that the

11   Definitions are not consistent with the provisions of applicable rules of procedure and to the extent that

12   the Definitions purport to require the responding party to take actions or provide information not

13   required by and which exceed the scope of discovery proper under the applicable rules of procedure.

14   Many of Plaintiff's Requests seek confidential and/or proprietary information.  Acer will not

15   produce responsive documents and things unless and until an appropriate protective order is entered by

16   the Court.

17   Any inspection or production made as a result of these responses will only be made once.

18   Accordingly, should Acer cause documents to be reproduced or ESI imprinted in any format for

19   Plaintiff's review, Plaintiff must designate the counsel who will receive the materials.

20   **RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS**

21   **REQUEST FOR PRODUCTION NO. 27**

22   Exemplars of the original product packaging for each of the ACER NOTEBOOKS.

23   **RESPONSE TO REQUEST FOR PRODUCTION NO. 27**

24   Acer objects to this Request to the extent:  (i) it seeks to impose discovery obligations beyond

25   those permitted under applicable rules of procedure; (ii) Plaintiff's definition of "ACER

26   NOTEBOOKS" is vague and ambiguous, particularly with regard to the phrase "Share Memory for

27   both system and graphics;" (iii) the Request is vague and ambiguous, particularly regarding the phrase

28

3

1    "original product packaging;" and (iv) the Request is overbroad and burdensome to the extent that it

2    seeks more than one exemplar for a given product.

3         Subject to and without waiving the foregoing objections, and based on Acer's understanding of

4    the words and phrases used in the Request attributing their ordinary and plain meanings, Acer responds

5    that Acer does not have exemplars responsive to this Request.

6    **REQUEST FOR PRODUCTION NO. 28**

7         DOCUMENTS, including but not limited to advertisements and promotional materials,

8    depicting the original product packaging for each of the ACER NOTEBOOKS.

9    **RESPONSE TO REQUEST FOR PRODUCTION NO. 28**

10        Acer objects to this Request to the extent:  (i) it seeks to impose discovery obligations beyond

11   those permitted under applicable rules of procedure; (ii) Plaintiff's definition of "ACER

12   NOTEBOOKS" is vague and ambiguous, particularly with regard to the phrase "Share Memory for

13   both system and graphics;" (iii) the Request is vague and ambiguous, particularly regarding the phrases

14   "promotional materials" and "original product packaging." Specifically, and without limitation, Acer

15   objects to the discovery of any information protected by the attorney-client privilege, joint defense

16   privilege, work product doctrine, or any applicable privilege, doctrine, or exemption that would make

17   the information immune or exempt from discovery, which privileges and protections are hereby

18   asserted.

19        Subject to and without waiving the foregoing objections, and based on Acer's understanding of

20   the words and phrases used in the Request attributing their ordinary and plain meanings, Acer responds

21   that Acer does not have DOCUMENTS responsive to this request.

22   **REQUEST FOR PRODUCTION NO. 29**

23        Exemplars of each of the ACER NOTEBOOKS produced in new condition.

24   **RESPONSE TO REQUEST FOR PRODUCTION NO. 29**

25        Acer objects to this Request to the extent:  (i) it seeks to impose discovery obligations beyond

26   those permitted under applicable rules of procedure; and (ii) Plaintiff's definition of "ACER

27   NOTEBOOKS" is vague and ambiguous, particularly with regard to the phrase "Share Memory for

28

4

**DEFENDANT ACER AMERICA CORPORATION'S RESPONSES TO**
**PLAINTIFF LORA WOLPH'S THIRD REQUEST FOR PRODUCTION**
**OF DOCUMENTS AND THINGS**                                    CV-09-1314 JSW

1   both system and graphics;" and (iv) the Request is overbroad and burdensome to the extent that it

2   seeks more than one exemplar for a given product.

3        Subject to and without waiving the foregoing objections, and based on Acer's understanding of

4   the words and phrases used in the Request attributing their ordinary and plain meanings, Acer responds

5   that Acer does not have exemplars responsive to this Request.

6   **REQUEST FOR PRODUCTION NO. 30**

7        All contracts or agreements between YOU and RightNow Technologies.

8   **RESPONSE TO REQUEST FOR PRODUCTION NO. 30**

9        Acer objects to this Request to the extent it seeks to impose discovery obligations beyond those

10  permitted under applicable rules of procedure or to the extent it seeks documentation otherwise not

11  relevant or related to the subject matter of this litigation and not reasonably calculated to lead to the

12  discovery of admissible evidence.

13       Subject to and without waiving the foregoing objections, and based on Acer's understanding of

14  the words and phrases used in the Request attributing their ordinary and plain meanings, Acer will

15  produce all fully-executed contracts between Acer (and/or any Acer corporate affiliate)and RightNow

16  Technologies to the extent that such contracts exist.

17  **REQUEST FOR PRODUCTION NO. 31**

18       All contracts or agreements between YOU and Sutherland Global Services.

19  **RESPONSE TO REQUEST FOR PRODUCTION NO. 31**

20       Acer objects to this Request to the extent it seeks to impose discovery obligations beyond those

21  permitted under applicable rules of procedure or to the extent that it seeks documentation otherwise not

22  relevant or related to the subject matter of this litigation and not reasonably calculated to lead to the

23  discovery of admissible evidence.

24       Subject to and without waiving the foregoing objections, and based on Acer's understanding of

25  the words and phrases used in the Request attributing their ordinary and plain meanings, Acer will

26  produce all fully-executed contracts between Acer (and/or any Acer corporate affiliate) and Sutherland

27  Global Services to the extent that such contracts exist.

28

DEFENDANT ACER AMERICA CORPORATION'S RESPONSES TO
PLAINTIFF LORA WOLPH'S THIRD REQUEST FOR PRODUCTION
OF DOCUMENTS AND THINGS                                    CV-09-1314 JSW

1    **REQUEST FOR PRODUCTION NO. 32**

2        All contracts or agreements between YOU and any third party that REFER OR RELATE TO

3    the storage, maintenance or compilation of ESI.

4    **RESPONSE TO REQUEST FOR PRODUCTION NO. 32**

5        Acer objects to this Request to the extent: (i) it seeks to impose discovery obligations beyond

6    those permitted under applicable rules of procedure; (ii) it is overly broad, is without temporal

7    limitation, and it seeks documentation otherwise not relevant or related to the subject matter of this

8    litigation and not reasonably calculated to lead to the discovery of admissible evidence; and (iii) is

9    vague and ambiguous with regard to the terms "storage, maintenance or compilation."

10       Subject to and without waiving the foregoing objections, and based on Acer's understanding of

11    the words and phrases used in the Request attributing their ordinary and plain meanings, Acer will

12    produce all executed contracts between Acer (and/or any Acer corporate affiliate) and any third party

13    that provided, is providing or will provide service or technical support on the ACER NOTEBOOKS.

14    **REQUEST FOR PRODUCTION NO. 33**

15        All contracts or agreements that YOU contend prohibits or limits YOU from producing

16    DOCUMENTS requested by PLAINTIFFS in this above-entitled litigation.

17    **RESPONSE TO REQUEST FOR PRODUCTION NO. 33**

18        Acer objects to this Request to the extent: (i) it seeks to impose discovery obligations beyond

19    those permitted under applicable rules of procedure; and (iii) is vague and ambiguous with regard to

20    the terms "prohibits" and "limits."

21        Subject to and without waiving the foregoing objections, and based on Acer's understanding of

22    the words and phrases used in the Request attributing their ordinary and plain meanings, Acer responds

23    that Acer does not have any documents responsive to this Request.

24    Dated: July 30, 2010            AKIN GUMP STRAUSS HAUER & FELD LLP

25

26                       By_____

                                 Chad A. Stegeman

27                       Attorneys for
                      Defendant Acer America Corporation

28

**DEFENDANT ACER AMERICA CORPORATION'S RESPONSES TO**
**PLAINTIFF LORA WOLPH'S THIRD REQUEST FOR PRODUCTION**
**OF DOCUMENTS AND THINGS**                 CV-09-1314 JSW

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

I am employed in the City and County of San Francisco. I am over the age of 18 and not a party to the within action; my business address is: 580 California Street, Suite 1500, San Francisco, CA 94104. On July 30, 2010, I served the foregoing document(s) described as: Defendant Acer America Corporation's Responses to Plaintiff Lora Wolph's Third Request for Production of Documents and Things on the interested party(ies) below, using the following means:

Daniel L. Warshaw
PEARSON, SIMON, WARSHAW &
PENNY, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: 818.788.8300
Fax: 818.788.8104
Email: dwarshaw@pswplaw.com

Michael P. Lehmann
HAUSFELD, LLP
44 Montgomery Street, Suite 3400
San Francisco, California 94104
Telephone: 415.633.1908
Fax: 415.358.4980
Email: mlehmann@hausfeldllp.com

James J. Pizzirusso
HAUSFELD, LLP
1700 K. Street, NW, Suite 650
Washington, DC 20006
Telephone: 202.540.7200
Fax: 202.540.7201]
Email: jpizzirusso@hausfeldllp.com

☒ BY UNITED STATES MAIL  I enclosed the documents in a sealed envelope or package addressed to the respective address(es) of the party(ies) stated above and placed the envelope(s) for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at San Francisco, California.

☐ BY OVERNIGHT DELIVERY  I enclosed the document(s) in an envelope or package provided by an overnight delivery carrier and addressed to the respective address(es) of the party(ies) stated above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier.

☐ BY ELECTRONIC MAIL OR ELECTRONIC TRANSMISSION.  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to the respective e-mail address(es) of the party(ies) as stated above. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on July 30, 2010 at San Francisco, California.

David Lamb
[Print Name of Person Executing Proof]

_David Lamb_
[Signature]

DEFENDANT ACER AMERICA CORPORATION'S RESPONSES TO
PLAINTIFF LORA WOLPH'S THIRD REQUEST FOR PRODUCTION
OF DOCUMENTS AND THINGS                                    CV-09-1314 JSW

# EXHIBIT 5



- Motherboards
- Videocards
- Memory
- Beginners Guides

News & Advanced Search | Feedback?

SEARCH



[X] Directory of Guides & Reviews

FORUMS

> Dec. ShoppingList
> Beginners Guides
> Weekly Newsletter
Archived Newsletters

Press Releases
Tech Glossary
Folding Team
3DMark Team
Forum Team

## Microsoft Windows Vista: How much memory is enough?



**Abstract:** Do you need as much memory when you're running office applications as you do when you're gaming? How much memory do you need in Vista to game comfortably, and spreadsheet smoothly? The answers are next!

| mfg'r link | category | date published | author |
|---|---|---|---|
| Search $ Price E | Microsoft.com | Memory | Aug 28.07 | C. Sun |

09.12.09 | 11:25A

XML RSS Newsletter

**Hardware Sections**

- Beginners Guides
- Cases and Access.
- CD-ROMs
- Chipsets
- Computers / SFF PCs
- Cooling - Heatsinks
- CPU / Processors
- Digital Cameras
- Hard Drives
- Home Theatre
- Memory
- MP3 Players
- Monitors
- Motherboards
- Mouse Pads
- Networking
- Notebooks
- PCs and SFF PCs
- Peripherals
- Powersupply
- Printers
- Servers
- Software / OS
- Videocards
- - - -
- Editorials

**Crucial Memory Upgrades**
Find The Right Memory Using Our Advisor Tool. Order Today Free S&H
crucial.com

**Compare the 2010 Ram HD**
Big Rig Styling with a Refined Interior. Check out the New Ram.
www.RamTrucks.com

**Ddr2 Memory**
Optimize your memory testing to keep pace with short design cycles.
www.tek.com

**Upgrade Ram Memory**
Automatically Find 100% Compatible Memory, Great Deals, Free Shipping
4AllMemory.com/RAM-Memor

**Home Inspection Licenses**
Obtain Your Home Inspection License Affordable Course, 100% Online.
www.HomeInspectionCourse.

Usually a hardware upgrade isn't required for a new operating system. Yet if you are planing to upgrade Microsoft Windows XP to M crosoft Windows Vista, it's almost impossible to avoid a PC overhaul. Aside from things like the speed of your processor (minimum 800MHz), and using a videocard that supports Vista's sublime Aeroglass graphical interface (DirectX 9), the most important and limiting factor is going to be memory. If the PC doesn't have enough RAM to satisfy Vista's intense thirst, you'll be the slowest thing on two wheels. For the record, Vista's minimum memory requirement is 512MB, though realistically that should be doubled.

Much of the focus on Microsoft Windows Vista has revolved around its steep graphical interface requirements. Vista craves graphics cards that are DirectX 9.0C compatible with 128MB of memory to run ts AeroGlass feature. Next is the large drive space requirement, sitting at 15GB just for ts installat on files, Vista is a fat OS.

Getting back to the memory requirements. M crosoft Windows XP required 128MB to operate (not fast, but it'll work), but four times that amount of system memory is required by Windows Vista just to install. Vista will function w th 512MB system RAM, but the ride is a rough one. M crosoft recommends that Vista computers ship with 1GB of memory, and considering its recommended specs, that's wise advice.

If you are not sure your computer will work with M crosoft Windows Vista, here's a quick test. If it's using SDRAM or RDRAM memory, it's probably too old. For a more definitive answer, run M crosoft's Windows Vista Upgrade Advisor and take a look at the report. If your PC is 2 years old or so, you will probably get by with a quick hardware upgrade here or there.

### What is the Right Amount of Memory for Vista?

Generally speaking more computer memory is better than less. However, installing more than 2GB of RAM doesn't necessarily translate into a faster Vista desktop PC. Only a few applicat ons may see improvement, and then the law of diminishing returns k cks in. So 2GB of RAM is generally cons dered the sweet spot for Windows Vista. As the operating system matures, along w th supporting software, it's possible that number will climb. It's a wise move to choose a PC that can be upgraded to 4GB.



**Application Monitoring Tool**
Integrated WebLogic, JVM, J2EE Web Transactions, Databases and Server Monitoring

**Try Free Edition**

ManageEngine
Applicat ons Manager

Download now

manageengine.adventnet.com    Ads by Google

**Industry PR**

» GIGABYTE Unleashes First UD7 Motherboard

» Seagate Ships 2TB ATA 6GB/s Hard Drive

» Corsair Obsidian Series 800D high-performance chassis



M crosoft Windows Vista has one new feature called ReadyBoost which you may have heard about. It was intended to augment PCs with low amounts of system memory so Vista might run qu cker. The thinking being that a USB drive could act as a dedicated read buffer for the system.

Regardless of what Microsoft may claim, ReadyBoost is more of a memory *supplement* than system memory *replacement*. A slower PC



Poll: Windows 7 Upgrade?

Are you planning on upgrading to Windows 7 on Oct. 28th?
- Yes, Windows 7 Here I come!
- No, Windows XP still works
- No, Windows Vista still works

GO

Total Votes: 4512



WOLPH000327



system will get more benefit from 1GB of system RAM than 4GB of ReadyBoost USB memory acting as a buffer.

PCSTATS has tested the impact of ReadyBoost with different amounts of system RAM, in this article. Impact was minimal on the whole, big changes occurred from the step up from 512MB to 1GB. There's a lot more to this, so have a look at the article, it will clarify any questions you may have about ReadyBoost.

Of all the different Microsoft Windows Vista versions, Home Basic gets away with the least system memory because the OS is more compact and robust. Its minimum requirements are 512MB, whereas the other versions are pegged at 1GB. Additional features like AeroGlass and Windows Media Center for example add to system load.

**If More RAM is Better, is a Lot More RAM Even Better?**

Short answer, no. If a PC is installed with 4GB of system memory, the computer itself will register 4GB but Windows Vista/XP will not be able to recognize it all. It's nothing to fret over, this is a normal limitation with 32 bit operating systems. The operating system will report 3.5GB or so, but the "missing memory" (varies between 500MB-750MB) is there, reserved for hardware devices.



It's possible to install more than 4GB of memory in a PC, but that will require the use of Physical Address Extensions (PAE). This feature is primarily a workstation/server option, and realistically there isn't much need for that much memory in a desktop system. Another option is to install Microsoft WindowsXP 64 bit Edition, or the 64 bit version of Windows Vista.

**Windows Vista SuperFetch uses more memory than WindowsXP's version**

Modern operating systems automatically load commonly used DLLs and programs into memory, so when decide to load an application on you use frequently, it pops up faster. To make this happen, since Microsoft Windows 95, there has been a function called Prefetch which monitors user activity and preloads those application extensions into system memory.

In Microsoft Windows Vista it is called SuperFetch, and it reserves about 33-50% of system memory for this purpose. Essentially Windows Vista looks at how the computer user accesses application and data, and keeps the most often used applications and tasks loaded into cache memory. This makes loading applications quicker and is supposed to offer users a smoother ride. It does not take system memory away from the OS or applications, if memory demand his high SuperFetch will automatically adjust its size.

We're just trying to clear the common misconception that Microsoft Windows Vista is poor at memory management. Windows Vista seems to consume a lot of memory because its SuperFetch feature grabs memory for itself upon startup.

### Vista Memory usage per version

| Operating System | Fresh Install Memory Usage | Recommended Memory Size | Installed System Memory |
|---|---|---|---|
| Microsoft Windows Vista Home Basic | 554MB | 512MB | 1GB |
| Microsoft Windows Vista Home Premium | 552MB | 1GB | 1GB |
| Microsoft Windows Vista Ultimate | 541MB | 1GB | 1GB |

The above examples were done with a total of 1GB of system memory. With 2GB or 4GB of memory, Windows Vista (all versions) grabs ~800 MB. The more system memory installed, the more Vista will be able to cache programs, tasks and services.

**Windows Vista: How much memory is enough?**

Up next we'll see how memory sizes affect different tasks within Windows Vista. Do you need as much memory when you're running office applications as you do when you're gaming? How much memory do you need in Vista to game comfortably, and spreadsheet smoothly? The answers are next!

Fix Virtual Memory: Guaranteed Tool
Faster-PC.net

START DOWNLOAD
Ads by Google

© 2009 PCSTATS.com                                        Next Page >

WOLPH000328

Page 1:  — Microsoft Windows Vista: How much memory is enough?

Page 2:  Benchmarking Vista Memory Sizes

Page 3:  Memory Size Benchmarks: Office Productivity, PCMark05, Doom 3, FEAR

Page 4:  Magic Number is 2GB, or 1GB if you're Skint

## SEARCH PCSTATS NEW - TRY IT OUT!

[  Search  ]  Use the power of Google to search all of PCSTATS and the PCSTATS Forums. Tell us what you think of this new feature - **FEEDBACK?**



**PCstats Network**

FrostyTech
TransmetaZone
BeginnersPC

**Features**

RamFinder
ShoppingList Assistance
PCstats.com Newsletter
Tech Glossary
Technology WebSite Listings

**Information About Us**

About Us
Employment / Internships
Privacy Policy

PermaLink News
Archived News
Submit News  (Review RSS Feed)
Site Map
PCstats Wallpaper

**Rydium Network**

Rydium Network
Advertising

How's Our Driving?

© Copyright 1999-2009 www.pcstats.com All rights reserved. Privacy policy and Terms of Use.

WOLPH000329



- Motherboards
- Videocards
- Memory
- Beginners Guides

News & Advanced Search  Feedback?

SEARCH



[X] Directory of Guides & Reviews

FORUMS

▸ Dec. ShoppingList
▸ Beginners Guides
▸ Weekly Newsletter
Archived Newsletters

Press Releases
Tech Glossary
Folding Team
3DMark Team
Forum Team

**Crucial Memory Upgrades**
Find The Right Memory Using Our Advisor Tool. Order Today Free S&H
crucial.com

**Performance Appraisals**
Automate Employee Appraisals, Improve Performance - Free Info Kit
SumTotalSystems.com

**Ddr2 Memory**
Optimize your memory testing to keep pace with short design cycles.
www.tek.com

**Choose the 2010 Ram**
With a 6.7L Turbo Diesel Engine, It's the Ultimate Truck for Towing.
www.RamTrucks.com

**Fix Windows Vista**
2008's Top Vista Repair Tool! Free Download & Guaranteed Results.
www.Faster-PC.net

---

Poll: Windows 7 Upgrade?

Are you planning on upgrading to Windows 7 on Oct. 28th?

○ Yes, Windows 7 Here I come!
○ No, Windows XP still works
○ No, Windows Vista still works

GO

Total Votes: 4512

---

09.12.09 | 11:26A

XML RSS Newsletter

**Hardware Sections**

- Beginners Guides
- Cases and Access.
- CD-ROMs
- Chipsets
- Computers / SFF PCs
- Cooling - Heatsinks
- CPU / Processors
- Digital Cameras
- Hard Drives
- Home Theatre
- Memory
- MP3 Players
- Monitors
- Motherboards
- Mouse Pads
- Networking
- Notebooks
- PCs and SFF PCs
- Peripherals
- Powersupply
- Printers
- Servers
- Software / OS
- Videocards

- - - -

- Editorials

**Industry PR**

» GIGABYTE Unleashes First UD7 Motherboard

» Seagate Ships 2TB ATA 6GB/s Hard Drive

» Corsair Obsidian Series 800D high-performance chassis

---



## Microsoft Windows Vista: How much memory is enough?

**Abstract:** Do you need as much memory when you're running office applications as you do when you're gaming? How much memory do you need in Vista to game comfortably, and spreadsheet smoothly? The answers are next!

| mfg'r link | category | date published | author |
|---|---|---|---|
| Search $ Price E   Microsoft com | Memory | Aug 28.07 | C. Sun |

### Benchmarking Vista Memory Sizes

In order to isolate the performance differences of Microsoft Windows Vista with different amounts of system memory, we'll be testing the following PC system w th 512MB, 1GB, 2GB and 4GB of memory. While Microsoft Windows Vista will techn cally run with as little as 256MB of memory installed, the operating system will not allow you to install it onto a computer unless t detects 512MB RAM.

In tially, PCSTATS was going to run a series of benchmarks to guage the impact of different levels of system RAM in three versions of M crosoft Windows Vista: Home Basic, Home Premium and Ultimate. However after a few qu ck tests we quickly found that all three versions of the operating system perform the same. For the purposes of this article, the benchmarks will be conducted on Microsoft Windows Vista Ultimate.

The purpose of the benchmarks on the following pages is to illustrate how the PC system reacts to the various memory configurations under Vista, for office applications and games. Please note that when the system is installed with 512MB of memory, it is in single channel mode. A DDR2-800 512MB dual channel memory k t was not available for testing. To keep this as simple as possible, all memory was set to run w th BIOS timings of 5-5-5-15 at DDR2-800 speeds. In other words, we've normalized the memory settings so each of the three different memory modules will operate at the same basic level.

Let's begin. First the test system configurat on below, and then the first benchmark of the day - Vista's Windows Experience Index.

### PCSTATS Test System Configurations

**Test System**

| | |
|---|---|
| Processor: | Intel Core 2 Duo E6600 |
| Clock Speed: | 9 x 266 MHz = 2.4 GHz |
| Motherboards: | Asus P5N32-E Plus (NF 650i) |
| Videocard: | MSI NX7800GTX-VT2D256E |
| Memory: | 512MB Corsair CM2X512-8500 |
| | 1GB Kit Corsair Twin2X1024-8500 |
| | 2GB Kit Corsair DOMINATOR Twin2X2048-8888C4DF |
| | 4GB Kit Mushkin XP2-6400 |
| Hard Drive: | 74GB Western Digital Raptor WD740 |
| CDROM: | AOpen Combo 52x |
| PowerSupply: | PC Power & Cooling TurboCool 510 SLI |
| Heatsink: | Intel Reference |
| Software Setup: | Microsoft Windows Vista Ultimate |
| | nVIDIA nForce 650i SLI 8.43 |
| | nVIDIA ForceWare 94 224 |
| Benchmarks: | Business Winstone 2004 |
| | PCMark05 |
| | 3DMark06 |
| | Doom 3 |
| | FEAR |



### Windows Experience Index          Source: Microsoft

The Windows Experience Index is a new feature built into Windows Vista™. It is designed to help consumers understand how well Windows Vista and the software running on it will perform on a specific PC. The index achieves this by assessing the capability of the PC and assigning a score to it. Higher scores indicate a better Vista experience on your PC.



### Windows Experience Index

| Memory Size Configuration: | Points | Ranking |
|---|---|---|
| 512MB System Memory | 1.7 | |

Chitka | Premium Sponsored Results



| 1GB System Memory | 4.5 | |
| 2GB System Memory | 5.3 | |
| 4GB System Memory | 5.3 | |

Microsoft Windows Vista reacts strongly between 512MB and 1GB of system memory! According to M crosoft, a rating of between 1-1.9 means the system can only provide adequate performance for basic tasks. A score this low also means Vista cannot run AeroGlass if you have a compatible videocard. It's interesting to see that Windows can also tell the difference between 1GB and 2GB of memory, going from a very good score to top end. Installing 4GB of memory does not boost the overall score any further.

**Fix Vista (2 minutes)**
2008's Top Vista Repair Tool. Free Download & Guaranteed Results.

**Create Photo Memory Books**
Use Our Free & Easy Design Software Easily Make a Custom Photo Book Now

Ads by Google

**< Previous Page**                  © 2009 PCSTATS.com                  **Next Page >**

Page 1:  Microsoft Windows Vista: How much memory is enough?
Page 2:  — Benchmarking Vista Memory Sizes
Page 3:  Memory Size Benchmarks: Office Productivity, PCMark05, Doom 3, FEAR
Page 4:  Magic Number is 2GB, or 1GB if you're Skint



manageengine.adventnet.com                  Ads by Google

## SEARCH PCSTATS NEW - TRY IT OUT!

[ Search field ]  [ Search ]    Use the power of Google to search all of PCSTATS and the PCSTATS Forums. Tell us what you think of this new feature - **FEEDBACK?**



powered by Google

**PCstats Network**
FrostyTech
TransmetaZone
BeginnersPC

**Features**
RamFinder
ShoppingList Assistance
PCstats.com Newsletter
Tech Glossary
Technology WebSite Listings

**Information About Us**
About Us
Employment / Internships
Privacy Policy

PermaLink News
Archived News
Submit News  (Review RSS Feed)
Site Map
PCstats Wallpaper

**Rydium Network**
Rydium Network
Advertising

How's Our Driving?

© Copyright 1999-2009 www.pcstats.com All rights reserved. Privacy policy and Terms of Use.

WOLPH000331



◆ Motherboards
◆ Videocards
◆ Memory
◆ Beginners Guides

SEARCH
News & Advanced Search  Feedback?



[X]  Directory of
Guides & Reviews

FORUMS

▸ Dec. ShoppingList
▸ Beginners Guides
▸ Weekly Newsletter
Archived Newsletters

Press Releases
Tech Glossary
Folding Team
3DMark Team
Forum Team

PayPal Shopping

SAVE UP TO
65%
THIS HOLIDAY
SEASON
FIND GIFTS

Get great deals
from brands like:

Walmart
hp
BARNES&NOBLE

PayPal Shopping

## Microsoft Windows Vista: How much memory is enough?



**Abstract:** Do you need as much memory when you're running office applications as you do when you're gaming? How much memory do you need in Vista to game comfortably, and spreadsheet smoothly? The answers are next!

Search $ Price E

| mfg'r link | category | date published | author |
|---|---|---|---|
| Microsoft.com | Memory | Aug 28.07 | C. Sun |

### Memory Size Benchmarks: Office Productivity, PCMark05, Doom 3, FEAR

**Office Productivity**                                      Source: Zdnet

Business Winstone 2004 runs real applications through a series of scripted activities and uses the time a PC takes to complete these activities to produce its performance scores.

Content Creation Winstone 2004 is a system-level, application-based benchmark that measures a PC's overall performance when running top, Windows-based, 32-bit, content creation applications in Windows XP.

### Office Productivity

| Business Winstone 2004: | Points | Ranking |
|---|---|---|
| 512MB System Memory | 24.3 | |
| 1GB System Memory | 29.4 | |
| 2GB System Memory | 29.6 | |
| 4GB System Memory | 29.5 | |

| Content Creation 2004: | Points | Ranking |
|---|---|---|
| 512MB System Memory | 35.2 | |
| 1GB System Memory | 40.6 | |
| 2GB System Memory | 40.8 | |
| 4GB System Memory | 40.7 | |

Winstone's Off ce Productiv ty benchmark illustrates why all SOHO and office PCs running Vista should have at least 1GB of RAM. The difference between 512MB and 1GB of total system memory is pretty visible. Performance between systems w th 1GB, 2GB and 4GB of memory are all approximately the same.

### Futuremark PCMark05 1.1.0                        Source: FutureMark

PCMark05 is a premium tool for measuring both normal home use and simple 3D performance of the latest PC hardware. There are 11 system tests - each one is designed to represent a certain type of PC usage. By running these tests, PCMark05 stresses the components in a similar manner as they are stressed in normal home usage.

### PCMark05:

| Overall | Points | Ranking |
|---|---|---|
| 512MB System Memory | 7012 | |
| 1GB System Memory | 7265 | |
| 2GB System Memory | 7306 | |
| 4GB System Memory | 7312 | |

| Memory | Points | Ranking |
|---|---|---|
| 512MB System Memory | 5232 | |
| 1GB System Memory | 5434 | |
| 2GB System Memory | 5452 | |
| 4GB System Memory | 5433 | |

PCMark05 benefits from a dramatic difference between 512MB and 1GB of system memory. The benchmark results are much closer when the system is installed with 2GB and 4GB of memory.

09.12.09 | 11:27A
XML  RSS Newsletter
Hardware Sections

- Beginners Guides
- Cases and Access.
- CD-ROMs
- Chipsets
- Computers / SFF PCs
- Cooling - Heatsinks
- CPU / Processors
- Digital Cameras
- Hard Drives
- Home Theatre
- Memory
- MP3 Players
- Monitors
- Motherboards
- Mouse Pads
- Networking
- Notebooks
- PCs and SFF PCs
- Peripherals
- Powersupply
- Printers
- Servers
- Software / OS
- Videocards
- - - -
- Editorials

Industry PR

» GIGABYTE Unleashes
First UD7 Motherboard
» Seagate Ships 2TB ATA
6GB/s Hard Drive
» Corsair Obsidian Series
800D high-performance
chassis

Poll: Windows 7
Upgrade?

Are you planning on
upgrading to Windows
7 on Oct. 28th?
○ Yes, Windows 7
  Here I come!
○ No, Windows XP
  still works
○ No, Windows Vista
  still works
GO
Total Votes: 4512





WOLPH000332

**PCSTATS ID Software Doom 3 1.3**

Source: id Software

Doom 3 takes advantage of the latest videocard technology and pushes the processing power of the CPU to its absolute limit. At its highest setting, Ultra quality, texture sizes pass the 500MB mark which means even tomorrow's videocards will have a hard time running everything. The frame rates in the game itself are locked at 60 fps so anything above that point is wasted. Each test is run three times with the third run being recorded.

### ID Software Doom 3

| LQ 640x480 | FPS | Ranking |
|---|---|---|
| 512MB System Memory | 143.2 | |
| 1GB System Memory | 168.3 | |
| 2GB System Memory | 178.5 | |
| 4GB System Memory | 178.6 | |

Gamers should definitely take note of the Doom 3 framerates here... Not ce the difference between 512MB and 1GB of system memory? There seems to be a bit of a performance difference between 1GB and 2GB but it's not as pronounced as the difference between 512MB and 1GB.

**PCSTATS Sierra FEAR 1.08**

Source: Sierra

FEAR is Sierra's latest first person shooter which relies heavily on DirectX 9 features. With its "Soft Shadows" feature enabled, even the fastest videocard run at a crawl, FEAR is definitely the new benchmark for future FPS games to follow.

### Sierra FEAR 1.08

| Minimum 640x480 | FPS | Ranking |
|---|---|---|
| 512MB System Memory | 417 | |
| 1GB System Memory | 462 | |
| 2GB System Memory | 497 | |
| 4GB System Memory | 502 | |

Again we see a rather large performance difference between the system with 512MB of memory and everything else. There is also a slightly performance boost when moving towards 2GB of memory, again something that gamers will want to take note of. Going from 2GB to 4GB doesn't do much.

**Recommended Download**
Boost PC Speed. Microsoft Certified. Free Download

**Toshiba Memory**
Save on Toshiba Laptop Memory When You Buy Direct From Toshiba

Ads by Google

**< Previous Page**          © 2009 PCSTATS.com          **Next Page >**

Page 1: Microsoft Windows Vista: How much memory is enough?
Page 2: Benchmarking Vista Memory Sizes
Page 3: — Memory Size Benchmarks: Office Productivity, PCMark05, Doom 3, FEAR
Page 4: Magic Number is 2GB, or 1GB if you're Skint

**Upgrade Your RAM Memory**
Maximize Your PC's Performance: Add More RAM: Cheapest/Easiest Upgrade!
4AllMemory com/RAM-Memory-Upgrade

**Chevy Silverado Vs. Ram**
Silverado Leads Multiple Categories Against the Ram, See Which Ones.
www.Chevrolet.com/Silverado

**Memory Foam Dog beds**
Wholesale Memory Foam Dog beds. Small to Jumbo Sizes! Free Shipping
icozeedogbed.com/TopQualityDogBeds

Ads by Google

## SEARCH PCSTATS NEW - TRY IT OUT!

Use the power of Google to search all of PCSTATS and the PCSTATS Forums. Tell us what you think of this new feature - FEEDBACK?

Search



powered by Google    SEARCH

PCstats Network          Features          Information About Us          Rydium Network

| | | | | |
|---|---|---|---|---|
| FrostyTech | RamFinder | About Us | PermaLink News | Rydium Network |
| TransmetaZone | ShoppingList Assistance | Employment / Internships | Archived News | Advertising |
| BeginnersPC | PCstats.com Newsletter | Privacy Policy | Submit News  (Review RSS Feed) | |
| | Tech Glossary | | Site Map | How's Our Driving? |
| | Technology WebSite Listings | | PCstats Wallpaper | |

© Copyright 1999-2009 www.pcstats.com All rights reserved. Privacy policy and Terms of Use.

WOLPH000334



Motherboards
Videocards
Memory
Beginners Guides

SEARCH

News & Advanced Search  Feedback?





**[X]** Directory of
Guides & Reviews



FORUMS

Dec. ShoppingList
Beginners Guides
Weekly Newsletter
Archived Newsletters

Press Releases
Tech Glossary
Folding Team
3DMark Team
Forum Team

**Crucial Memory Upgrades**
Find The Right RAM Memory Using Our Advisor Tool. Order Today Free S&H!
www.Crucial.com

**Fix Vista (2 minutes)**
2008's Top Vista Repair Tool. Free Download & Guaranteed Results.
www.Faster-PC.net

**Recommended Download**
Boost PC Speed. Microsoft Certified. Free Download
Uniblue.com/PCSpeed

**2GB DDR2 Memory**
Buy 2GB DDR2 Laptop Memory Shop Now & Save at Buy.com.
www.Buy.com

**Find Your RAM Memory**
Use our Easy Memory Finder Tool and Get the Exact RAM Your PC Needs.
www.4AllMemory.com/RAM-M

## Microsoft Windows Vista: How much memory is enough?

**Abstract:** Do you need as much memory when you're running office applications as you do when you're gaming? How much memory do you need in Vista to game comfortably, and spreadsheet smoothly? The answers are next!



| Search $ Price E | mfg'r link | category | date published | author |
|---|---|---|---|---|
| | Microsoft com | Memory | Aug 28.07 | C. Sun |

09.12.09 | 11:27A

XML  RSS Newsletter
**Hardware Sections**

- Beginners Guides
- Cases and Access.
- CD-ROMs
- Chipsets
- Computers / SFF PCs
- Cooling - Heatsinks
- CPU / Processors
- Digital Cameras
- Hard Drives
- Home Theatre
- Memory
- MP3 Players
- Monitors
- Motherboards
- Mouse Pads
- Networking
- Notebooks
- PCs and SFF PCs
- Peripherals
- Powersupply
- Printers
- Servers
- Software / OS
- Videocards
    - - -
- Editorials

**Industry PR**

» GIGABYTE Unleashes First UD7 Motherboard

» Seagate Ships 2TB ATA 6GB/s Hard Drive

» Corsair Obsidian Series 800D high-performance chassis

### Magic Number is 2GB, or 1GB if you're Skint

Before Vista made  ts debut, rumors of its demanding hardware requirements spread through the web like wildfire. It's true that Vista demands a certain class of videocard to enable Aeroglass, more hard drive space for  ts installation files and of course more system memory than any prev ous operating system from Microsoft.

After the processor, memory is the biggest factor in determining overall Vista system performance (at least in the 2D world). Vista calls for 512MB before it will install, yet many systems come just like that - 512MB of memory and Vista installed on the hard drive.

To test how M crosoft Windows Vista responds to different amounts of system memory, we ran a couple key benchmarks on a PC equipped with 512MB, 1GB, 2GB and 4GB of memory. From off ce productivity tests to gaming, and even Microsoft's built in benchmark, the task was to find out just how much memory you really need with Windows Vista.

### Homework, Office and Everyday Tasks

With 512MB of memory Vista crawls. Even in 2D office/workstation style work there was a noticeable lag. Microsoft's Windows Experience Index was particularly hard, scoring just 1.7 points. Not very impressive.

What the benchmarks don't say though was how laggy simple Windows tasks were… we could hear the HDD chugging away accessing the swapfile.

Increasing total system memory to 1GB was like night and day for the PC. Immediately everything was more responsive and the HDD LED was not a solid shade of orange. Not only did Vista itself register a huge bump, the Office Productivity results also got a decent boost in performance. Games also welcomed the 1GB of memory, some tests jumped 10% just by adding more system memory.



Moving to 2GB of total system memory increased the Windows Experience Index by three times, compared to what the computer scored with just 512MB of memory. In office tasks a PC is mainly user limited, so there was no major difference between 1GB and 2GB of RAM according to the office productivity benchmarks. There was a small performance boost in games when moving from 1GB to 2GB of memory as well.

If you're itching to upgrade to Microsoft Windows Vista, do yourself a favor and look at your PC carefully. Does it meet all the hardware requirements that Microsoft has laid out? If not, moving to Windows Vista may cause headaches. A few qu ck conclusions can be made about system memory and Windows Vista. For Vista, 512MB RAM is not enough even for word processing. It's quite a painful experience so make sure the PC has at least 1GB of memory.

### Gaming in Vista

Videocards are still the most important variable in gaming w thin Vista, but system memory size does affect

**Poll: Windows 7 Upgrade?**

Are you planning on upgrading to Windows 7 on Oct. 28th?

○ Yes, Windows 7 Here I come!
○ No, Windows XP still works
○ No, Windows Vista still works

GO

Total Votes: 4512





Chitika | Premium
Sponsored Results

WOLPH000335

framerates as well as improving game load times. A good quick v deocard will be impacted more by 2GB of memory than a flagship GPU will. On the whole, gamers will be best served with 2GB of system memory in Vista. If money is tight, 1GB is sufficient.

None of the benchmark applications require 4GB of memory, so the benchmark results do not indicate any performance boost when h tting the 32 bit memory limitation. We don't know any desktop applications that call for that amount of memory either, but that doesn't mean future programs won't. If you want a future ready PC, 4GB memory kits are available for a decent pr ce from Crucial.com and Kingston.com.

As it stands right now, you'll get the best overall performance from Vista with 2GB. So there you have it. If you're contemplating upgrading to Vista, or already running it, that's all you need to know about its memory requirements. Do yourself a favor and use at least 1GB of memory, testing w th 512MB was just painful…

Find out about this and many other reviews by joining the Weekly PCstats.com Newsletter today! Catch all of PCSTATS latest reviews right here.

**Related Articles**

Here are a few other art cles that you might enjoy as well…

- Overclocking and WindowsXP x64 Ed t on
- Windows Vista, HDCP and Dig tal Rights Management
- Windows XP Service Pack 2 / SP2 Overview
- Midori "Mobile" Linux Opensourced
- Mobile Linux Arrives… shortly

**Fix Vista (2 minutes)**
2008's Top Vista Repair Tool. Free Download & Guaranteed Results.

**PC Tools Official Website**
PC Tools - Winner of Best Spyware & Adware killer. Rated 5 Stars!

Ads by Google

**< Previous Page**                    © 2009 PCSTATS.com                    **Oh, One More Thing…»**

Page 1:   Microsoft Windows Vista: How much memory is enough?
Page 2:   Benchmarking Vista Memory Sizes
Page 3:   Memory Size Benchmarks: Office Productivity, PCMark05, Doom 3, FEAR
Page 4:   — Magic Number is 2GB, or 1GB if you're Skint

## SEARCH PCSTATS NEW - TRY IT OUT!

[Search]   Use the power of Google to search all of PCSTATS and the PCSTATS Forums. Tell us what you think of this new feature - FEEDBACK?

**PCSTATS**

powered by Google   [SEARCH]

**PCstats Network**          **Features**          **Information About Us**          **Rydium Network**

FrostyTech              RamFinder              About Us                 Rydium Network
TransmetaZone           ShoppingList Assistance  Employment / Internships  Advertising
BeginnersPC             PCstats.com Newsletter   Privacy Policy            How's Our Driving?
                        Tech Glossary
                        Technology WebSite Listings

PermaLink News
Archived News
Submit News  (Review RSS Feed)
Site Map
PCstats Wallpaper

© Copyright 1999-2009 www.pcstats.com All rights reserved. Privacy policy and Terms of Use.

WOLPH000336

# EXHIBIT 6



🖶 Print Article     ⊠ Close Window

# Buying a new PC? 'Windows Vista Capable' barely hits the mark

IBM'er says Vista's RAM sweet spot is 4GB

**Patrick Thibodeau**

**February 20, 2007** (Computerworld) Configuring a PC around the minimum hardware requirements of an application or operating system is lot like agreeing to live in a basement apartment. Sure, it will work as a place to live -- if you don't mind damp and dim living conditions.

Such may be the case for Windows Vista's **minimum requirement** of 512MB of RAM.

Microsoft's on-the-box minimum RAM requirement "really isn't realistic," according to David Short, an IBM consultant who works in its company's Global Services Divison. He says users should consider 4GB of RAM if they really want optimum Vista performance. With 512MB of RAM, Vista will deliver performance that's "sub-XP," he warned.

Short has been beta-testing Vista for two years and was at the IBM-oriented Share user group conference in Tampa, Fla., last week discussing some of Vista's performance requirements. His XP system has 2GB of RAM, which he calls the "sweet spot" for that operating system, but on Vista, 4GB of RAM may be closer to its "Nirvana," he said.



That's due in part to Windows SuperFetch, which takes data from the hard drive, stores it in the available RAM and makes it readily accessible to the processor. SuperFetch depends a great deal on user predictability and takes snapshots of user activity. If SuperFetch determines that an application is launched at a particular time, it will have it loaded into the available RAM. With more RAM, there's more caching and better software response, said Short.

Hardware vendors, of course, will offer systems built on Microsoft's minimum hardware requirements called "Windows Vista Capable," configured with 512MB of system memory and a processor that is at least 800MHz. But their heart may not really be in it.

For instance, Dell offers a **Windows Vista Capable** configuration that isn't capable of much, according to what Dell says about it on its Web site: "Great for ... Booting the Operating System, without running applications or games."

Dell recommends 2GB of system memory.

Microsoft may be using PCs loaded with 4GB of RAM for some of its customer demos; At least that's what Ann Westerheim, president of Ekaru LLC, reports. A Microsoft representative recently demonstrated Vista on a system with 4GB of system memory to some of its customers, and the performance was so impressive that it drew some "ohs and ahs" from the audience, said Westerheim. The Westford, Mass.-based company provides technology services for small and midsize business.

WOLPH000325

Westerheim said that for her personal use, she may configure a system with 2GB of RAM, only because of the cost of loading 4GB on a laptop.

Mueez Deen, director of graphics memory and consumer DRAM at Samsung Electronics, also recommends 2GB of RAM, calling that amount the "optimal density for the complete Vista experience -- economically and technologically."

**Related News and Discussion:**

- Continuing Coverage: **Windows Vista A to Z**
- Shark Bait: **Vista "upgrade"**
- Shark Bait: **Vista isn't as bad as you say**
- Joyce Carpenter: **Mac OS X better than Vista which is better than XP which is better than ...**
- Sound Off: **Vista/MacBook Review: What do you think?**

WOLPH000326

# EXHIBIT 7



http://www.seattlepi.com/business/290154_msftvista27.html

## Vista system may need more memory, Dell CEO says

*Friday, October 27, 2006*

**BLOOMBERG NEWS**

Microsoft Corp.'s Windows Vista computer operating system may need double the amount of main memory recommended by the world's biggest software maker, Dell Inc. Chief Executive Kevin Rollins said.

"I think they tell you maybe 1 gig of memory is OK," Rollins said Thursday at a speech at Shanghai's Jiaotong University, referring to Microsoft's recommendations. "No. Two gigs of memory would be great."

Microsoft's latest version of Windows, running more than two years late, is boosting demand for memory chips made by companies such as Samsung Electronics Co. Vista will increase sales of personal computers worldwide after its release next year as people buy new computers that can support the operating system, Rollins said.

"Everyone is going to want Vista when it's ready," Rollins said. Round Rock, Texas-based Dell is vying for top place among the world's PC makers with Hewlett-Packard Co.

Vista will require "at least" 1 gigabyte of system memory, Microsoft's Web site says, one-third more than the average 750 megabytes currently installed in most new PCs, according to a Sept. 19 report by Citigroup Inc. It costs $185 to upgrade a Dell Dimension E520 desktop computer to 2 gigabytes of memory from 512 megabytes, according to the company's Web site. That is more than triple the cost of upgrading the PC to 1 gigabyte.

*© 1998-2010 Seattle Post-Intelligencer*

# EXHIBIT 8

United States        Buy Online or Call 1-800-WWW-DELL                    Premier Login    Sign in    Cart

Search

Windows® . Life without Walls™ . Dell recommends Windows 7.

My Account    Premier Login    Technical Support    Order Support

# Microsoft Windows Vista ™

Frequently Asked Questions

## Hardware Requirements and Driver Availability

1) Are Windows Vista drivers available and how can I access these?

2) Is 2GB RAM¹ and a 256MB graphics card² a requirement to get full functionality of Windows Vista? How rich of a presentation might we expect if we stayed with our current 1GB RAM¹ and 128MB graphics card?

3) How do the hardware requirements differ between the various Windows Vista versions: Home Basic, Home Premium, Business, Ultimate and Enterprise?

4) What are the Windows Vista/ Office Requirements?

5) How does Windows Vista run on legacy systems - Dell OptiPlex™ GX260s, GX270s, GX280s and GX620s? Will Windows Vista operate on these if the systems are upgraded to 1-2GB of RAM?

6) Will Windows Vista be factory loaded on OptiPlex GX620?

7) What is a discrete graphics card vs enhanced graphic card?

8) Why are graphics cards preferable over integrated video? Does this have something to do with wide screen displays?

9) Will Windows Vista fully support 4GB of RAM in OptiPlex systems?

10) Will Dell offer Windows Vista Enterprise as an OEM version?

## Product Features

11) Does Windows Vista have a "classic view" as XP does? What is the new "Aero" interface?

12) Does Windows Vista have IE 7 or is IE 6 still the "default"?

13) What is different about the Group Policy in Windows Vista versus the latter flavour Windows?

14) Can Windows Vista join an AD domain 2000?

15) What is the difference between Windows Vista Ultimate and Windows Enterprise?

16) What is Shadowcopy?

17) Are there specific features that are important for the education vertical?

18) How has remote access changed in Windows Vista compared with XP? Will the new remote assistance allow "shadowing" of a user i.e.---see what they are seeing?

19) Do you have a feature comparison chart for XP vs Windows Vista?

## Imaging

20) For licensing customers, is it possible to have the Enterprise edition pre-loaded on Dell systems?

21) What is the difference in imaging with Windows Vista (e.g., Image X)?

22) What is the ability to use other imaging products such as Ghost?

## Security

23) Are Windows Vista security features sufficiently robust that we could dispense with virus protection software for the desktop?

24) What if I don't want my LAN users to be able to encrypt their files?

25) What are the differences between the EFS of Windows Vista and the EFS of Windows XP?

26) Will Vista's encryption replace the need for Pointsec (3rd party encryption software)? Does Windows Vista encryption provide the same level of encryption and features as Pointsec? Does Windows Vista also encrypt removable media such as floppy disks, USB keys, CDs, etc?

## Support/ Migration

27) How long will Dell systems ship with XP?

28) How can Dell assist with the inventory/assessment process to prepare for Windows Vista?

29) How does the Zero Touch migration work?

## Licensing

30) What licensing options are available for customers?

31) How will licensing be handled with non-OEM customers? Will we need licensing for a server?

32) Will we have to go through Microsoft to obtain a VLA or will we be able to purchase this thru Dell?

33) Regarding volume licensing, could you please describe the differences between MAK and KSM licensing?

## Office

34) Will Office 2007 work with XP?

## Miscellaneous

35) When will Windows Vista SP1 be released?

---

**1) Are Windows Vista drivers available and how can I access these?**
(a) Dell began posting Windows Vista drivers in December 2006, based upon availability from our suppliers. It is likely that some system drivers for Windows Vista may not yet be available. As available, Windows Vista drivers will be posted to www.support.dell.com. For some hardware and software, there may be no Windows Vista-compatible drivers available.

Back to Top

---

**2) Is 2GB RAM[1] and a 256MB graphics card[2] a requirement to get full functionality of Windows Vista? How rich of a presentation might we expect if we stayed with our current 1GB RAM2 and 128MB graphics card[2]?**
(a) Although 1GB RAM and 128MB graphics card may provide full functionality of Windows Vista in many instances, for an enhanced Windows Vista experience, Dell recommends the following hardware for Windows Vista Business, Windows Vista Home Premium, Windows Vista Ultimate and Windows Vista Enterprise: 2 GB Dual-Channel[1] RAM, 256 MB graphics card[2], dual-core processors and a 7200 rpm hard drive.

(b) In recent tests performed by the Dell CTO office, we found that the % of memory used when performing routine tasks* on a PC is reduced by half when configured with 2 GB Dual-Channel RAM and 256 MB Graphics, versus 1 GB RAM and an integrated graphics solution. As more applications are opened and more % of memory is consumed, the system memory becomes more challenged and system performance can be penalized. To help ensure a high level of system responsiveness, customers should follow Dell's recommendation for RAM and graphics. We also believe that users can benefit from the general advantages which can be observed when a PC is configured with a dual core processor and 7200 rpm hard drive.
    *Routine tasks: Windows Vista Home Premium, Antivirus, Sidebar, Messenger, Office 2007, Internet Explorer 7 (3 Windows - Viewing content from CNN.com, ESPN.com, Digg.com)
[Significant Disk Paging @ 1GB UMA]

|                     | 1 GB Dual Channel RAM, Integrated Graphics | 1 GB Dual Channel RAM + 256 MB Graphics Card | 2 GB Dual Channel RAM, 256 MB Graphics Card |
|---------------------|--------------------------------------------|----------------------------------------------|---------------------------------------------|
|                     | Core 2 Duo E6300 (1.83 GHz)                | Core 2 Duo E6300 (1.83 GHz)                  | Core 2 Duo E6300 (1.83 GHz)                 |
| % Memory Used       | 87%                                        | 63%                                          | 41%                                         |
| Physical Memory Used | 881.31                                    | 643.23                                       | 838.45                                      |

Dell CTO Internal Testing Results

Back to Top

---

**3) How do the hardware requirements differ between the various Windows Vista versions: Home Basic, Home Premium, Business, Ultimate and Enterprise?**
(a) Except for Home Basic, there are no significant hardware requirement differences between the Windows Vista versions. Windows Vista is designed to scale to the hardware present. For an enhanced Windows Vista experience, Dell's recommended hardware for Windows Vista Business, Windows Vista Home Premium, Windows Vista Ultimate and Windows Vista Enterprise are 2 GB Dual-Channel[1] RAM, 256 MB graphics card[2], dual-core processors and 7200 rpm hard drives. Windows Vista Home Basic will not support the enhanced Windows Aero™ interface, no matter what hardware you have.

Back to Top

---

**4) What are the Windows Vista/ Office Requirements?**
(a) Dell systems must be configured with a minimum of 512MB system memory (RAM) in order to provide the basic Windows Vista[3] experience. Systems which ship with only 512MB RAM will not support the Aero interface. Select entry-level, economical Dell systems may not run Aero, no matter the configuration. Aero and other premium benefits are not available with the Windows Vista Home Basic edition. However, they can be found in the Windows Vista Home Premium, Business, Ultimate and Enterprise editions.

(b) To run the premium versions of Windows Vista, including the Windows Aero™ user interface, PC's should be configured with at least 1GB system RAM[1] and 128 MB graphics memory[2].

(c) To help further optimize the Windows Vista experience, (with Microsoft® Office 2007) Dell recommends 2 GB dual-channel (2-DIMMs) system RAM[1], a Dual-Core processor, a 7200 rpm Hard Drive and at least a 256 MB discrete graphics card[2].

Back to Top

**5) How does Windows Vista run on legacy systems - Dell OptiPlex™ GX260s, GX270s, GX280s and GX620s? Will Windows Vista operate on these if the systems are upgraded to 1-2GB of RAM?**
a) Dell systems must be configured with a minimum of 512MB system memory (RAM) in order to provide the basic Windows Vista experience. Systems which ship with only 512MB RAM will not support the Aero interface. Select entry-level, economical Dell systems may not run Aero, no matter the configuration. Aero and other premium benefits are not available with Windows Vista Home Basic edition. However, they can be found in the Windows Vista Home Premium, Business, Ultimate and Enterprise editions.

Dell Recommendations

|  | **Basic Windows Vista Experience - No Aero** | **Windows Vista Aero Experience** | **Optimized Windows Vista Experience** |
|---|---|---|---|
|  | **GOOD** | **BETTER** | **BEST** |
| **System Memory** | 512MB RAM | 1GB RAM[4] | 2GB Dual Channel[4] (2 DIMMS) |
| **Graphics Memory** | Integrated or discrete | 128 MB Graphics Card (integrated or discrete)[2] | 256MB Graphics Card |
| **Processor** | modern processor (>800MHz) | 1 GHz 32-bit (x86) or 64-bit (x64) | Dual-Core |
| **Hard Drive** | >15GB free (recommended) | 40GB capacity, >15GB free | 7200 rpm |
| **Window Vista Aero Experience** | None | Aero enabled as a default, but performance may be compromised as more windows, applications and games are opened. | Can enhance Aero experience and system performance |
| **Great for...** | Booting the Operating System, without running applications or games | Multitasking (e-mail, basic photo editing, basic video editing, music, spreadsheets, browsing, and other applications) The experience is only assured in single monitor mode. Dual monitor is supported, but may affect the aero premium experience. | Multi-tasking with power-hungry applications (large spreadsheets, advanced video and photo editing, HD viewing and recording) Dual Monitor Usage |

b) Systems without a Windows Device Driver Model (WDDM) will not run Aero. The following systems do not have WDDM support, but can provide Basic Vista functionality with at least 512 MB System RAM:

c) OptiPlex™ GX280, SX280, GX270, SX270, 210L and 170L,
   1. Latitude™ D800, D600, D400, D410, D505, D810, D610-integrated, D510, X300 and 170L
   2. Dell Precision™ Workstation 360, 470, 650, 370, 380, 670, M60, M70, M20.

d) Although Dell plans to fully test Windows Vista on the following platforms to help ensure Basic Windows Vista functionality, Dell will not provide any required changes to BIOS or drivers to enable full Windows Vista functionality (such as Aero™ ) on these legacy systems
   1. Dell will qualify Windows Vista for Basic Windows Vista functionality on the following OptiPlex legacy platforms: OptiPlex GX620, GX520, GX280, SX280, GX270, SX270, 210L and 170L
   2. Dell will qualify Windows Vista for Basic Windows Vista functionality on the following Latitude legacy platforms: D800, D600, D400, D410, D505, D810, D610, D510, X300
   3. Dell will qualify Windows Vista for Basic Windows Vista functionality on the following Dell Precision Workstation legacy platforms: Dell Precision Workstation 360, 470, 650, 370, 380, 670, M60, M70, M20

e) To run the premium versions of Windows Vista, including the Windows Aero™ user interface, PC's should be configured with at least 1GB system RAM[1] and 128 MB graphics memory[2]

f) To help further optimize the Windows Vista experience, (with Microsoft Office 2007) Dell recommends 2 GB dual-channel[1] (2-DIMMs) system RAM, a Dual-Core processor, a 7200 rpm Hard Drive and at least a 256 MB discrete graphics card[2].

Back to Top

**6) Will Windows Vista be factory loaded on OptiPlex GX620?**
a) Windows Vista will not be an available OS OEM option on the OptiPlex GX620 as this product will end of life in January. The follow on replacement product, the OptiPlex 745 is available with

both the Windows Vista and Windows XP operating system options.

Back to Top

---

**7) What is a discrete graphics card vs enhanced graphic card?**
a) Currently, there are two types of graphics solutions available in the computer industry. The first and more common solution is integrated or UMA graphics, while the second is known as discrete graphics. Integrated graphics shares resources with the system processor (CPU) and system memory to display information onto the display. While integrated is capable of some 3D calculations, the shared resources may not deliver an optimal solution. By contrast, discrete graphics cards utilize a separate (or discrete) graphics processing unit (GPU) and as such, have separate graphics memory but some mainstream discrete graphics still borrow from the system memory.

1. Because this separate graphics solution unburdens the CPU and system
2. (memory, overall system performance generally can see a significant improvement
3. when running applications that utilize graphics. One such utilization is
        (i) Windows Vista Home Premium with Aero enabled. While it is possible to run Windows      Vista Home Premium with integrated graphics[2], overall system
4. performance can significantly improve with a discrete graphics card installed. In the context of your question, we would consider discrete graphics to be an enhanced graphics experience and therefore a discrete graphics card and an enhanced graphics card represent the same thing.

Back to Top

---

**8) Why are graphics cards preferable over integrated video? Does this have something to do with wide screen displays?**
a) Historically, the amount of available graphics memory played a direct role in the amount of resolution that a customer could display. Because wide aspect displays generally display at a higher native resolution than standard aspect, this may impact performance on older systems. However, in terms of today's technology, for everyday use (web, email, and office applications) graphics card choice does not significantly impact screen resolution.

b) There are several reasons why a customer would want to choose a graphics card (or discrete graphics) over an integrated solution, but before listing them, it may help to better understand the differences. Integrated graphics shares resources with the system processor (CPU) and system memory to display information onto the display. While integrated is capable of some 3D calculations, the shared resources may not deliver an optimal solution. By contrast, discrete graphics utilizes a separate (or discrete) graphics processing unit (GPU) thereby separating graphics memory from system memory. Because this separate graphics solution unburdens the CPU and system memory, overall system performance generally can experience a significant improvement when running applications that utilize graphics.

c) Within the Windows Vista context, there are two main usages for discrete graphics: Windows Vista Premium with Aero enabled and Direct3D/OpenGL applications. While it is possible to run Windows Vista Home Premium with integrated graphics[2], overall system performance can significantly improve with a discrete graphics card installed. This is because Aero relies on some three-dimensional methods of displaying windows and gadgets on the screen. Systems with discrete graphics solutions can typically display more windows and or gadgets on the screen at one time than an integrated solution. Additionally, many applications that can take advantage of 3D instructions sets, such as games, CAD, or other 3D modelling tools can only perform at their optimum setting with a discrete graphics card present. Since the Windows Vista OS scales with the hardware, the experience can significantly be enhanced with a discrete graphics card.

Back to Top

---

**9) Will Windows Vista fully support 4GB of RAM in OptiPlex systems?**
a) The Windows XP memory utilization limit with current Dell BIOS is 3.0 GB. With Windows Vista, the BIOS will be set at 3.5GB. The memory limitation is tied to a 32-bit operating system and system BIOS. 64-bit operating systems raise the maximum memory utilization, but will require applications designed for 64-bit.

Back to Top

---

**10) Will Dell offer Windows Vista Enterprise as an OEM version?**
a) No. Microsoft will provide availability of Windows Vista Enterprise directly to customers that purchase Software Assurance. Microsoft indicates that OEM manufacturers will not sell this edition as a standard offering.

Back to Top

---

**11) Does Windows Vista have a "classic view" as XP does? What is the new "Aero" interface?**
a) Windows Vista comes with 2 user experiences: Windows Vista Basic and Windows Vista Aero. The new Aero experience is designed to show translucent windows, 3-dimensional perspective, rich textures, advanced color mixes and animations. When a system which meets only the minimum hardware requirements for Windows Vista Home Basic is loaded with Windows Vista, the view will be similar to XP. The Windows Vista experience is designed to scale to the system's hardware capabilities — more fully featured systems can generally provide a richer Windows Vista user experience. Dell recommends at least 2GB of Dual Channel[1] system memory and a 256 MB graphics card[2] to help optimize the Windows Vista experience.

Back to Top

**12) Does Windows Vista have IE 7 or is IE 6 still the "default"?**
a) Windows Vista will come standard with Internet Explorer 7.

Back to Top

**13) What is different about the Group Policy in Windows Vista versus the latter flavour Windows?**
a) Global policy implementation is identical in Windows Vista compared to Windows Server 2003 SP1. Specific additions to group policy improve security such as use of specific security layer for remote (RDP) connections, user authentication using RDP 6.0 for remote connections, and do not allow supported Plug and Play device redirection.

Back to Top

**14) Can Windows Vista join an AD domain 2000?**
a) Yes

Back to Top

**15) What is the difference between Windows Vista Ultimate and Windows Enterprise?**
a) The Windows Vista Ultimate version can be provided through PC OEM's. The Windows Vista Enterprise edition can only be purchased directly from Microsoft and requires the purchase of a Software Assurance agreement in addition to a Microsoft software license.

b) Both Windows Vista Enterprise and Ultimate provide support for simultaneous installation of multiple user interface languages, subsystem for UNIX-based applications, support for BitLocker™ and Virtual PC Express, not available in other Windows Vista SKUs (except for Virtual PC Express in Windows Vista Business).

c) Only Windows Vista Enterprise grants the right to run up to 4 copies of Windows (any version) in virtual machines, not included in the Ultimate or Business SKUs. Windows Vista Ultimate provides support for consumer media center functions, not found in the Enterprise SKU.

Back to Top

**16) What is Shadowcopy?**
a) Windows Vista Shadowcopy is designed to save previous versions of files and makes them easily accessible through daily "restore points" that can capture older versions of files.

b) Available in the Ultimate, Business, and Enterprise editions of Windows Vista, this feature automatically creates point-in-time copies of files as you work, so you can quickly and easily retrieve versions of a document you may have accidentally deleted. Shadow copy is automatically turned on in Windows Vista and creates copies on a scheduled basis of files that have changed. Since only incremental changes are saved, minimal disk space is used for shadow copies.

Back to Top

**17) Are there specific features that are important for the education vertical?**
a) Many of the enhancements in productivity, security, simplified operations and mobility and connectivity can benefit any public or business segment. The multimedia features supported in the Ultimate and Enterprise editions, and domain joining features in the Windows Vista Business can be particularly beneficial to the educational vertical.

Back to Top

**18) How has remote access changed in Windows Vista compared with XP? Will the new remote assistance allow "shadowing" of a user i.e.---see what they are seeing?**
a) Taking remote files and folders offline is more discoverable and faster than it was in XP, according to Microsoft.

b) Delta Synch synchronizes only the changes to documents, not the whole document, making sync extremely efficient. Windows Vista also allows for remote access to content on another PC or a server.

c) Other features are:
    i) Background Sync - when reconnected to server, changes made to files while offline are automatically synched in the background.

    ii) Conflict Resolution - An interface for reconciling two versions of the same file when client copy does not match server copy.

Back to Top

**19) Do you have a feature comparison chart for XP vs Windows Vista?**
a) Many Microsoft Windows Vista features are available only in Windows Vista, while some are available as a Windows XP download. According to Microsoft, Windows Vista features not available on Windows XP systems include:

| USER EXPERIENCE | MOBILITY | HOME & SMALL BUSINESS CUSTOME | IT ADMIN. |
|---|---|---|---|
| | | PC-to-PC synchronization | Excellent deployment technologies streamline processes and enable further automation: |
| Windows Vista Basic & Windows Vista Aero user experiences* | Enhanced power management & fast shutdown | Enhancements to Media Center, including HDTV recording | System Image Manager: a tool that leverages the modulator architecture of Windows Vista and its XML-based unattend format to help enable servicing & language independence |
| Windows Device Driver Model (WDDM) | Smooth state transitions | Movie Maker HD | New Image Based Setup provides fast and reliable installations |
| New thumbnail previews | New Windows Mobility Center | Gaming Center and new games | Windows Imaging Format (WIM) technology and an advanced hardware abstraction layer can provide hardware independence |
| Unified home & domain login experience | Windows Vista Synch Center | Windows Mail and Calendar | Administration tools |
| Reading Pane integration into Windows Explorers (with Microsoft Office 2007 system at launch). | Feature enhancements to corporate roaming, including cached mode, Delta Synch, and increased limits on max folders | Fax and Scan Center | |
| Programs Explorer | Support for auxiliary limits on max folders | Enhancements to Backup and Restore | |
| Redesigned Control Panel | Support for hybrid drives | Enhancements to the PC-to-PC transfer feature | |
| Windows Photo Gallery | Networking user Experience enhancements | | |
| Shell support for RAW codecs | Windows Meeting Space | | |
| Search integration in Windows Explorers | Remote Desktop access using HTTP | | |
| MPEG-2 decoders* | | | |
| Parental Controls | | | |
| Outstanding performance (Windows SuperFetch, Automatic Disk Defragmentation, Windows ReadyBoost support) | | | |

* The Aero UI and MPEG-2 codecs are not included in the Windows Vista Home Basic and Starter Editions.

**Source: Microsoft Windows Vista Product Brief.**

Back to Top

---

**20) For licensing customers, is it possible to have the Enterprise edition pre-loaded on Dell systems?**
a) Dell Custom Factory Integration (CFI) can factory install Windows Vista Volume Licensing (VLA) images on Dell Client systems for those customers who have received their VLA media from Microsoft. Customers with a signed VLA agreement with Microsoft can send their customer-created Windows Vista image to CFI to install the Windows Vista image on a new Dell system. Customers will be required to provide CFI with their VLA PID/Product Key or VLA Windows Vista media. CFI is an option available for OptiPlex, Latitude and Dell Precision systems with a minimum of 25 units purchased a quarter.

Back to Top

---

**21) What is the difference in imaging with Windows Vista (e.g., Image X)?**
a) WIM files house multiple images simplifying image transfer. CFI PMs will provide customers

with specific Windows Vista imaging guidance to help them understand new image process requirements. ImageX is supported in the Dell customer factory install process.

b) VLA customers need not purchase additional imaging tools to create their images. VLA customers can build their Windows Vista images with the WAIK (Windows Automated Installation Kit), which includes ImageX.

Back to Top

---

**22) What is the ability to use other imaging products such as Ghost?**
a) Symantec has committed to providing a read-only version of Ghost which CFI will be able to use in-house and provide customers with a Ghost Windows Vista image (vs. an ImageX Windows Vista image) installed on their new Dell systems - for those customers that prefer a Ghost image. SGSS 2.0 will support Windows Vista. This version of Ghost is still in beta and is tentatively scheduled for release in February. CFI is currently testing the beta for factory imaging and will be available alongside the release from Symantec.

Back to Top

---

**23) Are Windows Vista security features sufficiently robust that we could dispense with virus protection software for the desktop?**
a) Although Windows Vista has security features (e.g, enhanced firewall, spyware defense, network account protection, encrypting file system, etc.), the OS does not replace traditional security software such as Symantec and McAfee. Dell recommends that you continue to utilize a 3rd party security solution in addition to the Windows Vista OS (similar to XP) to help ensure your systems are well protected.

Back to Top

---

**24) What if I don't want my LAN users to be able to encrypt their files?**
a) Encrypted File System can be controlled in the domain through group policy objects.

Back to Top

---

**25) What are the differences between the EFS of Windows Vista and the EFS of Windows XP?**
a) Windows Vista can enhance an administrator's ability to manage EFS on the network by allowing storage of EFS keys on smart cards.

Back to Top

---

**26) Will Vista's encryption replace the need for Pointsec (3rd party encryption software)? Does Windows Vista encryption provide the same level of encryption and features as Pointsec? Does Windows Vista also encrypt removable media such as floppy disks, USB keys, CDs, etc?**
a) Both the Windows Vista Enterprise and Ultimate SKUs contain full disk encryption technology (aka BitLocker™ ) that can be used in lieu of 3rd party solutions. The Windows Vista encryption feature currently only encrypts data on the OS volume and does not provide encryption for removable media. Therefore, you should carefully consider the support implications of non-TPM (removable media) -based BitLocker deployment within the Enterprise.

Back to Top

---

**27) How long will Dell systems ship with XP?**
a) Dell plans to factory install Windows XP on Relationship platforms for 12 months after Windows Vista launches.

Back to Top

---

**28) How can Dell assist with the inventory/assessment process to prepare for Windows Vista?**
a) At no charge, Dell offers Dell Client Manager (DCM) Standard available for download from www.dell.com/openmanage on OptiPlex, Latitude and Dell Precision Workstation systems. An OpenManage Client Instrumentation agent is available for download and can be deployed through your network with an Administrator tool. The DCM Standard offering enables inventory assessment of your systems connected to the network to help with your preparation for Windows Vista.

b) Through Dell Managed Services, Dell can assist your company by doing an on-site assessment to help you prepare for Windows Vista. These Services include:

i) Windows Migration Readiness Assessments

ii) Deployment Planning & Engineering

iii) Image Construction & Application Packaging

iv) Implementing Light Touch or Zero Touch Installs

v) Managing day-after user support

Back to Top

---

**29) How does the Zero Touch migration work?**
a) Zero touch migration is achieved through a combination of planning, design and deployment engineering services. We utilize Microsoft's BDD tools pre-loaded in the factory or leverage the customer's existing infrastructure to automate image and application deployment.

Back to Top

---

**30) What licensing options are available for customers?**
a) Dell offers a variety of Microsoft Volume Licensing programs including Open Business, Open Value, Select and Enterprise Agreements.

Back to Top

---

**31) How will licensing be handled with non-OEM customers? Will we need licensing for a server?**
a) At this time the Microsoft Windows Vista Operating System is only being offered for Desktops and Notebooks.

Back to Top

---

**32) Will we have to go through Microsoft to obtain a VLA or will we be able to purchase this thru Dell?**
a) Dell offers a variety of Microsoft Volume Licensing programs including Open Business, Open Value, Select and Enterprise Agreements.

Back to Top

---

**33) Regarding volume licensing, could you please describe the differences between MAK and KSM licensing?**
a) Beginning with Windows Vista, there will be two types of Volume License Keys: Multiple Activation Keys (MAK) and Key Management Service (KMS). MAK keys activate either individual computers or a group of computers by connecting directly to Microsoft servers over the Internet or by telephone. The keys can be used a limited number of times. This activation limit can be increased by calling your Microsoft Activation Center. The KMS is a service your organization can host internally to automatically activate computers running Windows Vista. To use the KMS, you must have a minimum of 25 computers running Windows Vista that are connected together. Computers that have been activated through KMS will be required to reactivate by connecting to your organization's network at least every six months.

b) Please visit the link below for more information on licensing:

http://www.microsoft.com/licensing/resources/vol/default.mspx

Back to Top

---

**34) Will Office 2007 work with XP?**
a) According to Microsoft, Office 2007 will work on Windows XP.

Back to Top

---

**35) When will Windows Vista SP1 be released?**
a) Microsoft has not publicly given an SP1 release date.

Back to Top

---

Printable Version

| Shop | Support | Community | Company Information | My Account |
| --- | --- | --- | --- | --- |
| Solutions | Home Users | Join the Discussion | About Dell | Sign-in / Register |
| Services | Small Businesses | Share Your Ideas | Corporate Responsibility | Order Status |
| Systems | Enterprise IT | Read our Blog | Careers | |
| Software & Peripherals | | Ratings & Reviews | Investors | |
| | | Community Home | Newsroom | |

Laptops  |  Desktops  |  Business Laptops  |  Business Desktops  |  Workstations  |  Servers  |  Storage  |  Services  |  Monitors  |  Printers  |  LCD TVs  |

Electronics  |  Top Searches

© 2010 Dell  |  About Dell  |  Terms of Sale  |  Unresolved Issues  |  Privacy  |  About Our Ads  |  Dell Recycling  |  Contact  |  Site Map  |  Feedback          Large Text

AT  |  AU  |  BE  |  BR  |  CA  |  CH  |  CL  |  CN  |  CO  |  DE  |  DK  |  ES  |  FR  |  HK  |  IE  |  IN  |  IT  |  JP  |  KR  |  ME  |  MX  |  MY  |
NL  |  NO  |  PA  |  PR  |  RU  |  SE  |  SG  |  UK  |  VE  |  ALL

snWW20

# EXHIBIT 9

# Windows Logo Program 3.0

*Guidelines for products that work well with Microsoft® Windows® operating systems*

# Windows Vista Logo Program Client System Requirements

Version 3.09  –  December 22nd, 2006

**Design and testing requirements for client systems and devices that work with Microsoft® Windows Vista family of operating systems, 64-bit and 32-bit editions**

The current version of this document and instructions on how to provide comments are available at http://go.microsoft.com/fwlink/?LinkId=40629.

Microsoft. © 2002-2006 Microsoft Corporation. All rights reserved. Information in these materials is restricted to Microsoft authorized recipients only. Any use, distribution or public discussion of, and any feedback to, these materials is subject to the terms of the attached license. By providing any feedback on these materials to Microsoft, you agree to the terms of that license.

MS-WOLPH 0001

| SYSFUND-0007 | | System meets minimum memory requirements for Basic or Premium implementations | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Effective Date: | June 1, 2006 June 1, 2007 (Ultra Mobile) June 1, 2007 (All Premium) | Consumer | | | | Business | | | |
| Old ID: | WLP-1 | Desktop | Mobile | Ultra Portable | Ultra Mobile | Desktop | Mobile | Ultra Portable | Ultra Mobile |
| Status: | Locked | | | | | | | | |
| Basic Logo | | $R^1$ | $R^1$ | $R^1$ | $R^1$ | $R^1$ | $R^1$ | $R^1$ | $R^1$ |
| Premium Logo | | $R^2$ | $R^2$ | $R^2$ | $R^{*2}$ | $R^2$ | $R^2$ | $R^2$ | $R^{*2}$ |

One gigabyte or more of physical system memory is recommended to ensure optimal performance when demanding application loads occur from multitasking applications or running more demanding experiences such as TV recording, high-end gaming, photo editing, video editing, or multimedia applications.

[1] All Windows Vista systems are required to have at least 512 megabytes (MB) (ullTotalPhys must report at least 448 MB) of system memory in order to qualify for the Basic Logo.

- For Basic systems, at least 448 MB of system memory must be available to the operating system and not allocated for other purposes. This does not include memory allocated from the operating system in the normal course of driver operation. For example, discrete graphics must be able to allocate a small amount of system memory to be used for DMA buffers. System memory permanently used by the graphics adapter or memory used by UMA graphics solutions is not considered an "other purpose". The value ullAvailPhys, reported by the GlobalMemoryStatusEx() API, must be consistent with this requirement. System memory used for "other purposes" will not take away from the ullAvailPhys value which is acceptable. There are no limits on memory allocated in this manner.

[2] Prior to June 1, 2007 all Windows Vista systems are required to have at least 512 megabytes (MB) (ullTotalPhys must report at least 504 MB) of system memory (non UMA based systems) in order to qualify for the Premium Logo.

[2] After June 1, 2007 all Windows Vista systems are required to have at least 1 gigabyte (GB) of system memory in order to qualify for the Premium Logo.

- Prior to June 1, 2007 at least 512 MB (ullTotalPhys must report at least 504MB) of system memory must be available to the operating system for systems. This does not include memory allocated from the operating system in the normal course of driver operation. For example, discrete graphics must be able to allocate a small amount of system memory to be used for DMA buffers. System memory permanently used by the graphics adapter or memory used by UMA graphics solutions is not considered an "other purpose". The value ullAvailPhys must be consistent with this requirement. System memory used for "other purposes" will not take away from the ullAvailPhys value which is acceptable. There are no limits on memory allocated in this manner.

- After June 1, 2007 at least 768 MB of system memory must be available to the operating system systems with Aero enabled. This does not include memory allocated from the operating system in the normal course of driver operation. For example, discrete graphics must be able to allocate a small amount of system memory to be used for DMA buffers. System memory permanently used by the graphics adapter or memory used by UMA graphics solutions is not considered an "other purpose". The value ullAvailPhys must be consistent with this requirement. System memory used for "other purposes" will not take away from the ullAvailPhys value which is acceptable. There are no limits on memory allocated in this manner.

- *Premium ultra-mobile systems are allowed to ship configurations that provide at least 448 MB of system memory available to the operating system until June 1, 2007. This corresponds to the same date that WDDM drivers are required for ultra-mobile systems.

When the system has greater than 512 MB of system memory installed, the following formula must be used to determine the amount of system memory which can be allocated for non-operating system usage such as system memory allocated for graphics:

$$M = (S - 512) \div 2$$

Where **M** is the maximum amount of total system memory that can be allocated for other purposes and **S** is the amount of physical system memory.

For example, a system with 1GB of memory may allocate up to 256MB of system memory to allocate for graphics, whether it runs Aero or not:

$$256MB = (1GB - 512MB) \div 2$$

**Design and Implementation Note**
Due to system resource needs a value of 512 MB will not be reported in ullTotalPhys. This requirement has been modified to allow for 8 MB or less of the physical system memory in a Premium system to be utilized.

The value ullTotalPhys defines the total physical system memory available to the operating system as reported by the GlobalMemoryStatusEx() API.

Note that by default Windows Vista will disable the Windows Vista (Aero) Theme if 512 MB or less system memory is detected for performance reasons. It is strongly recommended that Premium system ship with 1GB or more of system memory.

| SYSFUND-0026 | | System that has an integrated or internal pointing device either disables the device or enables dual operation if external device is PS/2-compatible | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Effective Date: | June 1, 2006 | **Consumer** | | | | **Business** | | | |
| Old ID: | B5.3.4.1.7 | Desktop | Mobile | Ultra Portable | Ultra Mobile | Desktop | Mobile | Ultra Portable | Ultra Mobile |
| Status: | Locked | | | | | | | | |
| | Basic Logo | I | I | I | I | I | I | I | I |
| | Premium Logo | I | I | I | I | I | I | I | I |
| **If-implemented definition:** If system has integrated or internal pointing device. | | | | | | | | | |

If dual operation is not possible, the BIOS must disable the internal pointing device by default when any external PS/2-type pointing device is detected. When the internal pointing device is disabled in BIOS, no input from the embedded pointing device must be sent through the PS/2 port to the operating system.

MS-WOLPH 0026

# EXHIBIT 10

REDACTED DOCUMENT

# EXHIBIT 11

REDACTED DOCUMENT

# EXHIBIT 12

REDACTED DOCUMENT

# EXHIBIT 13

REDACTED DOCUMENT

# EXHIBIT 14

REDACTED DOCUMENT

# EXHIBIT 15

REDACTED DOCUMENT

# EXHIBIT 16

REDACTED DOCUMENT

# EXHIBIT 17

REDACTED DOCUMENT

# EXHIBIT 18

1          UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF CALIFORNIA

3          SAN FRANCISCO DIVISION

4        ~~~~~~~~~~~~~~~~~~~~

5  LORA and CLAY WOLPH, on

6  behalf of themselves and all

7  others similarly situated,

8        Plaintiffs,

9

10    vs.         Case No.  CV 09 1314 JSW

11

12  ACER AMERICA CORPORATION,

13  a California corporation,

14        Defendant.

15        ~~~~~~~~~~~~~~~~~~~~

16      Videotaped Deposition of

17        LORA WOLPH

18

19       April 7, 2010

          8:59 a.m.

20

          Taken at:

21   Best Western Fostoria Inn & Suites

      1690 N. Countyline Street

22       Fostoria, Ohio

23

24    Buster Beck, Notary Public

25

1   APPEARANCES:
2
3       On behalf of the Plaintiffs:
4           Hausfeld, LLP, by
5           JAMES J. PIZZIRUSSO, ESQ.
6           1700 K Street, NW
7           Suite 650
8           Washington, DC  20006
9           (202) 540-7200
10          jpizzirusso@hausfeldllp.com
11
12      On behalf of the Plaintiffs:
13          Gary, Naegele & Theado, LLC, by
14          JORI BLOOM NAEGELE, ESQ.
15          446 Broadway
16          Lorain, OH  44052
17          (440) 244-4809
18          JBNaegele@gmail.com
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

1   APPEARANCES, Continued:
2
3       On behalf of the Defendant:
4           Akin Gump Strauss Hauer & Feld, LLP,
5           by
6           DAVID C. LAWRENCE, ESQ.
7           300 West 6th Street
8           Suite 2100
9           Austin, TX  78701
10          (512) 499-6207
11          dlawrence@akingump.com
12
13              ~ ~ ~ ~ ~
14
15  ALSO PRESENT:
16          Kurt Henschel, Videographer
17
18              ~ ~ ~ ~ ~
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

1           I N D E X
2
3   EXAMINATION OF LORA WOLPH     6   3
4   BY MR. LAWRENCE
5
6
7   Exhibit 15 was marked     28    16
8   Exhibit 16 was marked     122   8
9   Exhibit 17 was marked     130   1
10  Exhibit 18 was marked     196   18
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TSG Reporting - Worldwide    877-702-9580

1           THE VIDEOGRAPHER:  Today's date is
2   April 7th, 2010.  The time is 8:59.  We're on
3   the record.  This is the matter of Lora and
4   Clay Wolph, et al. versus Acer America
5   Corporation in the United States District
6   Court, Northern District of California, San
7   Francisco Division, case number CV 09 1314 JSW.
8   This deposition is taking place in Fostoria,
9   Ohio.  My name is Kurt Henschel, the legal
10  video specialist, from TSG Reporting.  The
11  court reporter is Buster Beck, also with TSG
12  Reporting.
13          Will counsel please introduce
14  yourself for the record.
15          MR. LAWRENCE:  David Lawrence for
16  the Defendants.
17          MR. PIZZIRUSSO:  James Pizzirusso
18  for the Plaintiffs.
19          MS. NAEGELE:  Jori Bloom Naegele
20  the Plaintiffs.
21          THE VIDEOGRAPHER:  Would the
22  reporter please swear in the witness.
23          LORA WOLPH, of lawful age, called
24  for examination, as provided by the Ohio Rules
25  of Civil Procedure, being by me first duly

TSG Reporting - Worldwide    877-702-9580

1      A.   What did he tell me?  He explained,
2   you know, what -- what was all on the software,
3   that there are charts and numerous graphics and
4   -- and diagrams that would be helpful.
5      Q.   Did he explain how it works?
6      A.   Yes.
7      Q.   Did he demonstrate to you how to
8   use it?
9      A.   Yes.
10      Q.   And that was before you bought it?
11      A.   Yes.
12      Q.   Did he tell you anything about, if
13   you're going to buy this and put it on a
14   computer, that it needs -- the computer would
15   have to have certain specifications?
16      A.   Yes.
17      Q.   And what did he explain to you were
18   those specifications?
19      A.   Well, he didn't explain it, but
20   there was a sheet that I had that had the specs
21   on it.
22      Q.   And do you remember what that sheet
23   said?
24      A.   I remember -- the only thing I
25   remember is that it had a minimum of 1 gig

1   required.
2      Q.   Of what?
3      A.   Of -- of memory.
4      Q.   Okay.  RAM memory?
5      A.   RAM.
6      Q.   Okay.  Did it say it can only be
7   used on a PC and not a Mac, or could it be used
8   on both?
9      A.   I don't remember exactly what was
10   written, but I -- I used that to purchase my
11   computer.  Whatever it said is what I used to
12   check off.
13      Q.   And that -- that computer being the
14   Acer computer?
15      A.   Yes.
16      Q.   That's the subject of this lawsuit?
17      A.   Yes.
18      Q.   Did you have the software before or
19   after you bought the Acer?
20      A.   Before.
21      Q.   Before?
22      A.   Um-hmm.
23      Q.   So, do you remember anything else
24   about that sheet of paper other than it said
25   you needed at least 1 gig of RAM?

1      A.   No.
2      Q.   Did it say you need a certain speed
3   or type of processor?
4      A.   Possibly, but I don't recall what
5   all was on that sheet.
6      Q.   Okay.  Do you still have that
7   sheet?
8      A.   No.
9      Q.   Do -- what -- what happened to it?
10      A.   I'd love to know.
11      Q.   If you wanted to get another one,
12   could you call up Dr. Amaro?
13      A.   I don't know.
14      Q.   Do you know if it's available
15   online?
16      A.   I do not know.
17      Q.   Do you know if there's a website
18   for the software?
19      A.   Yes.
20      Q.   Have you ever looked at it?
21      A.   Not since I -- not since I
22   purchased my equipment.
23      Q.   Okay.  So, other than saying you
24   need 1 gigabyte of RAM, you don't remember
25   anything else about it?

1      A.   Um-umm.
2      Q.   But you were using that sheet to
3   select the computer?
4      A.   Yes.
5      Q.   Did you ever -- I understand you
6   ended up buying a notebook computer, correct?
7      A.   Yes.
8      Q.   Did you ever consider buying a
9   desktop computer to use it?
10      A.   No.
11      Q.   And why not?
12      A.   That was not recommended because
13   you need portability.  I have two offices, and
14   I wanted to be able to move it back and forth.
15      Q.   When you say it wasn't
16   "recommended," it wasn't recommended by Dr.
17   Amaro?
18      A.   He really didn't say, it's just
19   more convenient for us to be able to move it
20   back and forth.
21      Q.   So, did -- you said it wasn't
22   recommended.  Did anyone recommend that you not
23   get a desktop, or was that just --
24      A.   No.
25      Q.   Okay.  It was just your own

# EXHIBIT 19

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

LORA AND CLAY WOLPH, on behalf of themselves and all others similarly situated,

       Plaintiffs,

vs.

ACER AMERICA CORPORATION, a California corporation,

       Defendant.

CASE NO. CV-09-01314 JSW

## DECLARATION OF GRANT GIRARD

1)     My name is Grant Girard. I am a resident of Arizona. I have done outside consulting work with the International Academy of Medical Acupuncture (IAMA) and have assisted Dr. John Amaro with designing his Electro Meridian Imaging (EMI) software program.

2)     The original specification sheet for the EMI program stated that the suggested memory requirement for EMI was initially 1 GB of RAM. It was later changed to 1-2 GB of RAM. The final and existing recommendation is for 2 GB of RAM. These were all for Vista computers. I wrote those technical specifications. Our internal testing revealed that these specifications were sufficient at the time they were in place.

     I declare under the penalty of the laws of the State of Arizona and the United States that the foregoing is true and correct.

Dated: September 13, 2010

_____

Grant Girard

1

# EXHIBIT 20

## System Requirements
- Windows XP or Vista (Vista Requires 1-2 GB Ram Memory)
- Microsoft Service Pack 2 for XP and latest updates
- 750 MHz Processor (Pentium 4 or Similar)
- 512 MB Ram Memory • 150 MB Free Disk Space
- USB Port • Sound Capability • Printer

## Software Installation
Please close all applications that are open, including any virus software such as Norton or McAfee.

1. Insert the EMI CD.
2. Once the EMI Installer starts, follow the screen instructions. You may be asked to install the 'Microsoft.net Framework', please select 'YES' to proceed with the installation.

If the install does not start automatically:
- Click on the 'Start' button, then click on 'Run'.
- In the Run Window type in: **D:\autorun**, click '**OK**'.

"D" is your CD drive, if your CD uses a letter other than D, substitute that letter.

## Hardware Installation
If you purchased the EMI Digital Probe, you must install the software BEFORE using the hardware. Hardware includes:
- 9 Volt Battery
- USB Cable
- Probe and Probe Cable
- Patient Metal Ground & Ground Cable
- Electronics Module with Velcro

### 9 Volt Battery
On the back of the Electronics Module, push down on the arrow and slide the door out. Insert the battery, as pictured inside the compartment. Place the door back on.

### USB Cable
Plug the cable end  into your computer. The plug is notched and can only be plugged in one way. Normally the symbol is facing up. Please do not force the plug into the socket.

Page 1

Page 2

### Module Cables
Probe Cable ▯- USB Cable ▭ ∴ Ground Cable

When inserting the cables into your Electronics Module, the symbols for the Probe and USB cables (indicated in red above) must be facing up. Please align the sockets carefully and do not force the plugs in.

Included with the Electronics Module is a strip of Velcro. You may wish to attach the Module to your PC or Laptop.

## Setting up the Program
- After installing your Software and Hardware, please restart your Computer.
- If your Computer does not recognize the EMI Electronics Module, or for any other problems, please consult the Troubleshooting section in the Help Menu of the EMI Program.

(over) ▶

Page 3

## Setting up the Program (cont.)
- The EMI Software installation has created an icon on your Windows Desktop.
- To start EMI, double click the icon on your desktop.
  - When the program opens click on the **Tools** button then go to **Setup**.



- Once the Setup Window is open, you may configure all your preferences in this screen.
  - You now can add your Address and Phone Number or change the password in this section. Note that the License name is preset and cannot be changed.

Page 4

- The Password that comes with the program is the number "1". We recommend you change it. The Password can consist of Numbers or Letters up to 15 digits.
- The EMI program comes preset with the "Probe Active" set to **ON**. If you **do not** have the EMI probe, you must set this to **OFF** or the program will indicate there is no probe every time an Exam is started.
- After setting your preferences, you can explore EMI or you may open the Help document for a good overview.
- Also under the Help button is a selection called EMI Guide. This is a short introduction on Meridian Therapy procedures

## Support
Your EMI Software and Hardware are covered by a one year warranty. If you have difficulties please call **1-888-322-8468**.



Page 5

**EMI**
*Electro Meridian Imaging™*
*Contemporary Acupuncture Diagnosis™*

*Quick Start*

*Copyright 2006 International Academy of Medical Acupuncture and Dr. John Amaro.*

GG000001

# EXHIBIT 21



202.540.7200 ph
202.540.7201 fax

1700 K Street, NW
Suite 650
Washington, DC 20006

## <u>HAUSFELD LLP FIRM RESUMÉ</u>

Lawyers at Hausfeld LLP (the "Firm") have represented businesses and individuals for decades in many of the major class actions litigated in the United States and abroad in areas such as antitrust/competition, securities fraud, environmental contamination, consumer protection, civil rights and human rights. Hausfeld LLP lawyers have been global leaders in developing numerous innovative legal theories that have expanded the quality and availability of legal recourse for aggrieved businesses and individuals in the United States and worldwide. The Firm is based in Washington, D.C., with offices in Philadelphia, New York, San Francisco, and London and affiliated offices in Europe, Asia, Latin America, Canada, and Australia.

Hausfeld LLP was founded by Chairperson Michael D. Hausfeld, who is widely acknowledged as one of the country's top civil litigators and a leading expert in the field of private enforcement of competition and antitrust laws and international human rights. He has been referred to by The New York Times as one of the nation's "most prominent antitrust lawyers" and by Washingtonian magazine as "a Washington lawyer determined to change the world - and succeeding." Led by Mr. Hausfeld, Hausfeld LLP lawyers have been at the forefront of the development of international human rights and antitrust theory and the litigation of such claims. As the global economy has produced worldwide integrated markets, the nature of antitrust violations has caused worldwide integrated injuries. For example, in *Kruman v. Christie's International PLC, et al.*, Docket No. 01-7309 (S.D.N.Y.) and In re Vitamins Antitrust Litigation, MDL 1285 (D.D.C.), both the parties and the anticompetitive actions were played out on an international stage. From Native Alaskans to Holocaust survivors, to victims of Apartheid in South Africa, Hausfeld LLP lawyers have also provided access to justice to individuals around the world by ensuring that global wrongs have global rights and remedies.

## Key Cases

Hausfeld LLP and its attorneys have been appointed and are currently serving as Lead or Co-Lead Class Counsel and in other leadership capacities in 33 class action and mass tort cases:

### <u>Antitrust</u>
- *Ace Delivery & Moving, Inc. v. Horizon Lines, LLC* ("Alaskan Shipping"), 08-cv-00207 (D. Ak.)
- *Brigiotta's Farmland Produce and Garden Center Inc. v. United Potato Growers of Idaho, Inc., et al* (D. Id.) 10-CV-307-BLW
- *In re Air Cargo Shipping Services Antitrust Litigation*, 06-md-1775 (E.D.N.Y.)
- *In re Automotive Aftermarket Lighting Products Antitrust Litigation*, No. 09-ML-2007-GW (PJW) (C.D. Cal.)
- *Bruce Foods Corp. v. SK Foods, LP* ("Processed Tomatoes"), 2:09-cv-00027-MCE-EFB (E.D. Cal.)
- *In re Chocolate Confectionary Antitrust Litigation*, 08-mdl-1935 (M.D. Pa.)

**HAUSFELD**LLP

- *In re Endosurgical Products Direct Purchaser Antitrust Litigation*, No. SACV 05-8809 JVS (MLGx) (C.D. Cal.)
- *In re Ethylene Propylene* ("EPDM"), 3:03-md-01542-SRU (D. Conn.)
- *In re Flat Glass Antitrust Litigation*, 2:08-mc-00180 (E.D. Pa.)
- *In re Florida Cement and Concrete Antitrust Litigation*, 09-23187-CIV-ALTONAGA/Brown (S.D. Florida)
- *In re Hydrogen Peroxide Antitrust Litigation*, 05-cv-666 (E.D. Pa.)
- *In re International Air Passenger Surcharge Antitrust Litigation*, M:06-cv-01793 (N.D. Cal.)
- *Kohlder Manufacturing Co., Inc. v. Kason Industries, Inc. et al*, No. 1:10-cv-01875-WSD (N.D. Ga.)
- *In re Methyl Methacrylate Antitrust Litigation* ("MMA"), 06-md-1768 (E.D. Pa.)
- *Molecular Diagnostics Labs. v. Hoffman-La Roche, Inc.* ("Taq"), 04-cv-01469 (D.D.C.)
- *In re Municipal Derivatives Antitrust Litigation*, 08-cv-2516 (S.D.N.Y.)
- *In Re NCAA Student-Athlete Name & Likeness Licensing Litigation*, No. C09-1967 VRW (N.D. Cal.)
- *In re Optical Disk Drive Antitrust Litigation*, No. 3:10-md-02143-VRW (N.D. Cal.)
- *In re OSB Antitrust Litigation*, No. 06-cv-826 (E.D. Pa.)
- *In re Pressure Sensitive Labelstock Antitrust Litigation*, MDL No. 1556 (M.D. Pa.)
- *In re Processed Egg Products Antitrust Litigation*, 2:08-cv-04653 (E.D. Pa.)
- *In re Rail Freight Fuel Surcharge Antitrust Litigation*,1:07-mc-00489-PLF-JMF (D.D.C.)
- *In re Transpacific Passenger Air Transport Antitrust Litigation*, 3:07-cv-05634 (N.D. Cal.)
- *In re Vitamins Antitrust Litigation*, MDL No. 1285 (D.D.C.)
- *In re Vitamin C Antitrust Litigation*, No. 1:06-md-01738-DGT-JO (E.D.N.Y.)

**Consumer Protection**
- *Pelletz v. Advanced Environmental Technologies, Inc.* ("Choicedek"), No. C08-0334 (W.D. Wa.)
- *Radosti, et al. v. Envision EMI, LLC*, 1:09-CV-00887-CKK (D.D.C.)
- *Ross v. Trex Co., Inc.*, No. 5:09-CV-00670 (N.D. Cal.)
- *In Re Sony PS3 "Other OS" Litigation*, CV-10-1811-RS (N.D. Cal.)
- *In re Tyson Foods, Inc., Chicken Raised Without Antibiotics Consumer Litigation*, 1:08-md-01982-RDB (D. Md.)
- *Wolph v. Acer America Corp.*, CV-09-01314-VRW (N.D. Cal.)

**Mass Tort**
- *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL 2047 (E.D. La.) (Of counsel to Plaintiffs' Steering Committee)
- *In re Prempro Products Liability Litigation*, 4:03-cv-01507-WRW (E.D. Ark.) (Plaintiffs' Steering Committee)

2



**Notable Successes**

The recent successes of Hausfeld LLP lawyers also include the following highlights:

• Hausfeld LLP has been listed by the US Legal 500 publication as one of the <u>top three</u> antitrust plaintiffs' firms in the country in 2010:

"Hausfeld LLP brands as a global plaintiff representation firm, targeted at providing justice to both individuals and businesses, and antitrust litigation is one of five key areas of expertise.…[T]he firm has been appointed co-lead counsel in over 20 significant cases. The firm is headquartered in Washington DC, and also has offices in New York, Philadelphia, San Francisco and London. One client ranks the firm as *'the best I have ever worked with'*. Recent successes include two cases in the airline industry, firstly as co-lead counsel in the British Airways/Virgin Atlantic Fuel Surcharge Price-Fixing Cartel Case, which resulted in a $200m settlement for the aggrieved plaintiffs; the precedent-setting case allowed UK citizens equal footing with US citizens in US courts. The firm also acted as co-lead counsel in negotiating and agreeing a $85m court-approved settlement with Lufthansa in an air cargo shipping price-fixing cartel case; the action against other plaintiffs continues. Other significant work included taking a leading part include the "Chinese dry-wall" litigation, and an action on behalf of victims of the South African apartheid regime against multinational corporations which allegedly aided and abetted crimes against humanity… Recommended lawyers include the firm's founder, Washington DC-based Michael Hausfeld, an experienced veteran who is *'inventive and determined'*. Also in Washington DC, Brian Ratner is an *'engaging, highly competent professional who can simplify complex antitrust matters and make them comprehensible to a non-antitrust attorney'*, and Andrew Bullion, *'experienced, knowledgeable and easy to communicate with'*. In Philadelphia, Brent Landau is *'very professional and personable'*. "

Hausfeld LLP was also listed by the US Legal 500 Publication as one of the top antitrust plaintiffs' firms in the country in 2009.

• In March 2009 the firm reached a historic global settlement agreement with Parker ITR regarding the company's involvement in the marine hose cartel. The settlement agreement represented the first private resolution of a company's global cartel liability without any arbitration, mediation or litigation. It thus signaled opportunities never before possible for dispute resolution and provides a new model for global cartel settlements going forward. Major oil company purchasers and other significant marine hose purchasers have already signed or agreed to sign the settlement agreement.

• In listing the top antitrust plaintiffs' firms in the US, the publication Legal 500 has commented that: "The 'outstanding' Mike Hausfeld, in Washington, DC, is a titan of the antitrust bar and a 'very creative' advocate who is the architect behind the firm's expansion into Europe…." In particular, Legal 500 noted that the London office "has not been idle; this year the firm's offices on both sides of the Atlantic worked on the price-fixing scandal between BA and Virgin Atlantic, and achieved a ground-

breaking $200m settlement in the first-ever transatlantic recovery."

• Michael Hausfeld was the only US plaintiff's lawyer expressly invited by the European Commission's DG Competition to comment on its EC Antitrust Damages Actions Green Paper of March 28, 2006. He also responded to the OFT's White Paper on private damages actions for competition law infringement. Michael Hausfeld was invited to speak at the OFT's consultation meeting on September 24, 2007.

• On July 10, 2007, in the case of *Diamond Chemical Company, Inc. v. Akzo Nobel Chemicals B.V. et al.*, a U.S. federal judge in Washington, DC granted the motion by Hausfeld LLP lawyers to award $5.1 million in undistributed settlement funds to The George Washington University Law School to endow a Center for Competition Law.  The *cy pres* award resulted from a successful antitrust lawsuit brought by Hausfeld LLP lawyers on behalf of a plaintiff class harmed by an international anticompetitive conspiracy to fix prices for the sale of sodium monochloroacetate and monochloroacetic acid in the United States and elsewhere.  This is a novel resolution in the face of increasing global trade; ill-gotten cartel profits will now be used to study and recommend improvements to global private anti-cartel enforcement.

In addition to the successes of Hausfeld LLP lawyers in the US, our pioneering antitrust work around the world has included the following highlights:

• Hausfeld LLP is serving as Lead Counsel having special responsibility for non-US claims in the *Air Cargo Antitrust Litigation* on behalf of air freight customers against a group of international flagship airlines for fixing prices on air freight shipping.  This case has already resulted in a landmark $85 million settlement with Lufthansa.  The settlement will result in thousands of European businesses recovering damages for infringements of both US antitrust and EU competition law.  Michael Hausfeld was the architect and lead settlement negotiator for the claimants.

• Hausfeld LLP is serving as Co-Lead Counsel in the *Air Passenger Antitrust Litigation* on behalf of thousands of air travelers around the world against British Airways and Virgin Atlantic Airways for fixing prices of air passenger transportation to and from the UK to all long-haul destinations in the world.  Hausfeld LLP lawyers secured the first recovery for foreign citizens based on foreign antitrust law in a US antitrust case.  European citizens and businesses will be significant beneficiaries of this settlement, which provides equal compensation for both domestic and foreign air passengers.

• Michael Hausfeld was the only plaintiff's lawyer to appear before the European Commission in 2002 on behalf of European consumers in the Microsoft matter.

• Hausfeld LLP lawyers successfully litigated and settled foreign claims in the case of *Kruman v. Christie's International PLC. et al.*, marking the first time that non-US claimants as a class received compensation for violation of competition laws (the fixing of auction commissions) – a milestone in both US antitrust jurisprudence and European recovery.

4

HAUSFELD LLP

- In the landmark case of *Empagran v. F. Hoffman LaRoche, Inc., et al.*, Hausfeld LLP lawyers represented foreign purchasers in U.S. federal court to recover the billions of dollars in overcharges that resulted from a global conspiracy to fix vitamin prices and allocate market share. This case was litigated by Hausfeld LLP lawyers all the way to the United States Supreme Court, which delivered a ground breaking judgment on US Sherman Act jurisdiction. The scope of the jurisdiction was defined and confirmed that intertwined US and non-US claims against worldwide cartels may continue to be brought in the US courts.  This case was designated as the "Matter of the Year" by the Global Competition Review.

**A Record of Leadership**

Hausfeld LLP lawyers have hosted, lectured and participated in numerous international conferences on four different continents. They have spoken on issues such as: the pursuit of damage actions in the US and EU on behalf of EU and other non-US plaintiffs; private civil enforcement of EU competition laws; the Supreme Court decision in *Empagran*; the principle of international comity; monopolization; and the extraterritorial jurisdiction of the U.S. antitrust laws. Hausfeld LLP attorneys have presented before regulators, judges, business leaders, in-house counsel, private lawyers, consumer, environmental and human rights advocates and institutional investors.  They have also written extensively on these subjects and many others, and they have led key competition policy debates around the world.

On the basis of Hausfeld LLP's experienced lawyers, history, visibility and recent successes, the firm is widely considered to be a leader in the antitrust bar.  Hausfeld LLP lawyers have a consistent track record of:

- Leading or participating in the world's most significant plaintiffs' private antitrust enforcement actions;
- Innovating at the cutting-edge of the private enforcement of antitrust in the US and globally; and
- Building a talented team of professionals representing one of the largest plaintiffs' private antitrust enforcement teams in the US and the largest dedicated plaintiffs' team in the UK and Europe.

Hausfeld LLP lawyers believe that, with the increasing incidence of global cartels and coordinated international enforcement of competition and antitrust laws, their firm is well positioned to provide unparalleled advice and the highest quality professional representation for claimants internationally.  This is increasingly recognized by the leading defense firms both publicly and in private as they seek to achieve global "peace" for their cartel clients.

**Non-Competition Matters**

Aside from their cutting edge work in the competition and antitrust fields, Hausfeld LLP lawyers have been at the forefront of leading human rights, civil rights, environmental, mass tort, consumer and other complex matters litigated in the United States and abroad. Richard Lewis is presently serving as lead counsel in an international environmental and human rights case involving drinking water contamination

HAUSFELD LLP

in Bhopal, India, as well as serving on the Plaintiff's Steering Committee in the federal Hormone Replacement Therapy ("HRT") mass tort litigation. Other recent successes of Hausfeld LLP lawyers in these areas include the following highlights:

- *Holocaust Litigation*

In the historic Swiss Banks litigation, Michael Hausfeld served, pro bono, as co-lead counsel for Holocaust survivors against the Swiss banks that collaborated with the Nazi regime during World War II by laundering stolen funds, jewelry, and art treasures. Michael Hausfeld obtained a $1.25 billion settlement. See *In re Holocaust Victim Assets Litig.*, Case No. CV 96-4849 (ERK) (MDG). He was also a lead counsel in litigation by survivors of World War II-era forced and slave labor against the German companies that profited from using the labor of concentration camp inmates. This litigation, which resulted in an unprecedented settlement of $5.2 billion for approximately two million claimants, was resolved by multinational negotiations involving the defendants, plaintiffs' counsel, and the governments of several countries.

- *In re The Exxon Valdez Litigation*, No. A89-095 Civ. (D. Ak.).

Michael Hausfeld was selected from dozens of attorneys around the country by federal and state judges in Alaska to serve as co-lead counsel for plaintiffs in the largest environmental case in United States history that resulted in a jury verdict of more than $5 billion (reversed and remanded; further proceedings pending).

- *In re Diet Drug Litigation* (Fen-Phen), MDL No. 1203 (E.D. Pa.).

As a member of the Plaintiffs' Management Committee and Sub-Class Counsel, Richard Lewis played a major part in the success of the Fen-Phen diet drug litigation and settlement. Richard Lewis and other plaintiffs' counsel achieved one of the largest settlements ever obtained in a mass tort case - $3.75 billion – on behalf of millions of U.S. consumers who used diet drugs that are associated with heart valve damage.

- *In re StarLink Corn Products Liability Litigation*, MDL No. 1403. (N.D. Ill.).

Richard Lewis was co-lead counsel and successfully represented U.S. corn farmers in a national class action against Aventis CropScience USA Holding and Garst Seed Company, the manufacturer and primary distributor of StarLink corn seeds. StarLink is a genetically modified corn variety that the United States government permitted for sale as animal feed and for industrial purposes, but never approved for human consumption. However, StarLink was found in corn products sold in grocery stores across the country and was traced to widespread contamination of the U.S. commodity corn supply. The settlement, which provided more than $110 million for U.S. corn farmers, was the first successful resolution of tort claims brought by farmers against the manufacturers of genetically modified seeds.

- *Roberts v. Texaco, Inc.*, 94-Civ. 2015 (S.D.N.Y.).

Michael Hausfeld represented a class of African-American employees in this landmark litigation that resulted in the then-largest race discrimination settlement in history ($176 million in cash, salary increases and equitable relief).

HAUSFELD LLP

Annex 1 of this resume lists quotes from journalists and publications regarding the work of Hausfeld LLP lawyers, as well as awards and recognitions.  Annex 2 lists many of the cases Hausfeld LLP lawyers have led and been involved in.  Annex 3 includes the profiles of Hausfeld LLP lawyers. Annex 4 provides information about the firm's London affiliate Hausfeld & Co. LLP and its attorneys. Finally, Annex 5 lists publications by Hausfeld attorneys, and Annex 6 provides contact information for the firm's offices.

HAUSFELD LLP

**Annex 1 – Quotes from journalists and publications regarding the work of Hausfeld LLP lawyers and recent awards and recognitions**

"One of the nation's preeminent antitrust class-action lawyers, [Michael] Hausfeld has been at the forefront of many historic and precedent-setting cases."
-*Washingtonian Magazine*, December 2009, "Thirty Stars of the Bar" feature

In 2009, US Legal 500 described Michael Hausfeld as "an outstanding antitrust litigator."
-*US Legal 500*, 2009

In 2008, *US Legal 500* discussed the work of Hausfeld LLP lawyers noting that the firm's attorneys are "involved in the first antitrust case in the US against Chinese manufacturers, in which the plaintiffs are alleging that major Chinese pharmaceutical companies conspired to fix prices and control export output of Vitamin C. The case raises thorny issues about the government's role in the defendants' pricing, and its output decisions."

*US Legal 500* also discussed the firm's attorneys' involvement in a "nationwide class action brought by the State of Mississippi, the City of Chicago and Fairfax County, Virginia against 37 leading banks, insurance companies and brokers alleging widespread price-fixing and bid-rigging in the multi-billion dollar municipal derivatives industry dating back to 1992."

In conclusion, *US Legal 500* noted that the firm's attorneys' continue "to pick up instructions on some of the most significant cases around, both purely domestic and those with an international element. This impressive success, both nationally and away from home, prompts clients to confirm that the firm manages to get 'a high percentage of the overall work', and that the firm is 'recognized as one of the top firms.' "
-*US Legal 500*, 2008

"Hausfeld haunts errant companies ranging from managed healthcare providers to makers of genetically engineered foods and bulk vitamins."
-*Lawdragon*, January 2008

In 2007, *US Legal 500* noted that Hausfeld LLP lawyers "have been particularly active in cases surrounding the aviation industry in recent times and [are], for instance, currently representing distribution company Niagara Frontier Distribution in class-action litigation pertaining to allegations that a group of major air cargo carriers conspired to inflate airfreight surcharges, a case that has already yielded an initial settlement in the region of $80m. Lawyers at the firm are furthermore acting on behalf of Swedish furniture chain Ikea in a proposed class action suit involving similar claims. . . . Further recent highlights include the recovery of $28.8m for a class of retailers in a monopolization suit against tape manufacturer 3M, and a lead role in litigation surrounding an alleged hydrogen peroxide cartel."

"Wins for Valdez victims and Holocaust survivors built [Michael Hausfeld's] reputation."
-*Lawdragon*, March 2006

8

HAUSFELD LLP

"I want to mention on the record the extraordinary work of the Hausfeld firm in the preparation and the submission of this claim.  Mr. Hausfeld in numerous other claims as well has exhibited the type of professionalism and skill that have made the Fund a success and my job that much easier.  I am grateful to him for his zeal, competence and professionalism."
-Ken Feinberg, Special Master, 9/11 Victim's Compensation Fund.

"Antitrust defense lawyers view Michael Hausfeld as among the top three or four antitrust litigators in the country on the plaintiffs' side. The reason: his ability to score multimillion-dollar recoveries from major corporations over alleged monopolistic and price-fixing conduct. Seen as "really a very, very aggressive" litigator, Hausfeld is not one to shy away from a tough fight and has supplemented his antitrust focus with a broad range of cases focusing on civil rights and international human rights. He represented Holocaust survivors in their suits to get World War II-era assets back from European Banks."
-*Lawdragon*, October 2005

"More importantly, the ingenuity here comes heavily from the lawyers on the plaintiff's side.  It was they who spotted something others had missed – based on an ambiguity in a 'foreign assistance' statute – and ran with it, all the way to the Supreme Court.  Indeed the amazing aspect of *F. Hoffman-LaRoche, Ltd. v. Empagran* is not so much the answers it provided but that some of the questions needed answering at all."
-David Samuels, from "Matter of the Year," *Global Competition Review*, Feb. 2005, in reference to the *Empagran* case.

"Hausfeld could be sweetness and light one moment and anger and darkness the next.  He was unpredictable and at times unreasonable. . . . But he was central to any successful negotiation because he had a keen sense of where the bottom line was."
-Stuart Eizenstat on the Holocaust cases, *The London Times*, Sept. 28, 2004.

The *Washingtonian* has listed Michael Hausfeld for the past several years as one of Washington's 75 best lawyers, saying he "consistently brings in the biggest judgments in the history of law" and that he is "a Washington lawyer determined to change the world - and succeeding."  The magazine has also referred to Michael Hausfeld as "the country's best-known litigator of big lawsuits with hundreds of plaintiffs and multiple defendants."

Representative Awards and Recognitions

"40 under 40"
*Legal Times;* July, 2009
Brian Ratner named one of the top Washington-area lawyers under forty years of age

2009 Attorneys Who Matter
*The Ethisphere Institute*
Michael Hausfeld named in a short list of "attorneys who matter" in the field of corporate compliance

HAUSFELD LLP

*2009 Chambers USA*
Michael Hausfeld cited in category of Products Liability: Plaintiffs Fellow, Litigation Counsel of America

*Competition Law 360*
Jon T. King, Editor

Women Antitrust Plaintiffs Attorneys
A national trade organization founded by Megan E. Jones in 2008.

500 Leading Lawyers in America
*Lawdragon*, May 2010
Michael Hausfeld

ABA Antitrust Section's Transition Taskforce
The taskforce, of which Michael Hausfeld was a member, advised the incoming Obama Administration

*Legal Times* Visionaries
May 19, 2008
Michael Hausfeld listed among 30 "Visionaries" in the Washington legal community.

50 Most Powerful People in DC
*GQ Magazine*; September, 2007
Michael Hausfeld named #40.

Fierce Sister Award
Summer 2007
For Michael Hausfeld's work on the Japanese Comfort Women case.

500 Leading Plaintiffs' Lawyers in America
*Lawdragon*; Winter 2007
Michael Hausfeld

International World-shakers
*The Lawyer* (UK); February 8, 2007
Michael Hausfeld named as one of top 40 international lawyers "making waves" in the UK.

500 Leading Lawyers
*Lawdragon*; Fall 2007 & Fall 2006
Michael Hausfeld

500 Leading Litigators
*Lawdragon*; Spring 2006

HAUSFELD LLP

Michael Hausfeld

100 Most Influential Lawyers
*The National Law Journal*; June 19, 2006
Michael Hausfeld is named as one of "the most influential lawyers in America."

Runner up for Matter of the Year
*Global Competition Review*; February, 2005
On *Empagran* matter, Michael Hausfeld praised for ingenuity in how the case was prosecuted.

**HAUSFELD** LLP

**Annex 2 – Case Digest**

Hausfeld LLP lawyers have served or are serving as lead or co-lead counsel, or on Plaintiffs' Executive Committee(s), in dozens of antitrust, human rights, civil rights, mass tort, environmental, and consumer protection actions, presenting numerous innovative legal theories and obtaining landmark judgments and settlements for individuals and businesses in the United States and abroad.  Some of these significant past and present cases include:

Antitrust/Competition

*In re Vitamins Antitrust Litigation*, MDL No. 1285 (D.D.C.).  Hausfeld LLP lawyers served as co-lead counsel for two certified classes of businesses that directly purchased bulk vitamins and were overcharged as a result of a ten year global price-fixing and market allocation cartel.  Chief Judge Hogan approved eight major settlements between certain vitamin defendants and the Class Plaintiffs, including a landmark partial settlement of $1.1 billion.  In a later trial before Chief Judge Hogan concerning four of the Class Plaintiffs' remaining unsettled Vitamin B4 (choline chloride) claims, a federal jury in Washington unanimously found Japan's second largest trading company, Mitsui & Co., Ltd., its wholly-owned U.S. subsidiary Mitsui & Co. (U.S.A.), Inc., DuCoa, LP, a choline chloride manufacturer based in Highland, Illinois, and DuCoa's general partner, DCV, Inc. liable for participating in the cartel and ordered them to pay $49,539,234, which was trebled to $148,617,702 under the federal antitrust laws.  The case was subsequently settled against the Mitsui defendants.

*In re Domestic Air Transportation Antitrust Litigation* (N.D. Ga.).  Plaintiffs alleged a conspiracy among major airlines to set prices.  In one of the largest consumer class actions ever brought to a successful conclusion, Hausfeld LLP lawyers were one of the lead counsel and obtained a settlement of travel discounts and cash totaling $458 million for the class of individuals and businesses using US domestic airlines.

*In re Rubber Chemicals Antitrust Litigation*, Master Docket No. C-03-1496 (N.D. Cal.).  In 2006, Hausfeld LLP lawyers, serving as Co-Lead Counsel, settled the direct purchaser class's global price-fixing claims with defendants Flexsys N.V., Flexsys America L.P., Akzo Nobel Chemicals International B.V., Akzo Nobel Chemicals, Inc., Crompton (now Chemtura) and Bayer for more than $300 million.  In December 2005, the EC fined four firms a total of €75.86 million.  Individual fines were as follows: Flexsys - €0 (immunity for initial cooperation); Bayer - €58.88 million; Crompton - €13.6 million; General Quimica+Repsol - €3.38 million.

*In re Relafen® Antitrust Litigation*, No. 01-12239-WGY (D. Mass.).  Hausfeld LLP lawyers have served as co-lead counsel on behalf of a class of direct purchasers of Relafen — a non-steroidal anti-inflammatory drug sold by SmithKline Beecham Corporation PLC and GlaxoSmithKline Beecham Corporation PLC (collectively, "GSK").  As alleged in the complaint, GSK unlawfully extended its monopoly in the U.S. market for Relafen and its generic equivalents by fraudulently procuring an invalid patent and using that invalid patent to prevent generic competition.  On April 9, 2004, after significant

12

**HAUSFELD**LLP

litigation, the United States District Court for the District of Massachusetts approved the $175 million settlement of this action.

*In re Buspirone Antitrust Litigation*, MDL No. 1413 (S.D.N.Y.).  Plaintiffs alleged that Bristol Myers-Squibb Company, a producer of the drug BuSpar7, unlawfully maintained a monopoly in violation of federal and state antitrust and unfair competition laws.  A $90 million settlement was approved in 2003. Hausfeld LLP lawyers served as one of four co-lead counsel.

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation*, No. 3:03-md-01542-SRU (D. Conn.).  Hausfeld LLP lawyers, serving as co-lead counsel, obtained class settlements totaling more than $73 million in this global price-fixing case on behalf of direct purchasers of EPDM, a synthetic rubber.

*In re Commercial Explosives Antitrust Litigation* (D. Utah).  Plaintiffs alleged a conspiracy among manufacturers of explosives to set prices.  Hausfeld LLP lawyers were co-lead counsel in this price-fixing case that resulted in a class settlements totaling over $72 million.

*Oncology & Radiation Associates, P.A. v. Bristol Myers Squibb Co., et al.*, Case No. 1:01CV02313 (D.D.C.).  Hausfeld LLP lawyers served as co-lead counsel in this case.  Plaintiffs alleged that Bristol-Myers Squibb unlawfully monopolized the United States market for paclitaxel, a cancer drug discovered and developed by the United States government, which Bristol sells under the brand name Taxol. Bristol's scheme included a conspiracy with American BioScience, Inc., a generic manufacturer, to block generic competition.  Hausfeld LLP lawyers' investigation and litigation of this case on behalf of direct purchasers of Taxol led to a settlement of $65,815,000 that was finally approved by U.S. District Judge Emmet G. Sullivan on August 14, 2003 and preceded numerous Taxol-related litigation brought by the Federal Trade Commission and State Attorneys General offices.

*In re Infant Formula Consumer Antitrust Litigation* (multiple state courts).  Hausfeld LLP lawyers instituted price-fixing cases on behalf of indirect-purchasers in 17 states under state antitrust laws against three companies who conspired to drive up the price of infant formula.  The cases resulted in settlements of $64 million for purchasers of infant formula.

*In re Flat Glass Antitrust Litigation*, MDL No. 1200 (W.D. Pa.). The plaintiffs alleged that the five major manufacturers of float glass and automotive replacement glass conspired to fix prices on a wide variety of glass products.  Hausfeld LLP lawyers served as co-lead counsel and obtained a total of $ 61.7 million in settlement funds on behalf of glass shops, window manufacturers, and others who directly purchased the affected products from the defendants.

*Nate Pease, et al. v. Jasper Wyman & Son, Inc., et al.*, Civil Action No. 00-015 (Knox County Superior Court, Maine).  In 2004, a state court jury from Maine found three blueberry processing companies liable for participating in a four-year price-fixing and non-solicitation conspiracy that artificially lowered the prices defendants paid to approximately 800 growers for wild blueberries. The jury ordered defendants Cherryfield Foods, Inc., Jasper Wyman & Son, Inc., and Allen's Blueberry Freezer, Inc. to pay $18.68 million in damages, the amount which the growers would have been paid absent the defendants'

HAUSFELD LLP

conspiracy. After a mandatory trebling of this damage figure under Maine antitrust law, the total amount of the verdict for the plaintiffs is just over $56 million. Hausfeld LLP lawyers served as co-lead counsel.

*In re Commercial Tissue Antitrust Litigation* (N.D. Fla). Hausfeld LLP lawyers joined forces with the State of Florida and other plaintiffs' attorneys to bring this class action against the major manufacturers of commercial tissue products which included commercially sold paper towels, toilet tissue and napkins. The case was scheduled to go to trial in Gainesville, Florida just a few months before it was settled for $56 million.

*In re Urethane Antitrust Litigation*, No. 2:04-MD-1516-JWL-DJW (D. Kan.). Hausfeld LLP lawyers, as co-lead counsel, obtained a class settlement totaling more than $55 million in this global price-fixing case on behalf of direct purchasers of Polyether polyols, intermediate chemicals used in the manufacture of rigid and flexible foams, among other applications.

*Kruman v. Christie's International PLC, et al.*, Docket No. 01-7309 (S.D.N.Y.). A $40 million settlement on behalf of all persons who bought or sold items through Christie's or Sotheby's auction houses in non-internet auctions was recently approved. Michael Hausfeld served as co-lead counsel on behalf of non-US plaintiffs. The settlement marks the first time that claims on behalf of non-US plaintiffs under U.S. antitrust laws have received compensation through a settlement in a U.S. court.

*In re Polychloroprene Rubber (PCP) Antitrust Litigation*, No. 3:05-md-01642-SRU (D. Conn.). Hausfeld LLP lawyers, as co-lead counsel, obtained class settlements totaling more than $40 million in this global price-fixing case on behalf of direct purchasers of PCP, a synthetic elastomer developed as a substitute for natural rubber.

*In re Lorazepam and Clorazepate Antitrust Litigation*, MDL No.1290 (D.D.C.). Generic drug maker Mylan Pharmaceuticals, Inc. entered exclusive deals to lock up supply of the raw ingredients for two popular anti-anxiety medications. Mylan then raised the prices of the drugs several times over. Hausfeld LLP lawyers served as co-lead counsel and obtained a $35 million settlement for direct purchasers of the affected medications.

*In re NBR Antitrust Litigation*, No. 2:03-cv-01898-DSC-ARH (W.D. Pa.). Hausfeld LLP lawyers, as co-lead counsel, obtained class settlements totaling $34.5 million in this price-fixing case on behalf of direct purchasers of nitrile rubber, a form of synthetic rubber.

*Molecular Diagnostics Laboratories v. Hoffmann-La Roche, Inc., et al.*, Civil Action No. 1:04CV01649 (D.D.C.). Hausfeld LLP lawyers obtained a settlement of $33 million on behalf of a class of purchasers of an enzyme ("Taq") used in DNA amplification, human genome research, and medical diagnostics who allege unlawful monopolization.

*IVAX Corp. v. Atofina Chemicals, Inc., et al.*, Civ. No. 02-00593 (D.D.C.). Hausfeld LLP lawyers served as lead counsel and obtained class settlements totaling $21 million on behalf of direct purchasers of certain chemicals known as organic peroxides.

**HAUSFELD**LLP

*Diamond Chemical Co., Inc. v. Atofina Chemicals, Inc., et al.*, Case No. 02CV1018 (D.D.C.).  Plaintiffs alleged that the major global producers of certain chemicals known as Monochloroacetic Acid ("MCAA") have conspired to fix prices on their products.  Hausfeld LLP lawyers served as lead counsel and obtained settlements of more than $14 million against the defendants.  The settlements led to a distribution to approved claimants of a remarkable 45% of approved MCAA purchases.  (See above regarding recent cy pres distribution in this matter.)

Human Rights/Civil Rights

*Balintulo v. DaimlerAG – In re South Africa Apartheid Litigation,* MDL No. 1499 (S.D.N.Y.). Hausfeld LLP represents the plaintiffs, direct victims and an Apartheid support group, who are suing major corporations, both U.S. and foreign, alleging liability for aiding and abetting human rights abuses by the apartheid regime.  The district court dismissed the plaintiffs' claims under the Alien Tort Statute (absence of subject matter jurisdiction) and the Torture Victim Protection Act (failure to state a claim).  On appeal, the Second Circuit Court of Appeals affirmed dismissal of the TVPA claims, but vacated the district court's dismissal of the ATS claims.  Upon reconsideration by the district court, claims against five corporate defendants are proceeding.

*September 11th Victim Compensation Fund*. Hausfeld LLP lawyers helped a number of survivors as well as the families of those who perished in the September 11th terrorist attack on the Pentagon obtain compensation from the September 11th Compensation Fund. We achieved significant awards - including one of the highest awards granted by the fund to a catastrophically injured survivor.

*Hwang v. Japan (Japanese Comfort Women),* 00-cv-02233 (D.D.C.).  Hausfeld LLP lawyers represented survivors of the system of sexual slavery instituted by the Government of Japan in the territories it conquered in World War II.  The women, euphemistically known as "comfort women," were recruited by force, coercion, or deception into sexual slavery for the Japanese Military – victims of what is now known and condemned as trafficking in persons.  Of the estimated 200,000 women enslaved by the Japanese military, only a few thousand survived the harsh treatment.

*Alexander v. Governor of Oklahoma* (Tulsa Race Riots), No. 02-cv-133 (Ok.).  Hausfeld LLP lawyers, as part of team of lawyers organized by Professor Charles Ogletree of Harvard Law School, represented the survivors of the nation's worst race riot.  On the night of May 31, 1921 through the morning of June 1, 1921, the African-American district of Tulsa, Oklahoma, then known as the "Black Wall Street," was invaded and burned to the ground by a white mob, with the participation of City and State authorities.  As many as 300 African Americans were killed, African-American homes and businesses burned to the ground, and the residents who were not killed or did not escape were rounded up and confined in detention centers.  The survivors brought suit and asked the State and City to include information about the Riot in history classes, for educational scholarships for children of survivors, and a memorial. Michael Hausfeld's efforts were recently highlighted in the documentary film, Before They Die.

HAUSFELD LLP

Mass Torts / Environmental / Consumer

*Pelletz v. Advanced Environmental Recycling Technologies, Inc.*, No. C08-0334 JCC (W.D. Wa.). Hausfeld LLP serves as co-lead counsel in a preliminarily approved nationwide settlement on behalf of owners of Choicedek decking materials which exhibited mold/mildew spots. The settlement, which involves free cleanings and full refunds if the spots return, is remarkable given that the product warranty specifically excludes mold/mildew from its coverage.

*In re Louisiana-Pacific Co. Inner-Seal Siding Litigation*, No. CV-95-879 JO-LEAD (U.S.D.C. Oregon). Hausfeld LLP lawyers served as co-lead counsel in a nationwide settlement class involving defective siding installed on 800,000 homes that soaked up moisture, resulting in swelling and cracking. The settlement provided up to $325 million to homeowners as replacement costs.

*Cox v. Shell*, Civil No. 18,844 (Obion County, Tennessee). This litigation charged Shell Oil Company, E.I. du Pont de Nemours, and Hoescht Celanese with manufacturing and marketing defective polybutylene pipes and plumbing systems. Hausfeld lawyers served as co-lead counsel for the class and secured a settlement providing a minimum of $950 million in relief, which was the largest class action settlement of its kind in U.S. history.

*In re Phenylpropanolamine (PPA) Products Liability Litigation*, MDL No. 1407 (W.D. Wa.). Hausfeld LLP lawyers served as co-lead counsel in this mass tort litigation involving OTC medication that led to strokes and numerous product recalls, which resulted in the nationwide settlement in 2004 of all PPA-related injury claims resulting from the ingestion of Dexatrim.

*West Virginia v. Purdue Pharma Co.*, (Cir. Ct. WV). Hausfeld LLP lawyers represented West Virginia Attorney General Darrell V. McGraw, Jr. in a suit against Purdue Pharma and Abbott Laboratories, the manufacturers and promoters of the painkiller OxyContin. The complaint alleged that Pharma and Abbott engaged in negligent aggressive marketing practices which encouraged over-prescription of this powerful narcotic, resulting in addiction and overdoses. The lawsuit sought to stop the aggressive and deceptive marketing techniques used in West Virginia, as well as monies to help record, prevent, and halt OxyContin abuse. After two years of litigation, and just before a jury was selected to try the case, Purdue Pharma settled the case with the State of West Virginia for $10 million.

*In re iPod Cases*, JCCP No. 4355 (San Mateo Cty. Ct., Cal.). Hausfeld LLP lawyers were involved with the nationwide settlement in this case on behalf of purchasers of early generation iPods which contained defective batteries and would no longer retain a charge. The settlement, approved in 2005, provided cash, discounts, and extended warranties for affected consumers.

*Harman v. Rohm & Haas Co., Inc.*, (Gloucester County, New Jersey). The Lipari Landfill in Pitman, NJ, was number one on the EPA's Superfund list of toxic waste sites in the 1970s. Hausfeld LLP lawyers obtained a multi-million dollar medical monitoring fund on behalf of hundreds of residents who lived near the landfill site in New Jersey.

HAUSFELD LLP

*City of Milwaukee v. NL Industries, Inc.* (Mil. Cir. Ct.).  Hausfeld LLP lawyers teamed with the City of Milwaukee to sue the manufacturers of lead pigment used in lead paint due to the lead poisoning hazards these products present to children.  The City is seeking abatement damages to fund the City's lead paint removal efforts.  The Wisconsin Court of Appeals became the first court in the country to recognize a municipality's right to bring these public nuisance claims.  In 2007, a jury found that the lead paint on homes in Milwaukee was a public nuisance, but found that the manufacturers were not responsible.  The case is currently on appeal.

*Stockbridge Community Ass'n v. Star Enterprise*, Case No. (Law) 108514, (Cir. Ct. Fairfax County, Va).  Michael Hausfeld secured a real estate protection program from oil companies for damages caused by leaking storage tanks in the Mantua section of Fairfax, Virginia.  Star Enterprise, a Texaco affiliate paid $50 million to settle medical and other damage claims made by about 180 families who alleged that their neighborhood was made almost uninhabitable by an underground oil leak from a Fairfax County tank farm.  The company also agreed to compensate as many as 450 families in the Mantua and Stockbridge neighborhoods for the dramatic dip in the value of their homes since the leak was discovered up to $150 million.

*Hunter v. Abex Corp.* (Norfolk Lead Smelter Litigation), (Cir. Ct., Norfolk, Va).  Hausfeld LLP attorneys recovered monetary damages for 82 children, teenagers and young adults who suffered lead poisoning caused by exposure to lead wastes from a lead smelter in their low-income neighborhood in Portsmouth, VA.

*South Africa Silicosis*. Hausfeld LLP has been invited to participate in precedent-setting litigation on behalf of South African gold miners who have suffered a disabling lung disease called silicosis.  The cases will be filed in the South African courts and allege that the workers suffered uncontrolled exposures to silica dust  in mining operations  managed by Anglo American Corp.  The litigation is designed to establish the workers' rights to compensation under the South African Constitution and various statutory compensation schemes, as well as to establish a medical monitoring program to benefit the workers.  It has been estimated that one in four South African gold miners suffer from this disabling disease.  The first "test case" was dismissed in 2008 and is presently on appeal.

*Sahu, et. al v. Union Carbide Corporation, et al.* (Bhopal Litigation), Index No.04 CV. 08825 (S.D.N.Y.).  Hausfeld LLP lawyers represent residents of Bhopal, India, who were exposed to toxic wastes which have contaminated the soil and drinking water surrounding the infamous Union Carbide Plant, which was the site of the 1984 gas leak which killed and injured thousands of nearby residents.  Since the gas leak disaster in 1984, Union Carbide has abandoned the plant, causing the remaining chemicals to enter the surrounding groundwater and resulting in high rates of cancer and neurological disorders in neighborhoods surrounding the plant.  In 1999, an initial lawsuit was filed in the Southern District of New York, seeking to compel Union Carbide to clean up the plant site and to provide medical monitoring to the surrounding communities and pay damages to those who have been injured by the extensive pollution.  Although this lawsuit was ultimately dismissed because the Court found that the named plaintiffs lacked standing (due to a lack of beneficial interest in the surrounding land), another case - filed in 2004 - is now pending.  In the 2004 action, the District Court granted summary judgment in favor of Union Carbide in 2006, but in 2008, the Second Circuit Court of Appeals reversed.  The case has now returned to the

HAUSFELD LLP

District Court for further proceedings and the plaintiffs will be seeking discovery in accordance with the Second Circuit's opinion.

Members of the Firm have played a prominent role in most of the major antitrust class actions since the Fed. R. Civ. R. 23 was amended in 1966.  These additional antitrust cases, organized by type of claims advanced, include:

Price-Fixing Cases

*In re Commercial Explosives Antitrust Litigation*, Consolidated Case No. 2:96md 1093S (D. Utah). Hausfeld LLP lawyers, as co-lead counsel, obtained a settlement of $77 million;

*Ocean Shipping Antitrust Litigation*, M.DL No. 395 (S.D.N.Y).  Hausfeld LLP lawyers, as co-lead counsel, obtained a class settlement of approximately $50 million;

*In re North Atlantic Air Travel Antitrust Litigation*, Civ. Action No. 84-ll03 (D.D.C.).  Hausfeld LLP lawyers, as co-lead counsel, obtained a class settlement of $30 million in coupons for air travelers between the United States and England;

*In re Screws Antitrust Litigation*, MDL No. 443 (D. Mass.).  Hausfeld LLP lawyers, as co-lead counsel, obtained a class settlement of approximately $20 million;

*In re Methyl Methacrylate (MMA) Antitrust Litigation*, Direct Purchaser Action File; 2:06-md-01768-TJS (E.D. Pa.). Hausfeld LLP is serving as co-lead counsel in this global cartel case;

*In re Hydrogen Peroxide Antitrust Litigation*, No. 2:05-cv-00666-SD (E.D. Pa.). Hausfeld LLP serves as co-lead counsel in this global cartel case;

*In re Ampicillin Antitrust Litigation*, MDL No. 50 (D.D.C.).  Hausfeld LLP lawyers represented the State of Michigan in a multidistrict litigation alleging a price-fixing conspiracy by manufacturers of ampicillin;

*In re Sugar Antitrust Litigation*, MDL No. 210 (N.D. Cal.).  Hausfeld LLP lawyers represented small businesses/consumers alleging a price-fixing conspiracy among sugar refiners and obtained a multi-million dollar settlement;

*In re Travel Agent Commission Antitrust Litigation*, MDL No. 1058 (D. Minn.).  Hausfeld LLP lawyers represented a class of travel agents claiming a horizontal price-fixing agreement by major airlines and obtained a multi-million dollar settlement;

*Nasdaq Market Makers Antitrust Litigation*, MDL No. 1023 (S.D.N.Y.).  Hausfeld LLP lawyers focused on discovery and expert work in this case where a billion dollar settlement was obtained for the class of purchasers of certain stock on NASDAQ;

18

HAUSFELD LLP

*In re Compact Disc Antitrust Litigation*, MDL No. 1216 (C.D. Cal.).  Represented direct purchasers of compact discs on price-fixing allegations;

*In re Infant Formula Antitrust Litigation*, MDL No. 878 (N.D. Fla.);

*Carbon Dioxide Antitrust Litigation*, MDL No. 940 (M.D. Fla.);

*Catfish Antitrust Litigation*, MDL No. 928 (N.D. Miss.);

*Chain Link Fence Antitrust Case*, Master File No. CLF-1 (D. Md.);

*Ocean Shipping Antitrust Litigation*, M.DL No. 395 (S.D.N.Y.);

*High Fructose Corn Syrup Antitrust Litigation*, MDL No. 1087 (C.D. Ill.);

*Commercial Tissue Products Antitrust Litigation*, MDL No. 1189 (N.D. Fla.);

*In re Bulk Popcorn Antitrust Litigation*, No. 3-89-710 (D. Minn.);

*In re Polypropylene Carpet Antitrust Litigation*, MDL No. 1075 (N.D. Ga.);

*Drill Bits Antitrust Litigation*, No. H-91-627 (S.D. Tex.);

*Paper Systems Inc., et al. v. Mitsubishi Corp., et al.* (E.D. Wisc.);

*In re Flat Glass Antitrust Litigation*, MDL No. 1200 (W.D. Pa.);

*In re Lease Oil Antitrust Litigation*, MDL No. 1206 (S.D. Tex.);

*In re Cigarette Antitrust Litigation*, MDL No. 1342 (N.D. Ga.) (Hausfeld LLP lawyers served as co-lead counsel representing class of cigarette purchasers in price-fixing case against tobacco industry.);

*In re Mercedes -Benz Antitrust Litigation*, Master File No. 99-4311 (AMW);

*In re Linerboard Antitrust Litigation*, MDL. No. 1261 (E.D. Pa.);

*In re Optical Disk Drive Antitrust Litigation*, No. 3:10-md-02143-VRW (N.D. Cal.);

*Kohlder Manufacturing Co., Inc. v. Kason Industries, Inc. et al*, No. 1:10-cv-01875-WSD (N.D. Ga.).

HAUSFELD LLP

## Monopolization

*Cothran v. Brunswick Corp.* (S.D. Ill.).  Hausfeld LLP lawyers took a lead role in representing a nationwide class of boat dealers on claims of monopolization of the inboard and stern drive marine engine market.  The case resulted in a settlement of over $20 million;

*In re Smokeless Tobacco Antitrust Litigation*, Civ. A. Nos. 00-1415 and 00-1454 (D.D.C.).  Hausfeld LLP lawyers represented direct purchasers of smokeless tobacco against United States Tobacco Co.;

*In re Microsoft Corp. Antitrust Litigation*, MDL No. 1332 (D. Md.).  Hausfeld LLP lawyers represented putative classes of direct purchasers of Microsoft operating system software and applications software;

*Amo Marine Products, Inc., et al. v. Brunswick Corp.*, No. 99-243 (D. Minn.).  Represented nationwide class of boat dealers on claims of monopolization of the inboard and stern drive marine engine market;

*Chastain v. AT&T,* Civ. Action No. 2088-70 (D.D.C.).  As a prelude to AT&T's breakup, Hausfeld LLP lawyers achieved large judgments on behalf of small independent interconnect telephone companies in two matters challenging various aspects of AT&T's abuse of monopoly power when AT&T was represented by Covington & Burling and Dickstein Shapiro Morin & Oshinsky;

*Societe Liz v. Charles of the Ritz, Civ.* Action No. 85-1129 (D.D.C.).  Represented a small retailer against one of the world's largest perfume manufacturers alleging monopolization of the perfume market;

*Cox v. Champion*.  Represented a small lumber company against an international pulp manufacturer alleging a price-fixing scheme and monopolization of the lumber market.

## Tying

*McGeorge v. British Leyland* (E.D. Va.).  Represented an automobile dealership charging a British automobile manufacturer with an illegal tie-in;

*In re Clozapine Antitrust Litigation* (N.D. Ill.).  Represented class of purchasers of psychotropic drug in tying case that resulted in settlement representing nearly 100 percent of damages.

## Group Boycott

*In re Lower Lake Erie Iron Ore Antitrust Litigation*, MDL No. 587 (E.D. Pa.).  Represented a small trucking company in a group boycott case which after trial resulted in a $12 million award to the client.

## Territorial Allocation

*In re Cardizem CD Antitrust Litigation*, MDL No. 1278 (E.D. Mich.).  Represented a putative class of indirect purchasers alleging unlawful efforts to delay entry of generic prescription drug competition;

**HAUSFELD**LLP

*In re Terazosin Hydrochloride Antitrust Litigation*, MDL No. 1317 (S.D. Fla.).  Represented a putative class of indirect purchasers against brand name drug manufacturer for delaying entry of generic substitutes.

Supply Restrictions

*Erie Forge and Steel, Inc. v. Cyprus Minerals Co., et al.*, No. 94-404 (W.D. Pa.).  (Nationwide class action on behalf of direct purchasers alleging conspiracy to restrict production of molybdenum.);

*California Sales and Marketing v. Satoshi Iue*, No. C738971 (Cal. Sup. Ct.).  Retained by 33 sales representatives of the Sanyo Fisher (USA) Corporation alleging, inter alia, conspiracy among Japanese VCR manufacturers to under-supply the United States market with low-end VCRs.

Exclusive Dealing

*In re Lorazepam and Clorazepate Antitrust Litigation*, MDL No. 1290 (D.D.C.).  Represented a putative class of direct purchasers alleging conspiracy to tie up supply of prescription drug active ingredient.

Franchise

*Call Carl, Inc. v. British Petroleum*, Civ. No. 73-1059-4 (D. Md.).  Retained by independent gasoline dealer franchisees of British Petroleum alleging unlawful termination;

*Vaughn v. General Foods* (N.D. Ind.).  Retained by Burger Chef franchisees who claimed a fraud/deception scheme in their franchise relationship;

*Entre Computers* (E.D. Va.).  Retained by franchisees alleging grey market sales/resale price maintenance by their franchiser.

**HAUSFELD**LLP

<u>Annex 3</u> – **Members of the Firm**

**Michael D. Hausfeld**

Mr. Hausfeld's career has included some of the largest and most successful class actions in the fields of human rights, discrimination and antitrust law. He has long had an abiding interest in social reform cases and was among the first lawyers in the U.S. to assert that sexual harassment was a form of discrimination prohibited by Title VII; he successfully tried the first case establishing that principle.

Among a long list of groundbreaking cases, in *Friedman v. Union Bank of Switzerland*, Mr. Hausfeld represented a class of victims of the Holocaust whose assets were wrongfully retained by private Swiss banks during and after World War II. The case raised novel issues of international banking law and international human rights law. He successfully represented the Republic of Poland, the Czech Republic, the Republic of Belarus, the Republic of Ukraine and the Russian Federation on issues of slave and forced labor for both Jewish and non-Jewish victims of Nazi persecution during World War II. He currently represents Khulumani and individuals in litigation involving abuses under apartheid law in South Africa.

Mr. Hausfeld also has a long record of successful litigation in the antitrust field, on behalf of both individuals and classes, in cases involving monopolization, tie-ins, exclusive dealings and price fixing. He is or has been co-lead counsel in antitrust cases against manufacturers of genetically engineered foods, managed healthcare companies, bulk vitamin manufacturers, technology companies and international industrial cartels. Mr. Hausfeld was the only private lawyer permitted to attend and represent the interests of consumers worldwide in the 2003 closed hearings by the EU Commission in the Microsoft case.

*The New York Times* referred to Mr. Hausfeld as one of the nation's "most prominent antitrust lawyers," and *Washingtonian Magazine* listed Mr. Hausfeld in several surveys of Washington's 75 best lawyers, saying he "consistently brings in the biggest judgments in the history of law" and that he is "a Washington lawyer determined to change the world – and succeeding."

Education
- Brooklyn College, B.A., *cum laude*, 1966
- National Law Center, The George Washington University, J.D., with honors, 1969

Bar Admissions
- District of Columbia
- New York

Affiliations & Honors
- Named by *Legal Times* among 30 "Visionaries" in the Washington legal community, 2008
- Named by The Ethisphere Institute in a short list of "attorneys who matter" in the field of corporate compliance, 2009
- Cited in the 2009 edition of *Chambers USA* in the Products Liability category
- Named to *SmartCEO Magazine* Legal Elite List, 2009
- Legal Times Fierce Sister Award, for work on the Japanese Comfort Women case, 2007
- Cited by *GQ* as one of "the 50 Most Powerful People in DC," 2007
- Named in *The Lawyer*'s 2007 "International World-shakers" list of 40 international lawyers "making waves" in the UK
- 100 Most Influential Lawyers, *The National Law Journal*, 2006
- Named repeatedly by *LawDragon* magazine as one of the 500 leading lawyers in the United States

22

**HAUSFELD**LLP

- U.S. Department of Energy Human Spirit Award, presented "in tribute to a person who understands the obligation to seek truth and act on it is not the burden of some, but of all; it is universal."
- Plaintiffs Fellow, Litigation Counsel of America
- B'Nai Brith Humanitarian of the Year Award, 2002
- Simon Wiesenthal Center Award for Distinguished Service
- Adjunct Professor, George Washington University Law School, 1996-1998
- Taught in Georgetown University Law Center, 1980-1987
- Member, Board of Directors, The George Washington University Law School

Selected Publications
- "Competition Law Claims – A Developing Story." *The European Antitrust Review 2010*
- "The United States Heightens Plaintiff's Burden of Proof on Class Certification: A Response." *Global Competition Litigation Review*, Volume 2 Issue 4/2009
- "Global Enforcement of Anticompetitive Conduct." *The Sedona Conference Journal*, Fall 2009
- "Observations from the Field: ACPERA's First Five Years." *The Sedona Conference Journal*, Fall 2009
- "Twombly, Iqbal and the Prisoner's Pleading Dilemma." Law360, October 22, 2009
- "The Value of ACPERA." Law360, June 2, 2009
- "Collective Redress for Competition Law Claimants." *The European Antitrust Review 2008*
- "Managing Multi-district Litigation." *The Antitrust Review of the Americas 2008*
- "A Victim's Culture." *European Business Law Review*, 2007


**Michael P. Lehmann**

Mr. Lehmann brings to the firm 29 years of experience as a business litigator, with a practice that ranged from class action litigation to business litigation on behalf of individual clients, and from extensive regulatory work before federal, state and international bodies to domestic and international arbitration.

Prior to joining Hausfeld LLP, Mr. Lehmann had worked since graduating from law school at what became Furth Lehmann LLP, where he eventually served as Managing Partner and in recent years has served as lead counsel for direct or indirect purchaser classes in numerous antitrust cases.

Education
- A.B. 1974, University of California at Berkeley
- J.D. 1977, Hastings College of the Law

Bar Admissions
- California

Affiliations
- American Bar Association


**Richard S. Lewis**

Mr. Lewis has been appointed to serve as co-lead counsel in mass tort and product liability class action cases including *In re StarLink Corn Products* (N.D. Ill) (asserting claims by farmers for genetic

modification contamination of the U.S. corn supply) and *In re PPA* (asserting claims by users of unsafe over-the-counter medicines). He has also been appointed to the MDL Steering Committee in *In re Prempro Products Liability Litigation*.

In addition, Mr. Lewis served as lead counsel in numerous actions to obtain medical monitoring relief for communities exposed to toxic chemicals from hazardous waste disposal practices or unsafe drugs. These include *In re Diet Drug Litigation* (Fen-Phen), which resulted in a $4 billion settlement providing medical monitoring in addition to individual personal injury awards, and *Harman v. Lipari*, a Superfund case that resulted in a settlement providing medical monitoring for thousands of residents who lived on or played near a landfill. He has litigated both individual and class childhood lead poisoning cases and he is presently lead counsel in a case against the lead pigment industry, *City of Milwaukee v. NL Industries Inc.* Mr. Lewis is also handling mass tort cases involving Vioxx, and environmental cases in India, South Africa, and Barbados.

Education
- Tufts University, B.A., *cum laude*, 1976
- University of Michigan, M.P.H., 1981
- University of Pennsylvania, J.D., *cum laude*, 1986; *Law Review* comments editor

Bar Admissions
- District of Columbia

Affiliations & Honors
- Law clerk, after law school, for the Honorable Stanley S. Brotman, U.S. District Court for the District of New Jersey
- National Finalist for the 2010 Lawdragon 500, an annual guide to the "500 Leading Lawyers in America"

## William P. Butterfield

A partner at Hausfeld LLP, Mr. Butterfield concentrates on antitrust litigation and is an internationally recognized authority on electronic discovery. Mr. Butterfield's recent achievements include settlements of over $120 million in a lawsuit alleging output restrictions in the wood products industry (*In Re OSB Antitrust Litigation*, (E.D. Pa.)), and almost $100 million in an antitrust case involving the chemical industry (*In Re Hydrogen Peroxide Antitrust Litigation*, (E.D. Pa.)).

Previously, Mr. Butterfield was one of the principal attorneys involved in nationwide litigation challenging lending practices conducted by one of the nation's largest sub-prime lenders. In that case, Mr. Butterfield worked extensively with the FTC and was responsible for bringing nationwide media and Congressional attention to lending practices conducted by Associates Finance. The plaintiffs and FTC eventually settled with Citigroup (which had acquired Associates Finance) for $240 million (*In Re Citigroup Loan Cases*, J.C.C.P. 4197).

HAUSFELD LLP

Mr. Butterfield was also a principal attorney for the plaintiff classes in *In re Prudential Securities Limited Partnerships Litigation*, which settled for $137 million, and *In re PaineWebber Securities Litigation*, which settled for $200 million.

Mr. Butterfield has been a leader in the field of e-discovery since the early 1990s, when he helped design and implement an electronic document repository to manage more than 15 million pages of documents produced in a complex securities case.  In 2005, Mr. Butterfield testified before the U.S. Judicial Conference Rules Committee regarding proposed electronic discovery amendments to the Federal Rules of Civil Procedure.  Mr. Butterfield is on the Steering Committee of The Sedona Conference® Working Group on Electronic Document Retention and Production.  He is also a member of the Sedona Conference® Working Group on International Electronic Information Management, Discovery and Disclosure.  Mr. Butterfield serves on the faculty of Georgetown University Law Center's Advanced E-Discovery Institute and the Masters Conference Advisory Board.  Mr. Butterfield has testified as an expert witness on e-discovery issues, and speaks frequently on that topic domestically and abroad.  Recently, he served as co-chair for the 12th Annual Sedona Conference® on Complex Litigation, and as a participant at the Duke University School of Law: 2010 Advisory Committee Conference on Civil Rules.

Mr. Butterfield began his legal career as an assistant prosecuting attorney for Montgomery County, Ohio.  In private practice, he has served as outside counsel for federal banking agencies, where he investigated and litigated claims in connection with failed financial institutions. He has also defended individuals and companies in federal courts and administrative tribunals in matters involving securities and commodities fraud, insider trading, takeover litigation, broker-dealer violations and registration issues.

Education
- University of Toledo, College of Law, J.D., 1978
- Bowling Green State University, B.A., 1975

Bar Admissions
- District of Columbia
- Ohio (inactive)
- United States Court of Appeals for the Third Circuit
- United States District Court of Maryland
- United States District Court for the District of Columbia
- United States District Court, Eastern District of Michigan

Affiliations & Honors
- Member, Sedona Conference® Steering Committee on E-Discovery
- Former adjunct professor, American University, Washington College of Law
- Georgetown University Law Center's Advanced E-Discovery Institute, Faculty Member
- Masters Conference Advisory Board, Member

Publications
- William P. Butterfield, Conor R. Crowley, Melinda R. Coolidge, "Diving Deeper to Catch Bigger Fish," DESI III Conference, June 8, 2009,
- William P. Butterfield, Editor-in-Chief, *The Case for Cooperation*, 10 Sedona Conf. Journal, 339-362 (2009 Supp.)
- Thomas Y. Allman, William P. Butterfield, et al., *Preservation, Management and Identification of Sources of Information that are Not Reasonably Accessible*, 10 Sedona Conf. Journal at 281-298 (2009)



## Christopher L. Lebsock

A partner, Christopher L. Lebsock specializes in civil litigation and trial practice.  He has recently worked on a number of technology related antitrust cases including *In re Flash Memory Antitrust Litigation* (N.D. Cal.), *In re TFT-LCD (Flat Panel) Antitrust Litigation* (N.D. Cal.), *In re Graphics Processing Units (GPUs) Antitrust Litigation* (N.D. Cal.), *In re Cathode Ray Tubes (CRTs) Antitrust Litigation* (N.D. Cal.), *In re Static Random Access Memory (SRAM) Antitrust Litigation*  (N.D. Cal.), *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation* (N.D. Cal.), and *In re Intel Corp. Microprocessor Antitrust Litigation* (D. Del.).

Mr. Lebsock is also actively representing a class of international air passengers in *In re Transpacific Passenger Air Transportation Antitrust Litigation* (N.D. Cal.) and purchasers of tomato products and paste in *Four In One Company et al. v. SK Foods et al.*, a class action pending in the Eastern District of California.  Mr. Lebsock is currently representing a public company in an effort to recover damages from its investment advisor as a result of the latter's breach of securities law, and he is assisting several individuals in personal injury matters.

Mr. Lebsock works with a number of law firms and trade associations in Asia to ensure that Asian companies victimized by international cartels obtain appropriate compensation for their injuries.

Prior to joining the firm, Mr. Lebsock was a principal attorney with The Furth Firm, LLP, where he concentrated in complex business litigation, particularly antitrust and labor and employment class actions. Mr. Lebsock was a principal member of the plaintiffs' trial team in *Savaglio v. Wal-Mart*, a class action of nearly 119,000 Wal-Mart hourly employees who sued their employer for wrongfully denying them meal periods and rest breaks. After more than three months of trial, the jury returned a verdict for the plaintiff class of more than $172 million, including $115 million in punitive damages. Mr. Lebsock was also the primary attorney at the firm responsible for litigating *In Re Automobile Antitrust Cases I & II* (S.F. Superior Court), a California class action in which the plaintiffs alleged that major automobile manufacturers illegally conspired to prevent the export of Canadian vehicles to the United States. Mr. Lebsock authored and argued an appeal in that case before California's First District Court of Appeals. The decision is published at 135 Cal.App.4th 100 (2005).

He has published several articles concerning the class action device and other procedural obstacles to bringing cases to trial.

Education
- University of Colorado, Boulder, B.A., 1993; Phi Beta Kappa
- University of California, Hastings College of the Law, J.D., 1996

Bar Admissions
- California Supreme Court
- Northern District of California
- Eastern District of California
- Central District of California

**HAUSFELD**LLP

- Ninth Circuit Court of Appeals

Affiliations & Honors
- State Bar of California, Member
- American Bar Association, Member
- *Hastings Constitutional Law Quarterly,* former Senior Managing Editor


## Andrew B. Bullion

Andrew Bullion has extensive complex litigation experience on both the plaintiff and defense sides. Prior to joining the firm, Mr. Bullion spent several years as a litigator in private practice in Philadelphia, handling complex commercial matters, including class actions, as well as tort law and intellectual property matters.

He is currently working on several national and international antitrust actions, including: *In re Air Cargo Shipping Services Antitrust Litigation* (E.D.N.Y.), alleging price-fixing of rates for airfreight shipping services by dozens of major international flagship airlines; and the *In re Air Passenger Antitrust Litigation* (N.D.Ca.), alleging price-fixing by British Airways and Virgin Atlantic airlines of surcharges added to the price of passenger tickets for long-haul flights.

Education
- Villanova University, B.A., 1989
- Villanova University School of Law, J.D., 1996

Bar Admissions
- District of Columbia
- New Jersey
- Pennsylvania


## Jon T. King

Mr. King is a partner at Hausfeld LLP's San Francisco office, and represents plaintiffs in competition matters, including antitrust cases, and in other complex litigation including investor arbitrations and securities class actions.  Mr. King also has counseled numerous individual, corporate and governmental entities regarding proposed mergers in several industries, has counseled a leading winery with respect to a distributor dispute before a state alcoholic beverage commission, and has served as co-lead arbitration counsel in a two week arbitration regarding the distribution of financial products.

Mr. King currently represents the Golden Gate Bridge, Highway & Transportation District, the governmental entity that operates the world famous Golden Gate Bridge and various transit systems, as one of the plaintiffs in *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1663 (D.N.J.), a case that has resulted in approximately $220 million in settlements to date.  Mr. King also counseled a federal governmental entity, a leading California utility company, and various large corporations with respect to

27

**HAUSFELD** LLP

settlement rights in that matter.  Other active matters of Mr. King's include antitrust litigation regarding the LCD, auto lighting, tomato, Alaska shipping, auction rate securities, and industrial door industries.

With respect to international disputes, Mr. King represented the leading French consumer association UFC-Que Choisir in connection with its efforts to gather evidence to prepare European antitrust litigation against Intel Corporation related to the litigation in the United States captioned *In re Intel Corporation Microprocessor Antitrust Litigation*, MDL No. 1717 (D. Del.), in which plaintiffs allege monopolization of the market for x86 microprocessors.  Mr. King also worked on an international arbitration matter for ARCO oil company relating to a contractual dispute.

Prior to joining the firm, Mr. King practiced antitrust law for eight years at The Furth Firm LLP, a San Francisco plaintiffs' firm, and for one year at Cohen Milstein Hausfeld & Toll, P.L.L.C., out of which the Hausfeld firm was born.  At those firms, Mr. King has worked on dozens of direct and indirect purchaser actions that resulted in hundreds of millions of dollars in settlements.  He began his legal career in Los Angeles at Skadden, Arps, Slate, Meagher & Flom LLP, one of the largest law firms in the world, where he worked on matters for the National Football League and various entertainment industry companies.

At The Furth Firm, Mr. King was appointed as plaintiffs' interim liaison counsel in the complex antitrust case captioned Hydrogen Peroxide Cases (San Francisco Superior Court, JCCP No. 4416), and he has been quoted on antitrust class action topics in Rubber & Plastics News and Competition Law 360.  Mr. King also is serving on the 2009 Editorial Advisory Board for Competition Law360 as the only representative from a plaintiffs' firm.

With respect to merger issues, Mr. King advised the City and County of San Francisco regarding the proposed merger of two hospital groups, advised numerous individuals, a hospital association, a medical center, a doctors' association and an insurance company trade association with respect to challenges to a proposed insurance company merger, and has consulted on issues regarding the merger of media entities.

Education
- Santa Clara University, B.A.
- University of California, Hastings College of Law, San Francisco, *cum laude*, J.D.; editor-in-chief, *Hastings Law Journal*; member, Order of the Coif

Bar Admissions
- All California state courts
- The U.S. District Courts for the Northern, Central and Eastern Districts of California
- The U.S. Court of Appeals for the Ninth Circuit
- *Pro hac vice* admission to Alaska, Arizona, Delaware, Connecticut, New Jersey, New York, Oklahoma, Texas, and Washington

Affiliations & Honors
- Member, 2009 Editorial Advisory Board, *Competition Law360*
- Clerked for the Honorable John M. Munter in San Francisco Superior Court



**Brian A. Ratner**

Mr. Ratner, a partner at the firm, has extensive experience representing domestic and foreign businesses and individuals in complex litigation at the trial and appellate levels. He is particularly experienced in the prosecution of antitrust litigation in federal and state courts throughout the United States, on behalf of direct and indirect purchasers alleging price-fixing and monopolization.

Mr. Ratner was named to the Legal Times 2009 "40 under 40" list, which recognized rising legal stars expected to play a key role in the Greater Washington legal community for years to come.  He was also recently featured in The Legal 500 where Hausfeld LLP was named as a Tier 1 firm nationwide in plaintiff antitrust litigation.

Mr. Ratner has litigated the matter of *In Re Vitamins Antitrust Litigation* (D.D.C.) on behalf of two certified classes of vitamin direct purchasers who were overcharged as a result of a ten-year global price-fixing and market allocation conspiracy. The case settled for over $1 billion. Mr. Ratner was a key member of a 2003 trial team in the case, in which a jury awarded a class of choline chloride purchasers more than $148 million in trebled damages - the twelfth largest U.S. jury verdict in 2003.  Mr. Ratner has also litigated, among other matters: *Empagran, S.A. et al. v. F. Hoffmann-LaRoche, Ltd., et al.* (D.D.C.), a case alleging a global vitamins price-fixing and market allocation conspiracy on behalf of foreign purchasers (remanded by U.S. Supreme Court); *Oncology & Radiation Associates v. Bristol-Myers Squibb Co.* (D.D.C.), alleging monopolization against a drug manufacturer, which settled for $65 million; *Molecular Diagnostics Laboratories v. Hoffmann-La Roche, Inc., et al.* (D.D.C.), alleging unlawful monopolization on behalf of a class of purchasers of an enzyme used in DNA amplification, human-genome research, and medical diagnostics, which settled for $33 million; and *In Re Vitamin C Antitrust Litigation* (E.D.N.Y.), alleging a conspiracy by Chinese manufacturers to fix prices and control the supply of vitamin C for export.

Mr. Ratner's substantial international work has included representing cartel victims in settlement negotiations and European courts. He currently represents purchasers of paraffin wax, air freight services, car glass, and marine hose who are seeking to recover losses in the UK as a result of price-fixing cartels. His work in the marine hose matter helped lead to a landmark private global settlement agreement with cartelist Parker ITR. Mr. Ratner has also lectured, organized conferences, and published articles on issues such as the private civil enforcement of competition laws and the mechanisms for collective redress around the world.

Prior to joining Hausfeld LLP, Mr. Ratner was a partner at Cohen, Milstein, Hausfeld & Toll, PLLC, in its antitrust and international practice groups.  He began his career at Jones, Day, Reavis & Pogue, where he focused on complex civil and commercial litigation, antitrust counseling, and merger clearance work related to the CBS/Viacom and AOL/Time Warner mergers.

Education
- University of Indiana, Bloomington, B.A., 1996
- University of Pittsburgh School of Law, J.D., 1999; managing editor, *Journal of Law and Commerce*

Bar Admissions
- Pennsylvania
- New Jersey
- District of Columbia

**HAUSFELD**LLP

- The United States Supreme Court
- Several federal courts

Honors and Publications

- Featured in *The Legal 500* where Hausfeld LLP was named as a Tier 1 firm in plaintiff antitrust litigation, June 15, 2010
- Named in the 2009 *Legal Times* "40 under 40" list recognizing rising legal stars in Washington, July 14, 2009
- Co-Author, "Principles and Objectives of Formal and Informal Settlements in EU Competition Cases:  The Claimant's Perspective," paper submitted for the European University Institute's 13th Annual Competition Law & Policy Workshop, publication forthcoming
- Co-Author, "A Proposal for a Transitional Forum," submitted for Antitrust Claims Against Foreign Firms and Cartels conference (Law Seminars International), September 7-8, 2006

**Megan E. Jones**

Megan E. Jones has been involved in, among other class actions: *In re Polyester Staple Antitrust Litigation* (W.D.N.C), which recovered over $30 million on behalf of the class; *In re Compact Disc Antitrust Litigation* (C.D.Ca.); *In re Rubber Chemicals Antitrust Litigation* (N.D. Ca.); *In re MMA Antitrust Litigation* (E.D. Pa.); *In re EPDM Antitrust Litigation* (D. Conn.); *In re Processed Egg Products Antitrust Litigation* (E.D. Pa.) and *ERC v. Archstone* (D.Md.), which was recognized by the Washington Lawyers' Committee for Civil Rights.  Ms. Jones was also involved in the $300 million global settlement with Bayer (resolving EPDM, Rubber Chemicals and NBR liability).

In addition to her antitrust expertise, Ms. Jones has developed an expertise in electronic discovery.  She is the co-author of *The Sedona Conference  Glossary: E-Discovery and Digital Management* (2nd Ed). (Dec. 2007) and *Navigating the Vendor Proposal Process: Best Practices for the Selection of Electronic Discovery Vendors.*  She is often asked to speak on electronic discovery issues.

Ms. Jones chairs the New Case Committee at the firm, which is responsible for overseeing all new case investigations at the firm.  She is also the founder of the Women Antitrust Plaintiffs' Attorney networking group.

Prior to coming to the Firm, Ms. Jones litigated intellectual property matters and represented clients before Congress at a Washington, D.C. law firm.

Education
- North Carolina State University in Raleigh, NC, *magna cum laude*, B.A., 1995
- University of North Carolina at Chapel Hill School of Law, J.D., 1999

Bar Admissions
- District of Columbia
- Maryland
- North Carolina



Affiliations
- Founder of Women Antitrust Plaintiffs' Attorney network group, 2008

Publications
- "Giving Electronic Discovery a Chance to Grow Up," *The National Law Journal*, December 15, 2009
- "Observations from the Field: ACPERA's First Five Years," *The Sedona Conference Journal*, Fall 2009
- CLE Speaker, "E-Discovery in Antitrust Lawsuits and FTC/DOJ Investigations: Managing and Producing Electronic Information Under the Amended Federal Rules," March 2009
- *Antitrust Law Developments*, 7th Edition, co-author of chapter on Non-Price Vertical Restraint, published by the American Bar Association, 2008
- Co-author of *The Sedona Conference Glossary: E-Discovery and Digital Information Management* (2nd edition), December 2007
- Co-author of *Navigating the Vendor Proposal Process: Best Practices for the Selection of Electronic Discovery Vendors*, published by The Sedona Conference
- Author of "Litigator 101," an ABA series regarding best practices in drafting discovery


## Hilary K. Scherrer

Ms. Scherrer is a partner in Hausfeld LLP's Washington, DC office.  She has extensive experience representing businesses and individuals in antitrust, consumer fraud, and other complex litigation matters, at both the trial court and appellate court levels.  She also has experience working on international settlement matters.

Ms. Scherrer is one of the principal attorneys in several high-profile domestic and international antitrust cases.  She manages all day-to-day aspects of the litigation in *In re Chocolate Confectionary Antitrust Litigation* (M.D. Pa.), a case alleging that the major chocolate manufacturers, Nestle, Mars, Cadbury and Hershey conspired to fix the prices of chocolate candy and *Animalfeeds International Corp. et al. v. Stolt-Nielsen SA et al.*, an arbitration regarding alleged customer allocation and bid rigging in the parcel tankers shipping industry.  Additionally, she manages electronic discovery in *In re Air Cargo Shipping Services Antitrust Litigation* (E.D.N.Y.), in which a partial settlement of $85 million was reached with defendants Deutsche AG, Lufthansa Cargo AG, and Swiss International Air Lines Ltd.

Ms. Scherrer works on a number of other antitrust cases, including:  *Bruce Foods Corporation v. SK Foods, LP et al.* (E.D. Cal.); *In re Aftermarket Filters Antitrust Litigation* (N.D. Il.); *In re Municipal Derivatives Antitrust Litigation* (S.D.N.Y.); *In re Publication Paper Antitrust Litigation* (D. Conn.); and *Ace Delivery and Moving, Inc. v. Horizon Lines LLC et al.* (D. Alaska).

In addition to her current work on antitrust cases, Ms. Scherrer represents Holocaust victims in a breach of contract case alleging certain German corporations failed to pay appropriate interest due on their payments to a reparations fund.

Prior to joining Hausfeld LLP, Ms. Scherrer litigated antitrust, consumer fraud, employment, and ERISA cases at firms in Washington, DC, and San Francisco, CA.  Among other cases, Ms. Scherrer was involved in Schwab v. Philip Morris USA et al. (E.D.N.Y.), the largest class action ever certified, in

**HAUSFELD** LLP

which the plaintiffs alleged a RICO conspiracy and fraud in connection with the marketing and sale of "light" cigarettes.

Education
- University of Colorado, Boulder, B.A., 1996
- American University Washington College of Law, J.D., cum laude, 2000

Bar Admissions
- California
- District of Columbia

Affiliations & Honors
- Interned during law school at the United States Supreme Court in the Office of Legal Counsel and for the Honorable Ricardo M. Urbina of the United States District Court for the District of Columbia
- *Law360 Competition* Editorial Advisory Board


**James J. Pizzirusso**

Mr. Pizzirusso is a partner in Hausfeld LLP's Washington, DC office. His practice focuses primarily on consumer protection, antitrust, environmental health, and product liability/mass torts. In addition to practicing law, Mr. Pizzirusso has served as a Visiting Associate Professor of Clinical Law at George Washington University Law School and is currently serving as an Adjunct Professor of Environmental and Toxic Torts.

Mr. Pizzirusso is one of the court-appointed, co-lead counsel in *In re Tyson Foods, Inc., Chicken Raised Without Antibiotics Consumer Litigation* (D. Md.). He was also recently involved in *Pelletz v. Advanced Environmental Recycling Technologies, Inc.* ("In re Choicedek Litigation"), (W.D. Wa.), a nationwide settlement involving mildew spotting on decking materials. Mr. Pizzirusso is currently investigating and litigating claims involving defective Chinese Drywall, which releases sulfur fumes and corrodes metal surfaces in homes.

In the antitrust field, Mr. Pizzirusso represents clients alleging price fixing and collusion in various retail and transportation sectors. Mr. Pizzirusso is one of the principal attorneys in *In re Processed Egg Products Antitrust Litigation* (E.D. Pa.).

Mr. Pizzirusso's practice also includes domestic and international environmental and public health litigation. He is currently representing numerous farmers and landowners in Barbados who have suffered reduced crop yields and property damages as a result of leaking jet fuel from an underground pipeline.

Mr. Pizzirusso has been asked to appear as a panelist at several conferences around the country and presented on topics including consumer protection law, toxic torts, lead paint litigation, and public interest litigation. Mr. Pizzirusso is also the author of several published papers including: Utilizing Novel Technologies to Sustain Trespass and Battery as Toxic Torts, *The Environmental Litigator* (Spring, 2008); Agency Rule-Making Power and the Clean Air Act: Putting the Brakes on American Trucking,

**HAUSFELD**LLP

Spring 2001 Term: Whitman v. American Trucking Associations, Inc., 7 *Envtl. Law.* 729 (June, 2001); and Increased Risk, Fear of Disease and Medical Monitoring – Are Novel Damage Claims Enough to Overcome Causation Difficulties in Toxic Torts, 7 *Envtl. Law*. 183 (September, 2000).

Education
* University of Tennessee-Knoxville, B.A., *summa cum laude*, 1998
* George Washington University Law School, with honors, 2001

Bar Admissions
* District of Columbia
* Virginia
* The Supreme Court of the United States
* The Fourth Circuit Court of Appeals
* Several federal district courts

Affiliations & Honors
* Adjunct Professor, Environmental and Toxic Torts, George Washington University Law School, 2009
* Visiting Associate Professor of Clinical Law, Vaccine Injury Clinic, George Washington University Law School, 2007

Publications
* author, "Liberalizing Rule 27 in the Twombly/Iqbal Era," *Law 360* (November 11, 2009)
* author, "Utilizing Novel Technologies to Sustain Trespass and Battery as Toxic Torts," *The Environmental Litigator* (Spring, 2008)
* author, "Agency Rule-Making Power and the Clean Air Act: Putting the Brakes on American Trucking," Spring 2001 Term: Whitman v. American Trucking Associations, Inc., 7 *Environmental Law* 729 (June, 2001)
* author, "Increased Risk, Fear of Disease and Medical Monitoring – Are Novel Damage Claims Enough to Overcome Causation Difficulties in Toxic Torts?" 7 *Environmental Law* 183 (September, 2000)
* Mr. Pizzirusso was recently profiled in the online publication Lawdragon.com

**Brent W. Landau**

Mr. Landau's practice focuses on representing plaintiffs in complex antitrust and consumer protection litigation. He has litigated claims of price-fixing and monopolization involving products and industries as varied as vitamins, microprocessors, transparent tape, medical devices, and stock car racing. In other cases, his clients have included consumers defrauded by manufacturers of "light" cigarettes and Indonesian villagers subjected to human rights abuses.

Mr. Landau graduated from the State University of New York at Binghamton, where he received a B.A. in History and Philosophy (*summa cum laude*, 1998) and was a member of Phi Beta Kappa. He obtained his law degree from Harvard Law School (*cum laude*, 2001), where he was co-chairperson of the Tenant Advocacy Project and a supervising editor of the Harvard Journal on Legislation.

**HAUSFELD**LLP

After law school, Mr. Landau served as a judicial law clerk to the Honorable Bruce W. Kauffman, United States District Court for the Eastern District of Pennsylvania. He then worked for six years at Cohen, Milstein, Hausfeld & Toll, P.L.L.C. before joining Hausfeld LLP.

Mr. Landau is the author of State Employees and Sovereign Immunity: Alternatives and Strategies for Enforcing Federal Employment Laws, 39 *Harv. J. on Legis.* 169 (2002); State Bans on City Gun Lawsuits, 37 *Harv. J. on Legis.* 623 (2000); and Sovereign Immunity and You: How New York State Employees Can Enforce Their Federal Employment Rights, United University Professions Working Paper Series (Dec. 2005) (presented at November 2005 UUP conference on "Preserving the Rights of Public Employees"). He also serves on the editorial board of The Antitrust Practitioner, the newsletter of the Civil Practice and Procedure Committee of the ABA Section of Antitrust Law, and is a member of the Federal Courts Committee of the Philadelphia Bar Association.

Education
- State University of New York at Binghamton, B.A., summa cum laude, 1998; Phi Beta Kappa
- Harvard Law School, J.D., *cum laude*, 2001

Bar Admissions
- Pennsylvania
- New York
- District of Columbia
- United States District Court for the District of Columbia
- United States District Court for the Eastern District of Pennsylvania
- United States Court of Appeals for the Second Circuit
- United States Court of Appeals for the Ninth Circuit

Affiliations & Honors
- Judicial law clerk to Honorable Bruce W. Kauffman, U.S. District Court for the Eastern District of Pennsylvania
- Supervising editor,  *Harvard Journal on Legislation*
- Member, Editorial Board, *The Antitrust Practitioner*
- Member, Federal Courts Committee of the Philadelphia Bar Association

Publications
- Author, "State Employees and Sovereign Immunity: Alternatives and Strategies for Enforcing Federal Employment Laws," 39 *Harv. J. on Legis.* 169 (2002)
- Author, "State Bans on City Gun Lawsuits," 37 *Harv. J. on Legis.* 623 (2000)
- author, "Sovereign Immunity and You: How New York State Employees Can Enforce Their Federal Employment Rights," United University Professions Working Paper Series (Dec. 2005) (presented at November 2005 UUP conference on "Preserving the Rights of Public Employees")

**Steig D. Olson**

Mr. Olson is a partner in Hausfeld LLP's New York office, where he practices in the fields of human rights and antitrust law. He also does pro bono work in the area of child refugee law and helps coordinate

34

**HAUSFELD** LLP

the firm's pro bono practice.  Mr. Olson is dedicated to helping aggrieved businesses and persons pursue legal redress.

HUMAN RIGHTS: Mr. Olson currently is one of the main counsel in *Balintulo v. Daimler AG* (S.D.N.Y.), in which he represents South African victims of human rights abuses by the former apartheid regime against corporations that allegedly aided and abetted the government's commission of the abuses. The case has resulted in several important decisions, including *Khulumani v. Barclay National Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007), in which the Second Circuit held that plaintiffs could seek to establish aiding and abetting liability under the Alien Tort Statute.

ANTITRUST: Mr. Olson also represents businesses in major antitrust actions seeking damages allegedly caused by corporate anticompetitive conduct, including price-fixing conspiracies.
Mr. Olson currently serves as a lead counsel in *In re Rail Freight Fuel Surcharge Antitrust Litigation* (D.D.C.), in which shippers nationwide seek damages for alleged price fixing of rail freight fuel surcharges by the nation's dominant freight-shipping railroads; and *In re Flat Glass Antitrust Litigation* (II) (W.D. Pa.), alleging price fixing by manufacturers of flat glass used in the construction industry.

Mr. Olson has played a major role in numerous cases that have resulted in substantial recoveries for overcharged purchasers.  For example, he was one of the leading lawyers in *Molecular Diagnostics Laboratories v. Hoffman-La Roche, Inc., et al.* (D.D.C.), alleging unlawful monopolization on behalf of a class of purchasers of an enzyme used in DNA amplification, human-genome research, and medical diagnostics.

PRO BONO: Mr. Olson maintains a pro bono practice and is one of the pro bono coordinators at the firm. Recently, Mr. Olson employed an innovative legal theory to win a grant of asylum by a New York Immigration Judge on behalf of a woman who came to the United States after suffering intra-familial sexual abuse as a child in El Salvador.  The Government has appealed the decision to the Board of Immigration Appeals, where it argues that the case raises novel issues of refugee law.

Education
- Vassar College, B.A., 1997
- Harvard Law School, J.D., magna cum laude, 2001

Bar Admissions
- New York

Affiliations & Honors
- Maintains *pro bono* practice and is a *pro bono* coordinator at Hausfeld LLP

Publications
- "Chipping Away: The Misguided Trend Toward Resolving Merits Disputes As Part of the Class Certification Calculus," 43 U.S.F.L. Rev. 935 (2009)
- "Efforts to Delay Competition from Generic Drugs: Litigation Along a Seismic Fault Between Antitrust and Intellectual Property Law," co-authored with Joshua P. Davis, 39 U.S.F.L. Rev. 1 (2004)

**HAUSFELD** LLP

- "Greater Scrutiny of the Merits During Class Certification: Are Class Action Standards Evolving?" Presented at the 2008 ABA Antitrust Spring Conference
- "Antitrust Class Actions: Continued Vitality," Global Competition Review, The Antitrust Review of the Americas (2008), co-authored with Michael Hausfeld and Seth Gassman

## Arthur N. Bailey, Jr.

Mr. Bailey has worked on *In re Intel Corporation Microprocessor Antitrust Litigation* (D. Del.), alleging monopolization of the market for x86 microprocessors, resulting in higher prices to consumers who purchased computers containing Intel chips. Prior to joining the firm, Mr. Bailey was employed by Kaplan Fox & Kilsheimer LLP where he worked on antitrust, securities fraud and consumer fraud class action cases.

Education
- Wooster College, BA.,
- University of Tulsa, J.D., 1999

Bar Admissions
- California

## Ralph J. Bunche

Ralph Bunche is an associate in the firm's Washington D.C. office. He joined in August 2009. Prior to joining the firm, Mr. Bunche was the legal advisor to Liberia's Minister of Finance where he worked on a range of matters, including legislative and regulatory reform of the tax and investment laws and the negotiation and implementation of concession (extractive and agricultural) and debt cancellation agreements. Prior to this, he was an associate at O'Melveny & Myers LLP focusing on antitrust and securities litigation.

Mr. Bunche's experience encompasses work on a range of sectors — including iron ore, petroleum, energy, rubber chemicals, natural rubber, palm oil, cocoa, eggs, dynamic random access memory, and securities brokers — and in a number of countries — including Bosnia-Herzegovina, India, South Africa, and Liberia.

Education
- Keele University (UK), B.A., (PPE)
- Essex University (UK), M.A., Human Rights
- Columbia University School of Law, J.D.

Bar Admissions
- New York



**Melinda Coolidge**

Ms. Coolidge is an associate at the firm focusing on antitrust and consumer cases.  She is currently involved in several cases, including *In re International Air Transportation Surcharge Antitrust Litigation*, MDL 1793, involving an international cartel among major airlines to fix the price of fuel surcharges for passenger flights, and *In re Air Cargo Shipping Services Antitrust Litigation*, MDL 1775, involving fixing prices of cargo shipments worldwide.

Prior to joining the firm, Ms. Coolidge served as a research assistant to Former Commissioner of the Federal Trade Commission, Robert Pitofsky, conducting research for his casebook, Trade Regulation, and for his book on the impact of conservative economic analysis on antitrust law, *Where the Chicago School Overshot the Mark*.  She also served as the Senior Articles Editor on the Georgetown Journal of Gender and the Law.  During her summers in law school, she worked at a boutique litigation firm representing whistleblowers against the government and at Heller Ehrman, LLP.  Prior to attending law school, she worked at Public Citizen, a national consumer advocacy non-profit organization.

Education
- Tufts University, International Relations and French, B.A., 2003 (magna cum laude)
- Georgetown University Law Center, J.D., 2008 (cum laude)

Bar Admissions
- District of Columbia
- Maryland

**Reena Gambhir**

Ms. Gambhir has worked on, among other antitrust class actions, *In re Hydrogen Peroxide Antitrust Litigation* (E.D.Pa.) and *In re Pressure Sensitive Labelstock Antitrust Litigation* (M.D.Pa) alleging price-fixing on behalf of purchasers. Among other international and pro bono matters, Ms. Gambhir represented detainees being held at the U.S. government's detention facility in Guantanamo Bay, and residents of Bhopal, India who are exposed to the 1984 Union Carbide gas leak's uncontrolled remaining toxic waste.

Prior to joining the Firm, Ms. Gambhir served as a law clerk at the Public Defenders Service for the District of Columbia and the Washington Legal Clinic for the Homeless. In addition, she studied in the International Human Rights Law program at Oxford University, and was a student attorney in the International Human Rights Clinic at the George Washington University Law School. Prior to law school, Ms. Gambhir worked as a paralegal at an immigration law firm in Boston, Massachusetts.

Education
- Boston College, English Literature, B.A., (minor in American Gender and Race Studies) (cum laude) 1999
- University of Chicago, M.A., Humanities, 2000
- National Law Center, George Washington University, J.D., 2004 (with Honors)



Bar Admissions
- Massachusetts
- Application to practice in New York pending. Supervised by principals of the firm.
- Application to practice in the District of Columbia pending. Supervised by principals of the firm.

Affiliations & Honors
- National Law Center, George Washington University, Thurgood Marshall Scholar


**Faris E. Ghareeb**

Faris Ghareeb, an associate at the firm, is a member of the antitrust and international practice groups.  He is currently involved in several cases, including *In re Air Cargo Shipping Services Antitrust Litigation* (E.D.N.Y.) and *In re Municipal Derivatives Antitrust Litigation* (S.D.N.Y.).

Mr. Ghareeb also serves as an adjunct professor at the George Washington University Law School, where he coaches the international commercial arbitration team.

During law school, Mr. Ghareeb represented George Washington University at the 2008 Willem C. Vis International Commercial Arbitration Moot.  He also interned in the civil litigation division of the D.C. Attorney General's Office, and clerked at Straus & Boies, LLP, where he focused on antitrust class actions.

Education
- Emory University, B.A., Political Science, 2004
- George Washington University Law School, J.D., 2008

Bar Admissions
- Application to practice in New York pending. Supervised by principals of the firm.


**Sathya S. Gosselin**

Mr. Gosselin is an associate in Hausfeld LLP's antitrust practice group.  He is currently involved in several matters, including *In re Rail Freight Fuel Surcharge Antitrust Litigation* (D.D.C.), in which shippers nationwide seek damages for alleged price-fixing of rail-freight fuel surcharges by the nation's largest freight-shipping railroads, and *In re Flat Glass Antitrust Litigation (II)* (W.D. Pa.), in which plaintiffs allege price-fixing by manufacturers of flat glass used in the construction industry.

Prior to joining the firm, Mr. Gosselin served as a staff law clerk for the United States Court of Appeals for the Seventh Circuit (2007-2009).  During law school, he was an extern with the Texas Civil Rights Project in Austin, Texas; a summer law clerk with Texas RioGrande Legal Aid; and a summer associate with two law firms engaged in civil rights and antitrust litigation.

HAUSFELD LLP

Education
- Vassar College, B.A., Religion, 1999 (with Honors)
- Cornell Law School, J.D., 2007

Bar Admissions
- Application for admission to the District of Columbia Bar pending. Supervised by principals of the firm.

Affiliations & Honors
- Symposium Editor, *Cornell Law Review*

HAUSFELDLLP

**Annex 4 – Hausfeld & Co. LLP**

Hausfeld & Co. LLP, the London affiliate of Hausfeld LLP, is dedicated to achieving justice for victims of economic abuse, crimes against society and human rights violations worldwide. The firm works to preserve a key element of the justice system – the ability to restore integrity to society.  Its clients are businesses and individuals, singly and in group actions.

Hausfeld & Co. has a strong track record in recovering compensation for European claimants. Its services improve the ability of European investors and businesses to participate in antitrust and other actions for collective redress within the U.S.

The firm is developing effective means for the private enforcement of competition laws in Europe. Its attorneys are in dialogue with competition and economic regulators, defendants, their advisors and the practicing and academic legal communities.  In London, the firm leverages its relationships with renowned economists and consulting firms to bring economic, accounting, and business advice to our work for claimants.

Practice Areas

Antitrust / Competition
Consumer Protection
Civil and Human Rights
Financial Services

Cases

Hausfeld & Co. is currently taking action against British Airways ("BA") in the High Court, London, on behalf of claimants who suffered loss as a consequence of BA's involvement with a number of other airlines in a global cartel to fix prices on air cargo shipments. As lead counsel for non-U.S. claims against a group of international airlines for fixing prices on air freight shipping, the firm has already obtained an $85 million settlement with Lufthansa for shipments within, to and from the United States. The settlement will result in thousands of European businesses recovering damages.

The firm also represents thousands of travelers who paid fuel surcharges to BA and Virgin Atlantic on flights to and from the UK. Both airlines have admitted they illegally fixed these charges. The principal beneficiaries will be European consumers and businesses.

In July 2009 Hausfeld & Co commenced proceedings against industry giants Shell and Exxon Mobil for their involvement in the paraffin wax price fixing cartel. The cartel took place throughout Europe for a period of 13 years between 1992 and 2005 and involved seven other major producers of paraffin wax.

The firm was the only claimants' firm to appear before the European Commission on behalf of European consumers in the Microsoft matter.

**HAUSFELD**LLP

Also in July, Hausfeld & Co. commenced proceedings against Dunlop Oil & Marine Limited for its involvement in the marine hose cartel. The cartel took place during the period from at least 1986 to 2007 and involved five other leading manufacturers of marine hose, all of whom conspired to fix, raise, maintain or stabilize the prices of the rubber hose which is used to transfer oil between storage facilities and/or buoys. Previously, the firm successfully negotiated a settlement with one of the marine hose cartelists, Parker.

Cartel Key

The EU estimates that the actions of illegal cartels cost businesses €2-3bn every year. Companies that suffer losses from cartel price-fixing and other anti-competitive practices deserve compensation but are sometimes deterred from action by the costs of litigation.  To overcome this obstacle, Hausfeld LLP's London affiliate Hausfeld & Co. has created an innovative insurance and funding mechanism called Cartel Key.

Cartel Key provides access to cartel compensation in the UK at minimal risk for claimants.

How Cartel Key works:
1.  The firm focuses on cartel cases where a competition authority or court has already found the cartelists to be liable (or even guilty under criminal law) or is highly likely to do so.
2.  The firm uses this decision as the basis for "follow on" collective claims by groups of victims in national courts in the EU; these courts must apply the decision and find the cartelists liable.
3.  The firm works with expert economists and forensic accountants to establish that the cartelists' illegal behavior caused quantifiable losses to victims.
4.  The firm's clients commit to stand and fight together to maximize recovery for all on settlement or by a judgment of the court.
5.  The firm works with FirstAssist Legal Protection, one of the UK's leading providers of Before- and After-the-Event legal expenses insurance ("BTE" and "ATE") to create a unique package that minimizes the financial risks of seeking compensation. The firm combines FirstAssist's ATE insurance with the provision of our legal services on a "success only" fee basis under well-established English law rules.  Hausfeld & Co. will only be paid if its clients win the case. Litigants pay the insurance premium only at the end of the case, and then only if the case succeeds.

Hausfeld & Co. and FirstAssist will together assess each cartel in determining the terms of the insurance. The firm will only advises clients to proceed with a claim that its attorneys think has very good prospects of success and where they believe that the insurance in place is sufficient to cover the risks that may arise in bringing the claim.

Cartel Key so far has been a valuable insurance solution for the firm's clients.  It has allowed numerous companies to seek compensation in major actions, including cases brought this summer by Hausfeld against paraffin wax and marine hose cartelists.



Hausfeld & Co LLP Attorneys

**Anthony Maton**

Anthony Maton is a partner specializing in competition and financial services litigation. He has extensive experience in complex international dispute resolution, including litigation, arbitration and mediation in a number of different jurisdictions. He has acted for Governments in regulatory investigations, for multinationals and for private business, and has worked in the USA and extensively throughout Europe, the Middle East and the Gulf.

Mr. Maton is a Solicitor with over 15 years experience, having been a partner in McGrigors and an associate at Slaughter & May. He is a member of the Chartered Institute of Arbitrators (he arbitrated under many rules including the LCIA, ICC and LME), an accredited Mediator and former Secretary and present Committee Member of the London Solicitors Litigation Association.

His recent experience includes acting in the Air Passenger settlement against BA/ Virgin, acting against BA in the London arm of the global air cargo cartel litigation being run by Hausfeld, and acting on the Parker Settlement in the Marine Hose cartel.

He has an Honors Degree in Modern History from the University of Oxford and has regularly spoken at conferences and seminars in the UK and abroad.

**Ingrid Gubbay**

Ingrid Gubbay is a consultant with Hausfeld & Co LLP in London. She practices antitrust, consumer and human rights law. Prior to joining Hausfeld & Co, Ms. Gubbay was the Principal Campaigns Lawyer for the largest consumer association in Europe, Which? Ltd. Last year in the case of JJB Sports v Consumer Association, Ms. Gubbay bought the UK's first antitrust representative action for damages on behalf of consumers (direct purchasers) under new statutory powers granted to Which? Ltd. by the Secretary of State.

Ms. Gubbay has an extensive background in bringing test cases involving collective actions in the UK and in Australia, where she was head of consumer litigation for the Legal Aid Commission (NSW). Ms Gubbay has written and presented on private enforcement for damages in antitrust law, and has lectured at the Universities of NSW and Essex UK in tort, administrative and international human rights law.

She is a member of the British Institute of Advanced Comparative law (BIICL) and sits on the comparative law working party of the UK Civil Justice Council, which is responsible for advising Government on civil procedural reform in the UK.

Education
- Advanced international Human Rights Law: LSE (2005)
- EU Law : Kings College London (2004)
- LLB, (Dist) University of NSW, 1994
- B.A.(Dist)  University of NSW, Australia

**HAUSFELD**LLP

- currently undertaking a PHD (research) at Queen Mary University London

Affiliations & Honors
- Awarded 'Most Outstanding Achievement in 30 years' : Legal aid Commission  (NSW) 30th Anniversary 2009
- Third place UK 'In House Lawyer' : The Lawyer awards 2007
- EU Competition Group : Law Society UK
- Solicitors International Human Rights Group (SIHG):  Law Society UK

Publications
- Co-authored the UK Civil Justice Council's Report on UK Collective actions
- Articles in the *Consumer Policy Review UK*, *Global Competition Review*, *Global Competition Insight*


**Nicola Boyle**

Nicola Boyle is an associate at Hausfeld & Co LLP in London. She joined the firm in October 2009 and is currently assisting on a number of competition, consumer and financial service complaints, seeking recovery on behalf of both businesses and individuals.

Ms. Boyle previously worked on the dispute resolution team at McGrigors. She has represented multi-nationals, private businesses, and individual claimants in a wide range of complex disputes in the financial services and energy sectors.  She is experienced in methods of alternative disputes resolution, having successfully resolved a number of complex multi-party disputes outside of the courts.  She has advised on a number of regulatory investigations and judicial review proceedings. She has also taught an undergraduate course in European law at the University of Birmingham.

Education
- University of Birmingham, LLM (focusing on E.U. environmental law)
- University of Birmingham, LLB (Honors)
- University of Birmingham, B.A.


**Scott Campbell**

Scott Campbell is an associate focusing on UK and European claimant and complainant competition matters. He joined in May 2007 from the London office of Latham & Watkins, where his practice focused on merger control, regulatory and defendant competition matters.

To date, Mr. Campbell has experience of matters relating to the transport, energy, media and technology, pharmaceuticals, financial services, telecommunications and retail sectors.

Within these sectors, he has:
- Acted on behalf of claimants in the High Court relating to a competition law-based claim.
- Initiated and defended competition complaints before the OFT, the European Commission, and regulators.

**HAUSFELD**LLP

- Acted for defendant clients in the context of OFT and UK Competition Commission competition investigations (such as Storecards and PPI).
- Assisted with large-scale, multi-jurisdictional merger control filings involving, among others, the European Commission (for example Bayer/Schering and Adidas/Reebok).

Education
- Postgraduate Diploma in EC Competition Law from King's College London
- M.Lit in Modern Historical Studies from the University of St Andrews
- M.A. (Hons) in Modern History from the University of St Andrews

Affiliations & Honors
- Quarterly contributor to the *Global Competition Litigation Review*

Publications
- *Recent Developments in the Civil Remedies Available in England and Wales in Respect of Breaches of EC Competition Law*, 2008 1 GCLR
- Co-author of the American Antitrust Institute's guide to competition litigation in England and Wales
- Co-author of the England and Wales section of *Getting the Deal Through - Private Antitrust Litigation 2010*

44

HAUSFELD LLP

**Annex 5 – Recent Publications**

"Giving Electronic Discovery a Chance to Grow Up." By Megan E. Jones. *The National Law Journal*. December 14, 2009.

"Liberalizing Rule 27 in the Twombly/Iqbal Era." By James J. Pizzirusso.  *Law360*.  November 11, 2009.

"Twombly, Iqbal And the Prisoner's Pleading Dilemma." By Michael D. Hausfeld, Michael P. Lehmann, and Spencer Jenkins.  *Law360*.  October 20, 2009.

"Competition Law Claims: A Developing Story." By Michael D. Hausfeld and Vincent Smith. *European Antitrust Review*. September 2009.

"Global Enforcement of Anticompetitive Conduct." By Michael D. Hausfeld. *The Sedona Conference Journal*. Fall 2009.

"Observations from the Field: ACPERA's First Five Years." By Michael D. Hausfeld, Michael P. Lehmann, and Megan E. Jones. *The Sedona Conference Journal*. Fall 2009.

"The Value of ACPERA." By Michael D. Hausfeld. *CompetitionLaw 360*. June 2009.

"Chipping Away: The Misguided Trend Toward Resolving Merits Disputes as Part of the Class Certification Calculus." By Steig D. Olson. *University of San Francisco Law Review*. Spring 2009.

"Response to EU Commission Green Paper on Consumer Collective Redress." By Ingrid Gubbay and Vincent Smith. February 2009.

"Private Enforcement Claims: Are They a Risk for Consumers and Businesses?" By Ingrid Gubbay and Anthony Maton. Competition Law Insight. January 2009.

"Collective Redress for Competition Law Claims." By Michael D. Hausfeld and Vincent Smith. *European Antitrust Review*. September 2008.

"Managing Multi-District Litigation." By Michael D. Hausfeld and Michael P. Lehmann. *Antitrust Review of the Americas*. September 2008.

"A Victim's Culture." By Michael D. Hausfeld and Andrea Hertzfeld. *European Business Law Review*. December 2007.

Links to most of the above publications can be found at www.HausfeldLLP.com.

HAUSFELD LLP

**Annex 6 – Offices**

Washington, DC

202.540.7200 ph
202.540.7201 fax
1700 K Street, NW Suite 650
Washington, DC 20006

San Francisco

415.633.1908 ph
415.358.4980 fax
44 Montgomery Street, Suite 3400
San Francisco, CA 94104

New York

212.830.9850 ph
212.480.8560 fax
11 Broadway, Suite 615
New York, NY 10004

Philadelphia

215.985.3270 ph
215. 985.3271 fax
1604 Locust St, 2nd floor
Philadelphia, PA 19103

Hausfeld & Co. LLP - London

(00 44) 20 7665 5000 ph
(00 44) 20 7665 5001 fax
12 Gough Square
London
EC4A 3DW

For more information about the firm please visit www.HausfeldLLP.com.

4812-6219-9303, v. 1

# EXHIBIT 22

## Declaration of Ronald S. Alepin in Support of Plaintiffs' Motion for Class Certification

### I. Background and experience

1. I have worked in the computer industry since 1971, designing and developing system software and hardware as well as in managing software and hardware companies. I have been an independent computer industry consultant with my own practice for more than 25 years. I specialize in consulting for computer hardware, software and services companies. My clients have included some of the world's largest information technology ("IT") companies, including Original Equipment Manufacturers (OEMs), which design and build PC computers. I have significant experience in designing, testing (including benchmarking), and manufacturing computer systems. A copy of my current curriculum vitae is attached to this report as Exhibit A.

2. I have been retained as a consultant and an expert in several matters involving technology issues. For example, I was retained by the Assistant Attorney General for Antitrust at the U.S. Department of Justice, the States Attorneys General, and the Non-Settling States with respect to antitrust litigation involving Microsoft. In addition, I have appeared before the European Commission and European Courts as an expert in cases involving Microsoft. I have also been retained as a consultant and expert by PC manufacturers (OEMs) in several cases involving computer design and the PC industry. I have examined the records of consumer complaints in conjunction with claims concerning computer system failures. I was also an expert in the *Kelley v. Microsoft* case which involved consumer fraud claims against Microsoft over its marketing of Vista-ready computers.

### II. Statement of Assignment

3. I understand that this case involves consumers who purchased laptop (or notebook) computers manufactured and sold by Acer. These laptops contained 1GB[1] of Dynamic Random Access Memory (DRAM) shared between the CPU and graphics processor ("shared memory") in contrast to other laptops sold with graphics cards containing additional and separate graphics memory ("discrete memory"). The systems at issue here also came pre-installed with Microsoft's Vista Home Premium or Vista Business ("Vista Premium") Operating

---

[1]  1 gigabyte is 1,073,741,824 bytes.

REDACTED

System ("OS").[2]  Plaintiffs allege in their Complaint that Acer's laptops with 1GB of shared memory did not contain enough memory to adequately run the Vista Home Premium OS.  I understand that the Plaintiffs' computer in this case experienced freezing, lock-ups, crashes, and operated very slowly right out of the box.  According to the Plaintiffs, after Acer refused to repair or refund the computer, they installed additional memory at their own expense and these problems subsided.

4.      I have been asked by Plaintiff's counsel in this matter to address three issues: **(1)** Do the notebook systems at issue in this case possess sufficient memory to adequately run the Vista Premium OS; **(2)** Are the complaints and inquiries that Acer received from consumers running Vista Premium notebooks and from retailers selling these products indicative of problems associated with insufficient memory; and **(3)** whether the cost of repairing or remedying any defective laptops can be established on a common basis -- i.e., whether a single remedy universally applied can resolve the issues for all purchasers.  If necessary, I have also been asked to provide a rebuttal to any of Acer's expert testimony.

5.      In addition to my own knowledge and skill having worked in the computing industry for more than 35 years and with Microsoft operating systems and PCs since their introduction in 1981, I relied on: (a) legal documents filed in these proceedings including the First Amended Complaint, (b) depositions, declarations and other testimony taken, (c) documents produced by Acer; and (d) publicly available reports (including my own) and documents from *Kelley v. Microsoft Corp.*, a class action case in which I also served as an expert witness, (e) other publicly available documents.  Exhibit B to this declaration contains a list of such materials.

**III. Summary of Opinions**

6.      While my work is ongoing and I understand that additional discovery is still expected, based on my review and work to date, I have reached the following conclusions:

---

[2]  It is my understanding that Acer did not sell computers with the Vista Ultimate operating system.

REDACTED

A.      Microsoft recommended at least 1GB of system memory in order for users to experience the "basic functionality" of the Vista Home Premium Operating System.

B.      To run Aero,[3] the visual identity of Windows Vista Premium, Microsoft required a minimum of 128 MB of graphics memory.

C.      While OEMs such as Acer could comply, as a technical matter, with Microsoft's minimum individual "Windows Logo Requirements," (which allow systems with 1GB of total memory, shared between the system and graphics, to license and install Vista Premium), in those "Logo Requirements" and elsewhere, Microsoft strongly recommends 1GB or more of system memory.

D.      Many PC professionals and other OEMs, such as Dell, recommend 2GB or more of system memory on computers running Vista Premium.

E.      Acer's notebooks containing 1GB of shared memory between the CPU and graphics processor, like that of the Plaintiffs in this case, failed to meet minimum levels necessary to ensure an appropriate customer experience and would not be expected to function properly or adequately under normal usage.

F.      None of the problems that the Plaintiffs experienced can be attributed to any software that Plaintiffs installed on their computer or other problems peculiar to their computer, such as a defect in manufacturing or customer abuse.  The Plaintiffs' computer did not differ from similar Acer computers sold in the market.

G.      All class members who attempted to use the Vista Premium operating system's features the way an ordinary user would be expected to use these features on Acer's notebooks with 1GB of RAM and shared memory would be similarly affected.

H.      The replacement of the 512MB SO-DIMM[4] memory modules with a 2GB memory module restores the systems to reasonable performance and eliminates most of the problems associated with insufficient memory (e.g., slowness and lock-ups).

---

[3] Aero is an acronym invented by Microsoft which stands for "Authentic Energetic Reflective and Open."  It was used to describe the visual features associated with Vista Premium.

3

REDACTED



K.      A single remedy, the purchase and installation of additional memory, can resolve the issues for all purchasers of Acer notebooks marketed and sold with Vista Premium and 1GB of shared memory.  The cost to remedy these computers can be established on a common basis.

**Topic (1): The memory required to adequately run Vista Home Premium and whether the computers at issue in this case meet those requirements.**

**A. Vista History**

7.      Microsoft released its Windows Vista operating system to retail consumers on January 30, 2007, two months after making it available to commercial customers.

8.      Microsoft made Vista available in five basic editions: Home Basic; Home Premium; Ultimate; Business; and Enterprise.  They have the following features:[5]

---

[4] SO-DIMM stands for "Small Outline Dual In-line Memory Module" -- which is the format for memory used in laptop computer systems.

[5] (http://windows.microsoft.com/en-us/windows-vista/products/compare).  Vista Premium features are in the two center categories.  Vista Enterprise Edition is sold to corporations and governmental organizations with features that track the Vista Business Edition.

REDACTED

| | Home Basic | Home Premium | Business | Ultimate |
|---|---|---|---|---|
| **Features** | | | | |
| Stay safe. Protect your PC and information with Windows Defender and Firewall. | ✓ | ✓ | ✓ | ✓ |
| Find what you need with Instant Search and Internet Explorer 7. | ✓ | ✓ | ✓ | ✓ |
| Simple networking connectivity. Stay connected with the Network and Sharing Center. | ✓ | ✓ | ✓ | ✓ |
| The Windows Aero desktop experience includes glass-like menu bars, Windows Flip 3D, and Live Thumbnails. | | ✓ | ✓ | ✓ |
| Choose from a variety of laptops. Enjoy more choice with Windows Mobility Center and Tablet PC support. | | ✓ | ✓ | ✓ |
| Share documents and collaborate with Windows Meeting Space. | | ✓ | ✓ | ✓ |
| Use a secondary screen on your laptop or extend your display to other devices using Windows Sideshow. | | ✓ | ✓ | ✓ |
| All-in-one media center functionality makes any room a media room using Windows Media Center and Media Center Extenders. | | ✓ | | ✓ |
| Automatically back up your files with Scheduled Backup. | | ✓ | ✓ | ✓ |
| Make DVDs with Windows DVD Maker. | | ✓ | | ✓ |
| Play three premium games on your PC: Chess Titans, Mahjong Titans, and Inkball. | | ✓ | | ✓ |
| Create high-definition (HD) movies with Windows Movie Maker in HD. | | ✓ | | ✓ |

5

REDACTED

| | | | |
|---|---|---|---|
| Protect against hardware failure with Windows Complete PC Backup and Restore. | | | ✓ | ✓ |
| Scan, fax, and receive documents and images with Windows Fax and Scan. | | | ✓ | ✓ |
| Remotely access your business resources and applications using Remote Desktop Connection. | | | ✓ | ✓ |
| Add to your Windows experience with Windows Ultimate Extras. | | | | ✓ |
| Protect your data against loss using Windows BitLocker Drive Encryption. | | | | ✓ |

**B. The PC Platform**

9.      Personal computers (PCs) are computers intended for use by a single user at a time.  PCs (sometimes referred to as IBM-compatible personal computers or IBM PCs -- acknowledging IBM's role in the creation of this branch of computing's evolutionary tree), are personal computers that have at their core, an x86 compatible central processing unit or CPU. Intel is the company that originally developed the x86 architecture and today is the world's largest producer of x86 CPUs. The Pentium 4 and Core2Duo are examples of the more popular Intel CPU brands.  AMD (Advanced Micro Devices) is another well-known x86 CPU manufacturer.  Intel and Microsoft work together across a wide variety of technologies to define the essential characteristics of today's PCs so often that the PC platform is often referred to as "Wintel" for "Windows" and "Intel."  Acer used both AMD and Intel CPUs in its laptops.

10.      In an x86-based PC, the CPU communicates with the outside world -- DRAM memory, video displays, disk drives, USB devices, etc. -- via chipsets (also manufactured by Intel among others) also known as bridges.  Modern PCs have two bridges, the North Bridge and the South Bridge, the latter handling data movement to and from the slower devices in the PC such as the keyboard/mouse, disk drives, PCI/e bus, USB and SATA ports and so on.  The North Bridge handles data transfer between the CPU and the higher speed DRAM memory controller and video graphics adapter, as well as mediating data transfer to and from the South Bridge. CPUs are combined with these North and South bridges on motherboards to form the primary building block of the PC.  It is common that multiple generations of CPUs function with different

REDACTED

generations of Bridge chips.  Acer produces laptops using chipsets from Intel and other manufacturers including NVidia.

11.     Some North Bridges subsume video graphics functionality.  These systems are described as having "integrated graphics" or "UMA" (Unified Memory Architecture) in contrast to PCs where the graphics functionality is disposed on a separate chip and often on an entirely separate printed circuit board.  Such systems are referred to as having "discrete" graphics.  The shared memory notebooks at issue here are UMA systems.

12.     Since the PC was first introduced in 1981, it included separate circuitry to handle the video display function.  Over time the demands of applications and users for increasingly sophisticated and rich graphical content playback on the PC have led to the development of very powerful, specialized processors equipped with their own high speed memory and optimized to display video information.  Next to the CPU, the GPU (or Graphics Processing Unit) is the most evolved piece of silicon in the PC.  PC video adapters allow an increasingly large proportion of the processing associated with delivering rich colorful graphics to be off-loaded from the CPU, freeing it up to do other work thereby improving the overall performance and responsiveness of the system from the user's point of view.

13.     ATI (now a part of AMD), NVidia and Intel are the leading manufacturers of video graphics adapters for use in PCs.  ATI and NVidia make discrete video graphics solutions where the graphics processor and its memory are separate from other system components.  In contrast, Intel (and to some degree, NVidia) manufacture integrated graphics solutions wherein the subsystem is part of the chipset and the graphics memory is carved out of the total memory available to the CPU (i.e., from the DRAM).  From the OEM's point of view, there are advantages and disadvantages to both the integrated and the discrete solutions.  Integrated graphics subsystems allow for the development of the lowest cost PCs while designs based on discrete graphics chips produce PCs with the highest levels of performance.  Acer manufactures laptops with integrated graphics (like the models in the class), as well as laptops with discrete graphics.

7

REDACTED

14.     An "integrated graphics" shared memory design can reduce the cost and complexity of the motherboard design because no additional memory chips are required on the board.  There is usually some mechanism (i.e., via the BIOS) to select the amount of system memory to use for graphics leaving the rest free for other uses.  A side effect of this in some designs is that when some portion of RAM is allocated for graphics, it becomes effectively unavailable for anything else (i.e., to run the OS or applications).  Thus, PCs with integrated graphics can suffer from performance issues for two very important reasons: 1) having the graphics subsystem and CPU contend for memory access slows overall performance of the system; and 2) removing memory from the total amount available for the OS substantially slows performance of the OS in cases where available memory is already limited.

15.     On desktop PCs, even those that originally shipped with an integrated graphics adapter, it is usually possible to upgrade the graphics subsystem without necessitating other changes.  By replacing the graphics adapter printed circuit board inside the PC's chassis (or adding one in the case of an original integrated graphics solution), the system's graphics capabilities can be upgraded.  Even If the PC was originally sold with an integrated video display subsystem built in on the motherboard, it is possible to disable it and add a newer, more capable graphics subsystem using an external video card.  With notebooks, including those produced by Acer, however, the situation is more difficult and video-based upgrade options are very limited if any exist at all.  If a notebook was designed to use an integrated video display adapter (as is the case with notebooks at issue here), it is not practical to add a discrete graphics adapter either externally or internally.  This is because most PC laptops are designed to be used as a complete integrated system -- except for the addition of memory (and possible upgrade replacement of the disc drives).  PC notebooks are not designed with extensibility in mind.  They must, nevertheless, satisfy the needs of the customer over the economic life of the system.

**C. Windows Vista & WDDM**

16.     As discussed above, the graphics controller is the second most complex and powerful hardware component inside the PC after the CPU.  Complex device drivers are required to access and exploit the functionality inside of graphics adapters.

REDACTED

17.     In an effort to Improve the reliability, performance, functionality and appearance of Vista over its predecessor OS, Windows XP, Microsoft developed a new architecture called WDDM or Windows Device Driver Model.  The development of WDDM required collaboration with graphics vendors (e.g., NVidia, Intel, ATI) to redesign their own drivers and to develop graphics hardware that would adequately support the signatures features introduced with Vista.

18.     WDDM was introduced by Microsoft to provide users with a video experience on a PC that rivaled those available from gaming consoles and HD (high definition) DVD playback devices, while maintaining compatibility with existing PC applications and providing an improved platform for next generation, graphically intense applications.  As originally conceived, WDDM was a key technology that was essential to the Vista Premium experience. WDDM was also the foundation of Aero -- a feature available only on Vista Premium -- and Microsoft's code name for the advanced graphical features such as:

        A.     Glass - Translucent effects on window interface elements that allowed users to focus on the content rather than on the interface elements;

        B.     Windows Flip and Flip3D - Allowing users to manage confidently the open applications on their desktops;

        C.     Dynamic Windows and taskbar thumbnails - Providing animated effects when activating and deactivating application windows;

        D.     Smoother performance - Eliminating pixelation when dragging windows around the desktop or when switching applications with multiple menu bars, ribbons and buttons.

19.     Many of the Aero features, such as Glass and Windows Flip that were enabled by WDDM, had analogues in the Apple OS X operating system and were seen by Microsoft as important competitive elements in an improved, easy-to-use graphical operating environment. WDDM was a prerequisite for these "eye candy" types of features in Windows Vista.  Insofar as Vista Premium was an evolved operating system that offered consumers an even more graphically immersive experience, Aero and video performance were essential pieces of the OS.

REDACTED

Thus, OEMs that offered Vista Premium operating system equipped notebooks needed to ensure that they had the ability to run Aero with adequate graphics and video performance.

20.      WDDM improved the performance of the graphics subsystem, by allowing for multitasking through the inclusion of a GPU scheduler to prioritize graphics operations and memory manager to arbitrate video memory allocation.  Further, in terms of serviceability, WDDM allowed the updating of graphics drivers without rebooting -- a convenience to many users.  All of these improvements assumed, of course, the requisite hardware installed on the PC.  In addition to the improvements visible when moving windows on the screen, Vista users would experience improved performance on video playback especially when connected to an external video source such as a HD (High Definition) display.  In fact, it was essential to Windows Vista's ability to permit playback of protected HD content.

21.      Vista's Aero was not the only new technology to put additional demands on PC hardware.  Many of the other features of Vista increased the need for faster processors and significantly more memory than Windows XP -- up to twice as much and more.  To deliver users a satisfactory experience when using Vista's new capabilities, especially those of Vista Premium, OEMs needed to improve the overall performance and capacity of their systems.

**D. Windows Vista Logo Requirements**

22.      Microsoft licenses its Vista operating system to OEMs to pre-install on their computers.  ███████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████ In order to attach the logo sticker, these OEMs also had to meet certain requirements found in the Windows Vista Logo Program Client System Requirements (WVLPSR), which mandated that manufacturers' systems pass certain tests.  These tests were performed on an OEM's systems before any additional OEM software was installed.

---

[6] ███████████████████████████████████████████████████████

[7] ████████████████████████████████████████████████████████████

REDACTED

23.  It is my experience that OEMs regularly and routinely perform tests to establish the overall performance of their systems and will not ship systems that do not perform according to expectations.

24. The requirements found in the WVLPSR were minimum baseline requirements. In some instances, Microsoft "recommended" or "strongly recommended" that OEMs go beyond the minimum baseline requirements in these guides.

25. 

26. Prior to Vista's release, publicly available documents produced in the *Kelley v. Microsoft* case revealed that Microsoft kept the Windows logo requirements low so that retailers could still sell XP-based systems that did not meet Vista's requirements as "upgradeable" to Vista (even though these systems would not be able to upgrade to Vista Home Premium and the Aero features).[11]

---

[8] ███████████████████████████████████████████████

[9] ████████████████████████████████████████████████████████████

[10] ██████████████████████████████████████

[11] *Kelley v. Microsoft,* 2:07-cv-00475-MJP, No. 129, Exhibit A, Redacted Pursuant to Microsoft's Confidentiality Designations and the Court's Order Granting in Party and Denying in Part Motion to Seal, No. 129, entered on February 26, 2008 (various Bates numbers).

REDACTED

27.     In Version 3.09 of the WVLSPR, dated December 22, 2006 (before Vista was released to the public) Microsoft stated: "Prior to June 1, 2007, at least 512 MB . . . of system memory must be available to the operating systems for systems."[12]  Microsoft then indicated that "[a]fter June 1, 2007, at least 768 MB of system memory must be available to the operating systems with Aero enabled [Vista Home Premium]."  This document also stated that "one gigabyte *or more* of physical system memory is *recommended* to ensure optimal performance when demanding load applications occurs from multitasking applications . . . ."[13] (Emphasis added).

28.     Version 3.09 also included a formula for determining memory requirements under the logo program: M = (S - 512) ÷ 2 - where "M" equals the maximum amount of memory that can be dedicated for other purposes and "S" is the amount of physical system memory. The document stated, "For example, a system with 1GB system memory may allocate up to 256MB of system memory to allocate for graphics, whether it runs Aero or not: 256MB = (1GB - 512) ÷ 2."  Microsoft also noted in this document that "*[i]t is strongly recommended* that Premium systems ship with 1GB of system memory *or more*."[14]  (Emphasis added).

29.     ███████████████████████████████████████████████████
████████████████

**E.  Microsoft Recommended Requirements**

30.     ███████████████████████████████████████████████████
██████████████████████████████████████████  For example, in addition to the language in the logo requirements "recommending" or "strongly recommending" 1GB *or more* of system memory, Microsoft also had similar recommendations on its website and in other publicly available documents.

---

[12]  Windows Logo Program 3.0: Windows Vista Logo Program Client System Requirements (Version 3.09) (December 22, 2006), MS-WOLPH 0001 – MS-WOLPH 0087.
[13]  *Id.*
[14]  *Id.*
[15] ████████████████████████████████████████████████████
████████████████████████████                    ████████████████████████
[16] ██████████████████████████████████████████████████

12

31.     The "Microsoft Knowledge Base" is a repository of over 150,000 "articles" made available over the internet to the public by Microsoft Corporation.  It contains information on many problems encountered by users of Microsoft products.  Each article bears an ID number and articles are often referred to by their Knowledge Base ("KB") ID.  The Knowledge Base can be accessed by entering keywords or the ID number at http://support.microsoft.com/search

32.     These KB articles inform a wide range of users, including programmers and OEMs, on different issues and potential work-arounds beneficial to the Microsoft customer base.  These articles are most often initiated from Microsoft's customer support services.  ███ ████████████████████████████████████████████████████████████ ██

33.     Microsoft issued a Knowledge Base article regarding its *recommended* system requirements for running the Vista Basic and Vista Home Premium operating systems on PCs at Article ID: 919183.[18] ██████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████ ██  This article states:

**Recommended minimum hardware requirements for Windows Vista**

The following list describes the recommended minimum hardware requirements for basic functionality of the different editions of Windows Vista. Actual hardware requirements will vary, depending on system configuration and on the programs and the features that you install. If you install Windows Vista over a network, additional hard disk space may be required.

**Windows Vista Home Basic**

o     800-megahertz (MHz) 32-bit (x86) processor or 800-MHz 64-bit (x64) processor
o     512 megabytes (MB) of system memory
**Note** On system configurations that use system memory as graphics memory, at least 448 MB of system memory must be available to the operating system after some memory is allocated for graphics.
o     DirectX 9-class graphics card
o     32 MB of graphics memory
o     20-gigabyte (GB) hard disk that has 15 GB of free hard disk space
o     Internal or external DVD drive

---

[17] ███████████████████████████████

[18] "Recommended minimum hardware requirements for Windows Vista," Article ID: 919183 ("Last Review: November 13, 2007 – Revision: 3.6"), "System Requirements for Vista," Wolph000323 – Wolph000324.

[19] ████████████████████████████████████████████████

13

REDACTED

- o   Internet access capability
- o   Audio output capability

**Windows Vista Home Premium, Windows Vista Business, Windows Vista Enterprise, and Windows Vista Ultimate**

- o   1-gigahertz (GHz) 32-bit (x86) processor or 1-GHz 64-bit (x64) processor
- o   1 GB of system memory
- o   Windows Aero-capable graphics card

**Note** This includes a DirectX 9-class graphics card that supports the following:
- ▪   A WDDM driver
- ▪   Pixel Shader 2.0 in hardware
- ▪   32 bits per pixel
- o   128 MB of graphics memory (minimum)
- o   40-GB hard disk that has 15 GB of free hard disk space (the 15GB of free space provides room for temporary file storage during the install or upgrade.)
- o   Internal or external DVD drive
- o   Internet access capability
- o   Audio output capability

**Note** A Windows Aero-capable graphics card is a graphics card that meets the following requirements:

- •   Supports a Windows Display Driver Model (WDDM) driver
- •   Has a DirectX 9-class graphics processor unit (GPU) that supports Pixel Shader 2.0
- •   Supports 32 bits per pixel
- •   Passes the Windows Aero acceptance test in the Windows Driver Kit (WDK)

34.     Microsoft's recommended minimum requirements for "basic functionality" apply to individual components in the system, not to the system as a whole.  Accordingly, it is also necessary to consider the performance of the entire system.

35.     Microsoft "notes" that the recommended requirements for Windows Vista Home Basic allow for integrated (or shared) graphics memory (32 MB) with system memory. This is because Windows Vista Home Basic does not have Aero and the other immersive graphical experiences that are available with Windows Vista Premium.

36.     Microsoft provides no such "note," however, with respect to the Vista Premium operating system about the ability to share graphics memory and system memory.  I believe

REDACTED

this omission is deliberate.[20]  Instead, Microsoft recommendations are separate: 1GB of system memory *and* 128MB of graphics memory.

37.     Prior to Vista's release, Microsoft established specifications for systems that could be upgraded to Vista.  On these systems, called "Vista Capable" and "Premium-Ready" machines, Microsoft made an allowance for shared memory and noted: "If the GPU uses shared memory, then no additional graphics memory is required beyond the 1GB system memory requirement; If the GPU uses dedicated memory then 128MB is required."[21]  After Vista was released, Microsoft removed that language for machines that actually ship with Vista Home Premium as noted in the documents discussed above.  To the extent requirements differed as between Premium-Ready computers and those regarding computers that shipped with Vista Home Premium installed, an OEM should follow the recommendations for those systems that are actually shipped with the product.

38.     All of the Acer models at issue in this case[22] shipped with Vista Premium, and even though they met the bare minimum of the Logo Requirement's memory guidelines, none met Microsoft's *recommended* requirements, which were 1GB of system memory *and* 128MB of graphics memory.  There is no reason why a system with discrete graphics would require more memory than one with a shared memory system -- the OS would require the same memory on either system.

---

[20]   As with the KB article, on the Microsoft's website for Windows Vista System Requirements, Microsoft also states the minimum recommended requirements and again makes no mention of shared memory systems for Vista Home Premium:

If you want to run Windows Vista on your PC, here's what it takes:

- 1 gigahertz (GHz) 32-bit (x86) or 64-bit (x64) processor
- 1 gigabyte (GB) of system memory (512 megabytes (MB) for Home Basic)
- 40 GB hard drive with at least 15 GB of available space (20 GB for Home Basic)
- Support for DirectX 9 graphics with WDDM and 128 MB of graphics memory (32 MB for Home Basic)
- DVD-ROM drive
- Audio Output
- Internet access (fees may apply)

Windows Vista System Requirements, http://windows.microsoft.com/en-us/windows-vista/products/system-requirements (last visited November 16, 2010).
[21]   Microsoft TechNet: Windows Vista Enterprise Hardware Planning Guidance (© 2010 Microsoft Corporation), ACER00002635 – ACER00002637.
[22]   ███████████████████████████████████

15

REDACTED

39.     All of the Acer models at issue had 1GB of total system memory which shared memory with graphics and left significantly less than 1GB (25% less or 768MB as in the case of the Plaintiffs) to run the operating system and other applications.[23]  I believe that this remaining memory, particularly in a shared memory system, was inadequate to run the memory-intensive Vista Premium operating system and would have caused the computers at issue in this case to perform unsatisfactorily leading to slowness, sluggishness, freezing, long boot times, and/or crashes (or lock-ups) when used under ordinary conditions.  Acer's quality control efforts should have detected this before these products were released to the market.

40.     Given the limited and insufficient memory available in these particular Acer systems, based on my review to date, it is my opinion none of the computers at issue here would have delivered the performance that a reasonable consumer would expect.

**F.  Computer Professional Recommendations**

41.     While Acer continued to build and ship these 1GB shared memory systems with Vista Premium, computers professionals, as well as other OEMs, were recommending 2GB or more of memory in order for a computer to adequately function with Vista Home Premium.

42.     Soon after Vista was released, industry experts began to publish the results of tests reporting on the performance on Vista-equipped computer systems.  PCstats.com, a well-respected PC website, ran memory testing on computers containing Vista Ultimate and published the results on August 28, 2007 in an article titled: "Microsoft Windows Vista: How much memory is enough?"[24]  This article confirmed that "2 GB of RAM is generally considered the sweet spot for Windows Vista."

43.     The article discussed the testing that was undertaken: "In order to isolate the performance differences of Microsoft Windows Vista with different amounts of system memory, we'll be testing the following PC system with 512MB, 1GB, 2GB and 4GB of memory."  The desktop computer used also had a 256MB discrete graphics card.  Thus, the systems tested did not have shared memory as the notebook computers at issue here do.

---

[23] Plaintiffs' computer system shipped with only 768MB of RAM available for the operating system leaving 256MB for graphics.
[24] "Microsoft Windows Vista: How much memory is enough?," PCstats.com, WOLPH000327 – WOLPH000336.

REDACTED

44.     The Windows System Assessment Tool (WinSAT) is a module of Microsoft Windows Vista which measures the capability of a computer's hardware and software configuration and expresses this measurement as a number (called a base score) that is reported as a Windows Experience Index (WEI).  The WEI includes five subscores: processor, memory (RAM), graphics, gaming graphics, and primary hard disk; the base score is equal to the lowest of the subscores.  A higher base score generally means that a computer will perform better and faster than a computer with a lower base score, especially when performing more advanced and resource-intensive tasks.  At the time of these PCstats.com tests, the base scores ranged from 1 to 5.9.[25]

45.     According to the PCstats.com article: "With 512MB [and a 256MB Graphics card] of memory Vista crawls.  Even in 2D office/workstation style work there was a noticeable lag. Microsoft's Windows Experience Index was particularly hard, scoring just 1.7 points.  Not very impressive.  What the benchmarks don't say though was how laggy simple Windows tasks were... we could hear the HDD chugging away accessing the swapfile."  The article concluded: "[a]s it stands right now, you'll get the best overall performance from Vista with 2GB."

46.     Another article in *ComputerWorld*, "Buying a new PC? 'Windows Vista Capable' barely hits the mark," dated February 20, 2007 (shortly after Vista's release), also examined recommended Vista memory requirements.[26]  This article quotes a Microsoft Vista beta-tester as follows: "Microsoft's on-the-box minimum RAM requirement 'really isn't realistic,' according to David Short, an IBM consultant who works in its company's Global Services Divison.  He says users should consider 4GB of RAM if they really want optimum Vista performance.  With 512MB of RAM, Vista will deliver performance that's 'sub-XP,'[[27]] he warned.  Short has been beta-testing Vista for two years and was at the IBM-oriented Share user group conference in Tampa, Fla., last week discussing some of Vista's performance requirements.  His XP system has

---

[25]  What is the Windows Experience Index?, http://windows.microsoft.com/en-US/windows-vista/What-is-the-Windows-Experience-Index (last visited November 16, 2010).

[26]  Patrick Thibodeau, "Buying a new PC? 'Windows Vista Capable' barely hits the mark: IBM'er says Vista's RAM sweet spot is 4GB," *ComputerWorld*, http://www.computerworld.com (February 20, 2007), WOLPH000325 – WOLPH000326.

[27]  Windows XP was Vista's predecessor.

17

2GB of RAM, which he calls the 'sweet spot' for that operating system, but on Vista 4GB of RAM may be closer to its 'Nirvana,' he said."

47.    The same *ComputerWorld* article also discusses Dell's recommendations:  "For instance, Dell offers a Windows Vista Capable configuration that isn't capable of much, according to what Dell says about it on its Web site: 'Great for ... Booting the Operating System, without running applications or games.'  Dell recommends 2GB of system memory."  Finally, the article quotes a representative from Samsung: "Mueez Deen, director of graphics memory and consumer DRAM at Samsung Electronics, also recommends 2GB of RAM, calling that amount the 'optimal density for the complete Vista experience -- economically and technologically.'"

48.    In an article published before Vista was released, Dell's CEO, Kevin Rollins, is quoted as saying, "I think they tell you maybe 1 gig of memory is OK [to run Vista].  No. Two gigs of memory would be great."[28]

49.    Dell's website has a list of Frequently Asked Questions regarding Vista that also recommend at least 2GB of RAM to ensure adequate functionality of computer systems running Vista:[29]

**2) Is 2GB RAM and a 256MB graphics card a requirement to get full functionality of Windows Vista? How rich of a presentation might we expect if we stayed with our current 1GB RAM2 and 128MB graphics card?**

(a) Although 1GB RAM and 128MB graphics card may provide full functionality of Windows Vista in many instances, for an enhanced Windows Vista experience, Dell recommends the following hardware for Windows Vista Business, Windows Vista Home Premium, Windows Vista Ultimate and Windows Vista Enterprise: 2 GB Dual-Channel

---

[28] "Vista system may need more memory, Dell CEO says," October 27, 2006 (Bloomberg), available at http://www.seattlepi.com/business/290154_msftvista27.html.
[29] See Microsoft Windows Vista: Hardware Requirements and Driver Availability, http://www.dell.com/content/topics/global.aspx/solutions/en/winvista_faqs_rel (last visited Nov. 16, 2010).  Dell repeats in a footnote the minimum requirement from the Microsoft logo program: "If the GPU uses shared memory, then no additional graphics memory is required beyond the 1GB system memory requirement.  If the GPU uses dedicated memory then 128MB minimum is required."  Dell contradicts this in the main body when it observes that "1GB RAM and a separate 128MB graphics card *may* provide full functionality", but additional memory is needed as a practical matter "for an enhanced Windows Vista experience."  (emphasis added)

REDACTED

RAM, 256 MB graphics card, dual-core processors and a 7200 rpm hard drive.

(b) In recent tests performed by the Dell CTO office, we found that the % of memory used when performing routine tasks* on a PC is reduced by half when configured with 2 GB Dual-Channel RAM and 256 MB Graphics, versus 1 GB RAM and an integrated graphics solution. As more applications are opened and more % of memory is consumed, the system memory becomes more challenged and system performance can be penalized. To help ensure a high level of system responsiveness, customers should follow Dell's recommendation for RAM and graphics. We also believe that users can benefit from the general advantages which can be observed when a PC is configured with a dual core processor and 7200 rpm hard drive.

*Routine tasks: Windows Vista Home Premium, Antivirus, Sidebar, Messenger, Office 2007, Internet Explorer 7 (3 Windows - Viewing content from CNN.com, ESPN.com, Digg.com) [Significant Disk Paging @ 1GB UMA]

| | 1 GB Dual Channel RAM, Integrated Graphics | 1 GB Dual Channel RAM + 256 MB Graphics Card | 2 GB Dual Channel RAM, 256 MB Graphics Card |
|---|---|---|---|
| | Core 2 Duo E6300 (1.83 GHz) | Core 2 Duo E6300 (1.83 GHz) | Core 2 Duo E6300 (1.83 GHz) |
| % Memory Used | 87% | 63% | 41% |
| Physical Memory Used | 881.31 | 643.23 | 838.45 |

**Dell CTO Internal Testing Results**

50.     Dell's testing describes symptoms and results similar to those I observed on Acer's systems (discussed in more detail below) that had 1GB of RAM and integrated graphics -- only the impact was even more acute on Acer's notebooks. I am not aware of Acer making any similar disclaimers or recommendations to consumers about computer memory as Dell did.

51.     None of the Acer models at issue in this case met computer professional or other OEM recommendations for a computer with Vista Home Premium installed, which called for at least 2GB of system memory. All of the Acer models at issue here had 1GB of total system memory which shared memory with graphics and could not adequately run the operating system and other applications. In my opinion, Acer provisioned these notebooks with

19

REDACTED

insufficient memory to run Vista Premium -- a memory intensive OS.  This would have caused the Acer computers at issue in this case to fail to function properly.

**G.  Acer/Microsoft Testing Data**

52.     In my experience, computer manufacturers prepare standardized tests and benchmarks for each unique system that they produce in order to confirm whether the system meets the performance and reliability specifications which were established for the model when it was designed or, in the case of Original Design Manufacturers, when it was spec'ed out.



REDACTED



59.     On WEI scores of 3.0 or slightly above a computer would not be expected to function fully and properly in many user environments.  According to Microsoft, a computer with a score in the 2 range "is generally not powerful enough to run Windows Aero, or the advanced multimedia experiences that are available with Windows Vista. . . .  A computer with a base score of 3 is able to run Windows Aero and many new features of Windows Vista at a *basic* level.  Some of the new Windows Vista advanced features *might not have all of their functionality available*."[37]  To have full functionality, a computer needs a base score of at least 4.0.[38] ████████████████████████████████████████████████████████████

---

[35] ████████████████████████████████████████████

[36] ████████████████████████████████████████████████████████████

[37]   What is the Windows Experience Index?, http://windows.microsoft.com/en-US/windows-vista/What-is-the-Windows-Experience-Index (last visited November 16, 2010) (emphasis added).
[38] *Id*.

REDACTED

## H.  The Wolph Computer

60.     According to the Wolphs' Complaint, they experienced slowness, lock-ups, and freezing when using their computer out of the box.  At some point after purchase, the Wolphs installed a commercial software package on their computer called EMI (Electro Meridian Imaging).[39]  In my opinion, based on my review of the EMI software and its website, this software would not have been responsible for the problems the Wolphs experienced with their computer.

61.     The Wolphs took their computer to Noguska LLC, a computer repair center near where they lived, seeking expert assistance to resolve their problems.  The Noguska representative blamed the computer failures on the lack of memory and Acer.[40]

62.     In order to establish the performance and capabilities of personal computers, it is customary to create a controlled and repeatable environment in which to operate the systems and to select a series of benchmark tests which are representative of the usage which is anticipated of the computer systems and the environment in which the personal computer is intended to operate.  There are many such benchmarking products available and they are widely used in our industry.  I am very familiar with them and have used them in many cases involving computer functionality for more than 15 years.  In addition, I have been responsible for the establishment of a benchmarking center with more than a dozen senior engineers, the development of benchmarking software, and the design and development of benchmarking hardware for more than 35 years on a variety of computers.

---

[39] It is my understanding that the recommended memory requirements for the EMI software, at the time the Wolphs purchased it, were 1GB of RAM, which is what their computer contained.  On later versions of the software, the EMI recommended requirements were increased to 2GB of RAM.  Deposition of Lora Wolph, at 42:22-43:5 (April 7, 2010); Declaration of Grant Girard (September 13, 2010); EMI System Requirements GG000001.

[40] The Noguska technician noted: "The specifications for the computer show that it was shipped with 1 GB DDR-2 of system memory.  As a technician/engineer, I felt this was inadequate system memory for a computer operating Windows Vista.  Especially since the video memory is shared with the system memory, leaving a usable 768 MB of memory.  Since the memory was so low, performance of Windows was significantly decreased.  This is because Microsoft specifies that Windows Vista needs at least 1GB of full system memory to operate properly.  The solution to this was to add 2 GB more of system memory to make the computer fully functional.  It is my conclusion that all Acer brand notebook computers do not meet most quality standards for computing."  Letter and Bill to Clay Wolph from Noguska LLC (Nov. 3, 2008), WOLPH000145 – WOLPH000146.

22

REDACTED

63.     To address some of the questions asked of me in this particular case, I obtained Plaintiffs' computer and a second computer virtually identical to that of the Plaintiffs to also run my own benchmark tests.  I purchased a new Acer notebook over eBay.com, which is a method I have used in the past to obtain computer models for testing.  The model number of the eBay unit is an Acer Aspire 4520-5803.   The Wolph computer is an Acer Aspire 4520-5458.  The only difference between these two models was the speed of the CPU (an AMD Athlon 64) -- the Wolph computer was 1.8GHz, whereas the eBay computer was 1.7GHz.  I inspected the two computers to determine whether there were any signs of damage or abuse and found none. The two units were in "like new" condition.  I also inspected the computers to confirm they had all of their constituent parts with nothing added, removed or replaced.  Both laptops had everything that they should have had when Acer shipped the computers except in the case of the Wolph notebook where one of the two original 512MB SO-DIMM memory modules was in an attached antistatic bag and, in its stead was a 2GB DDR2 PC-5300 (677 MHz) SO-DIMM.

64.     To ensure that benchmarking results were repeatable, it was necessary to restore the computers to their original factory default conditions including the BIOS defaults[41] -- which I did using the Acer provided software (eRecovery).  On the Wolph computer, I also replaced the 2GB memory stick with the original 512MB stick -- as would have been in the computer when it was shipped.  Using the as-shipped systems, I ran a series of benchmarks from various manufacturers, in addition to the WinSat (WEI) tests from Microsoft.[42]  I ran these tests multiple times returning the systems to their original default conditions before each test.[43]  The results obtained were within the margins of the accuracy of these tests, meaning the results were reliably obtained.

65.     The systems as configured and shipped by Acer, had only 768 MB of memory available to the operating system, while 256MB of memory had been allocated to graphics.[44] Out of the box, as I was attempting to set up the benchmarking tests, it became immediately

---

[41]  The EMI software installed on the Wolph's computer was not installed on the system, nor was anything else installed (other than that which Acer puts on the system) for these initial tests.

[42]  According to documents produced in this case, Acer used some of the same benchmarks I chose.

[43]  This protocol is commonly used in the industry and is the same as that recommended and used by other industry practitioners, analysts, and reporters.

[44]  The amount of memory can be seen on the Windows Experience Index screens, among other locations.

REDACTED

apparent to me that the systems behaved sluggishly and were non-responsive for significant periods of time -- even when attempting to accomplish the most mundane and ordinary of tasks. For example, when attempting to copy files from one window to another, the system would lock-up for many seconds at a time, leaving me with the impression that it had crashed. The system was simply being overwhelmed by trivial tasks. Video playback, a function which most Vista Premium users can be expected to use, resulted in lost frames, stuttering, and other problems that are symptomatic of insufficient system resources and memory. Users of Vista Premium can also be expected to have multiple tasks operating simultaneously on their computers ("multitasking"). Multitasking requires that the system have access to memory resources. Users of such systems expect and demand that they be able to switch from window to window instantaneously. I found the combination of delayed and unpredictable responses to make these Acer systems all but unusable.

66.     While operating the Acer systems with a modest amount of multitasking,[45] I used the Windows Resource Monitor, available with Vista, to monitor memory usage. The paging rates were elevated and contributing to the delays in system response times. I also traced the hard page faults during period of activity and inactivity. When the Wolph computer system had only 768 MB of memory, the number of hard faults was high (as was hard disc activity) indicating excessive swapping activity which would inevitably manifest itself in delays and unresponsiveness.

67.     On the benchmark tests, the Acer systems scored at the lower end of the scales established by these benchmarking tools.[46]  In addition, on all of the benchmarks, the subject systems ran dramatically slower than when the system was memory was upgraded.

68.     I acquired two 1GB DDR2 677MHz PC-5300 SO-DIMM memory modules to use in addition to the 2GB SO-DIMM the Wolphs had acquired. I ran three complete sets of benchmark tests: one with the two original 512MB SO-DIMMS, a second with the two 1GB SO-

---

[45] I chose web browsing with three tabs, one with an Adobe Flash video screen, OpenOffice 3.0 Writer editing a 4 page document and a Windows Explorer windows open on the My Documents folder.
[46] For example, the PCMark05 and 3DMark06 benchmarks, both used by Acer, have databases cataloging performance for "common" (average) and fastest systems as measured by each test. The common and fastest 3DMark06 systems were at 17,600 and 47,240 respectively while the Acer systems scored in the mid-200s.

REDACTED

DIMMs, and a third test using one original 512MB SO-DIMM and 2GB SO-DIMM acquired by the Wolphs.  Based on the results, (a) the basic componentry of the system continued to perform at rated speeds (a 1.8GHz AMD CPU still computed square roots at the same speed regardless of the memory installed); and (b) the overall system performance of the Acer laptops with 2GB (or more) performed significantly better than with 1GB.  In other words, the performance increase from the additional memory was dramatic and greater than would be expected based on my experience.  On application benchmarks (versus synthetic benchmarks), the scores were significantly improved.[47]

69.     In my opinion, the Acer systems at issue in this case when configured with 1GB of memory shared between the system and graphics, and equipped with Vista Premium will not provide an acceptable level of performance.  The addition of 1.5GB of memory (by replacing a 512MB stick with a 2GB stick) or the replacement of the two 512MB SO-DIMMS with two 1GB SO-DIMMS will mitigate the problems the consumers would be expected to experience and provide consumers with acceptable levels of performance while using these systems.[48]

**Topic (2) whether the complaints and inquiries that Acer received are indicative of problems with insufficient memory**

**A.  Acer's Customer Service Databases**

70.     A computer with insufficient memory to adequately run Vista Premium would likely experience the same issues I encountered when testing the Acer systems that are part of the class: slow and unpredictable responses, choppy video playback, lagging, freezes and lock-

---

[47] Application or workload benchmarks measure system performance by running real-world programs on the system to simulate workload of a typical user of the system.  Synthetic benchmarks use programs that exercise one specific component of the system and measure its speed or capacity.  Application benchmarks give a much better measure of real-world performance on an entire system, whereas synthetic benchmarks are useful for testing individual components of the system, like a hard disk.

[48] The additional memory will not convert these systems into something they are not: high-performance; high-end laptop computer systems.

REDACTED

ups, and other issues.[49]  These problems would manifest themselves regardless of the existence
of additional software installed.[50]



71.

72.

73.

[49]  Unpredictable response times lead to such undesirable effects as pressing the "send" or the "buy" button multiple times on a web page because the user receives no feedback indicating that the input has been accepted by the browser.
[50]  Acer systems included in the Complaint were generally sold to consumers in the "value" segment of the market. Consumers in this segment are expected to use commercially available software packages designed for and tested to run on Windows.
[51]
[52]

REDACTED



74.

75.

76.

---

[53] Microsoft Access Database of Siebel Customer Service Requests, ACER00002445.

27



77. ████████████████████████████████
████████████████████████████████████
█████████████████████████████████
████████████████████████████████████
███████████████████████████████
██████████████████████████████████████

78. ██████████████████████████████
████████████████████████████████████
████████████████████████████████████
███████████████████████████████████
██████████████████████

79. ███████████████████████████████
████████████████████████████████████
████████████████████████

**B. Retailer Returns**

80. ██████████████████████████████████
████████████████████████████  ████
████████████████████████████████████
█████████████  ██████████████████████

─────────────────────
54 ██████████████████████████████████
███████████████████████████████████████
55 ████████████████████████████

REDACTED



REDACTED



83.

84.

85.

**C. Consumer Survey**

86.

REDACTED



87. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

88.     In my experience, it is good practice for an OEM to track the rate and number of problems by type of product SKU to ensure that they are not experiencing an extraordinary numbers of failures. █████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

**Topic (3): Can the cost of repairing or remedying any defective laptops be established on a class-wide basis:**

89.     I was also asked by Counsel for Plaintiffs to determine if these systems could be "fixed" using a common remedy.  If so, I was also can the costs of repairing each of the Acer computers at issue be quantified on a common basis.  The answer to these questions is yes: a common remedy -- the addition of memory -- adequately resolves the issues affecting these consumers.  The cost of the additional memory and the related expenses for its installation can be computed for all users in the relevant market.

90.     All of the computers at issue here have similar memory specifications as the Wolphs' computer: 1GB of PC-5300 667MHz SO-DIMM memory, shared between the graphics

---

[64] ████████████████████████████████████████

REDACTED

and system, and no discrete graphics.  Since it is generally impossible to add a new graphics card to these types of notebooks (which would leave the 1GB dedicated to the operating system's use), I believe an appropriate technical remedy would be to repair the computers through the addition of RAM that would allow the computers to function adequately and as intended with the Vista Premium OS.

91.     Notebooks manufactured and sold to Class Members during this period have only two slots for memory.  I tested the systems with 2GB of memory (removing the other 512MB stick) and saw significant improvement.  Accordingly, to remedy these systems to perform adequately with Vista Premium, I believe that the addition of 2GB of RAM would be sufficient whether that memory were disposed on two 1GB modules or one 2GB module.

92.     Memory for laptop computers is designed generally to allow for the use of different speed grades (PC-4200, PC-5300 and PC-6400) and different memory sizes (e.g., 512MB or 1GB memory sticks) and different component memory sizes (e.g., 512MB made up of 16 32MB chips, or 8 64MB chips) -- OEMs can use PC-5300 memory or PC-4200 memory on the same system -- performance may vary, though.  The same is true for stick size and component sizes -- they can be mixed within a product line.  It is also possible, especially in the aftermarket for users to acquire a second memory stick that is not fully matched to the first stick installed in the system.[65]  Thus a user can install a 2GB memory stick into a system with a 512MB stick and receive the benefits of additional memory -- although some performance may be lost while doing so.  In general and within limits, a user can add a faster memory module or one with more RAM to a system that already has a slower memory module with less RAM -- such a system will operate at the speed of the slowest module, however, and there may be other conflicts.[66]  Thus, it is possible to add a 2GB module to one slot, leaving in or removing the other 512MB SO-DIMM installed.  Alternatively, it is also possible to swap out both SO-DIMMs and replace them with two 1GB SO-DIMMs of the appropriate speed (i.e., PC-5300, DDR2, 677MHz).  Using DIMMs of different speed and different capacity will not produce the

---

[65] OEMs eschew such intra-unit mixing of memory modules as it raises the number of different configurations substantially that the OEM would need to support.

[66] Generally speaking, memory or laptop vendors prefer matched configurations.

REDACTED

maximum benefit to users, however.   The critical issue in this case, in my opinion, however, is not maximizing memory speed but rather maximizing memory available to the Vista operating system.

93.     Accordingly, another option would be to replace the two 512MB modules with a matching set of 1GB modules but that can be more expensive than just adding one 2GB module.[67]

94.     As of November 2010, Bestbuy.com has individual 2GB memory sticks for laptops averaging between $29.99 and $46.99 (not including sales tax and shipping).

95.     As of November 2010, Walmart.com has individual 2GB memory sticks for laptops averaging between $34.98 and $74.88 (not including sales tax and shipping).

96.     I believe that these prices are consistent with other national retailers.

97.     To arrive at estimates for the costs of service for the installation of additional memory, I surveyed the prices charged by the service arms of two nationwide PC repair companies: Firedog and Geek Squad (which handles in-store repairs for Best Buy).  I examined the in-home and in-store service fees (if available) for hardware installation of memory.

98.     Geek Squad's in-store hardware installation is $49.99 while its in-home charge is $149.99.[68]

99.     Firedog's in-home service charge for the addition of memory is $135.99.[69]

100.    At today's prices, the least expensive cost to purchase 2GB of laptop RAM is approximately $30.00, with at home memory installation costs of between $135.99 - $149.99. In-store installation is $49.99.

---

[67] For example, Bestbuy.com has individual 1GB memory sticks average between $19.99 and $24.99 a piece (for a pair, prices would be doubled).  Best Buy also has a Memory Master, 2-Pack of 1GB PC2-5300 SO-DIMM Laptop Memory Kit for $35.99.  Walmart.com has individual 1GB memory sticks for laptops averaging between $22.88 to $32.88 (not including sales tax).

[68] Geek Squad Hardware Installation, http://www.geeksquad.com/services/computer/service.aspx?id=2927 (last visited Nov. 19, 2010).

[69] FireDog: Upgrade my PC, http://www.firedog.com/upgrade-my-pc (last visited Nov. 19, 2010).

REDACTED

I declare under the penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Dated November 22 2010

Ronald S. Alepin

REDACTED

**Exhibit A to Declaration of Ronald S. Alepin - Curriculum Vitae**

*Ronald S. Alepin*

### S U M M A R Y

- Forty years experience in the computer industry, thirty as an independent industry and technology consultant, and twenty-five on legal and public policy issues affecting the computer industry

- In-depth knowledge of and experience in

    ◊ The design and development of server, mainframe, minicomputer and PC-based systems and the underlying technologies;

    ◊ Software, including operating systems, middleware, n-tier applications & development platforms;

    ◊ The manufacturing, sales, distribution and support of computer systems and software;

    ◊ Hardware, including the design of semiconductor chips and computer systems (including PCs, laptops and mainframes), memory systems, disk drives, platters, batteries, and thermal systems;

    ◊ Telecommunications, including the design and implementation of protocols for mainframe, client/server and Internet-based networks;

    ◊ The business, economics and finances of the computer industry including the software development process;

    ◊ Legal and policy issues affecting the information processing industry

- Management and Consulting appointments including:

    - General Manager of Fujitsu's North American Software Division;

    - Senior leadership and visionary positions, including Chief Technology Officer ("CTO") & Vice-President Strategic Planning, Fujitsu Software

    - Principal consultant to the States' Attorneys General in States v. Microsoft

    - Principal consultant to the Antitrust Division of the U.S. Department of Justice on antitrust issues affecting the software industry;

    - Principal consultant to Morrison & Foerster on the IBM/Fujitsu arbitration, the largest intellectual property proceeding in history;

- Engagements with governmental agencies and commissions in the U.S. and the European Community on matters relating to competition law, information disclosure, intellectual property protection for computer software, software development and technology acquisition.

- Various engagements as an expert in matters involving computers, microprocessors, computer software and the computer industry;

REDACTED

---

### P R O F E S S I O N A L   E X P E R I E N C E

**<u>President of Los Altos Systems Research ("LASR")</u>**         1981 – Present

Through my technology consultancy called Los Altos Systems Research, I provide consulting services in the areas of the design and development of computer systems, including hardware and software, the management of development projects and computer business generally.  My clients include global software and hardware companies, IT service-providers as well governmental agencies and professional services firms.

Recent assignments involving software have included:

- ✓ establishment of a clean room software development process for a large multinational corporation;

- ✓ analysis of mainframe operating system software;

- ✓ examination of potential copyright infringement in high-end digital video editing software;

- ✓ evaluation of software development methodologies, cost estimations amd delivery for large, complex projects including social networking websites and multinational financial information web portals;

- ✓ an evaluation of the methodology using for browser measurement;

- ✓ a business evaluation of the licensing provisions of computer software licensing provisions

- ✓ a technical assessment of communications protocols,

- ✓ the viability of reverse engineering communications protocols for workgroup server interoperability;

- ✓ a review and analysis of patents and other intellectual property rights asserted of these protocols,

- ✓ an analysis of software patents (more than 250), and the design recovery and source code comparison of multimedia authoring software, .

REDACTED

Recent assignments involving hardware have included:

- ✓ evaluation of Liio battery failures in camera systems;

- ✓ assessment of memory subsystem performance in personal computers;

- ✓ examination of premature failure of PC components failures (hinges, batteries, power supply cables);

- ✓ Flash RAM and SRAM performance and usage;

- ✓ Thermal design for personal computers.

- ✓ Patents on personal computer systems including multimedia chips.

Over time I have expanded my practice to include the intersection of technology and the law. Beyond my engagement as Technical Advisor to Morrison & Foerster, one of the country's leading law firms, described below, I have been retained as an expert in several computer technology-centered trade secret, copyright, patent, antitrust, and class action disputes including Apple, Calix Networks, Compaq, DirecTV, Fujitsu, IBM, Iconnix, Microsoft, MicroUnity, Novell, Opera, Oracle, Phase Metrics, RealNetworks, Sun Microsystems and Toshiba.

I was retained by the CCIA (Computer and Communications Industry Association), the SIIA (Software and Information Industry Association) and ECIS (the European Committee on Interoperable Systems whose principle members include IBM, Sun, Redhat and Oracle) as their computer and software industry expert in the proceedings against Microsoft in Europe. I was retained by RealNetworks in the European and Korean proceedings as a technical expert evaluating the bundling of Media Players. I was retained by Oracle to evaluate the business and technical issues presented by Microsoft's Workgroup Server Protocol Program, "WSPP" which involved several in-depth reviews of Microsoft's interoperability information.

I have been involved in public policy issues touching the computer industry for twenty years, including active roles in the EU Software Directive and the IBM Undertaking. I have specialized in the crucial role of interoperability in the IT industry since 1978. I was retained by the Assistant Attorney General for Antitrust at the United State Department of Justice as an expert in the computer industry and technology and also by the State Attorneys General during their investigation and preparation for trial in the liability phase of the present case. In 2007, I was retained as an expert in by the "Non-Settling" States Attorneys General in their successful motion to extend the duration of certain provisions of the Remedies Decree issued in the U.S. DOJ v. Microsoft.

REDACTED

I have appeared before the European Commission and its various departments more than two dozen times over the past twenty years, most recently in October, 2004 to testify at the Microsoft Interim Measures hearings in Luxembourg and in December of 2005 in connection with a technical evaluation of Microsoft's compliance under the Commission's Decision.  In 1988 and 1989, I worked with the Commission during its drafting of the Software Directive to develop provisions that would balance intellectual property protection with competition.  From 1980 to 1992, I appeared numerous times before the Competition Directorate at their request in conjunction with their investigation of IBM and subsequently with regard to the operation of IBM's Undertaking (IBM's settlement agreement under which it was required to supply interface information to competitors).

I am acknowledged in two books about computer software, competition and copyright law.

---

## Extended Engagements

---

### Technical Advisor, Morrison & Foerster                    1991 – 2009

I worked with Morrison & Foerster's Intellectual Property/Technology Transactions practice group.  My role was to work with the group's attorneys and its clients in litigation, patent, contractual, licensing and M&A matters involving computer technology.

### Chief Technology Officer & Vice-President, Strategic Planning, Fujitsu Software
2002 – 2006

As a consultant, I was retained to act as Vice-President, Strategic Planning and Chief Technology Officer for Fujitsu Software Corporation where I assisted in the development of strategies, products and` partnerships, most recently on the effort to globalize Fujitsu's grid and SOA computing initiatives.

### Chief Technology Consultant, Fujitsu Limited               1996 – 2002

As Chief Technology Consultant to Fujitsu Limited, I assisted the world's third largest computer company in developing strategies, products and partnerships, including its relationships with Intel and IBM as well as evaluating potential acquisitions and technology licenses.

---

REDACTED

**General Manager, Enterprise Products Division, Fujitsu Software**     2000 – 2002

I was General Manager of the Enterprise Products Division for Fujitsu Software Corporation., responsible for the development, worldwide sales, support and marketing of Fujitsu's *i*-Flow, Java-based business process management middleware software.  I also had P&L responsibity for Fujitsu's J2EE-based Interstage Application Platform Suite in North America.

I conceived, co-designed and developed a software system for the remote monitoring of the performance and security of websites including streaming media and transaction-based sites using a distributed network of computers located around the country.

As the general manager, I negotiated dozens of contracts involving software to be included as part of products to be resold by licensees.  I also evaluated technology and software product purchases.

---

**Principal Consultant to the States' Attorneys General**               1998, 2007

I was retained directly by the States' Attorneys General as their chief technical and industry consultant in the investigation of Microsoft and the preparation for trial. The resulting proceedings before Judge Jackson led to a finding of liability. Subsequently, I was retained as an expert in the States' Attorney Generals successful motion to extend the remedy over Microsoft beyond five years.

---

**Party Chief Technical Representative**                                1985 – 1997

I served as the chief technical advisor to Morrison & Foerster's attorneys in their representation of Fujitsu in its multi-billion dollar antitrust and copyright dispute with IBM over mainframe computer software.   My assignments included assessments of both technical and business issues.  I conducted the largest ever analysis of software for copyright infringement – designing the study, directing the efforts of more than 30 engineers and six consultants.  The project reviewed more than 10 million lines of source code in more than 30 programs, including operating systems, language compilers, networking software and data management.

The result of the proceedings was the creation of an intellectual property licensing and transfer regime (which lasted eight years) with a comprehensive set of rules

REDACTED

and procedures for the extraction of information necessary to achieve interoperability. I was responsible for the technical content of the provisions governing the scope of information necessary to achieve interoperability and the rules governing the operation of the regime. I represented Fujitsu in any disputes concerning the interpretation of these provisions and their applicability to technical specifications sought by either party.

---

**Principal Consultant to the U.S. Department of Justice, Antitrust Division** 1994 – 1996

I was retained directly by the Assistant Attorney General for Antitrust to assist in an investigation of certain aspects of the software industry. In this capacity I was responsible for providing the Assistant Attorney General, the Special Trial Counsels and the Department with assessments of the industry and for evaluating the technical and business evidence generated by the Department's investigations. In particular, I was the technical and industry expert in the 1993 Microsoft investigation which led to the 1994 Consent Decree; the Tunney Act proceedings before Judge Sporkin, the Microsoft-Intuit Acuqisition, and the Windows 95 MSN bundling and related investigations.

Separately I was retained by the Antitrust Division to assist in the evaluation of the competitive effects of certain mergers in the software industry. In particular, I was asked to assist in the Department's review of the impact of Computer Associates' acquisition of Legent on the market for computer systems management and performance measurement software.

I also consulted with the Division in its evaluation of the effects of IBM's 1996 suit to terminate the 1956 Consent Decree.

---

## History

**Amdahl Corporation** 1978 – 1981

Responsibilities included Processor Product Marketing Manager for Amdahl's 5860 family of IBM System 370 compatible processors; Manager, Benchmarks,

REDACTED

Performance Evaluation and Competitive Analysis; and Principal Programmer. I authored and co-authored three Amdahl software products.

**L'Industrielle Services Techniques, Inc. ("IST")**                    1975 – 1978

Director of Software Development for IST, a major service bureau using IBM mainframe equipment.

**Sociètè de Mathématiques Appliquées ("SMA")**            1974 – 1975

Manager Software Development for SMA, a major service bureau using IBM mainframes and CDC 6600 computers.

**Bell Canada**                                                        1971 – 1974

Systems Programmer for Bell Canada.

REDACTED

## E D U C A T I O N

**McGill University**                                                    1967 -- 1971

Four years in Honors Economics and Econometrics.

## O R G A N I Z A T I O N S

**Memberships**

Association for Computing Machinery ("ACM")

Institute of Electrical and Electronic Engineers ("IEEE").

**Boards**

Vice-Chairman for the Americas, 2001/2004,
Workflow Management Coalition ("WfMC").

Board of Directors, Eclipse.org

REDACTED

**Exhibit B to Declaration of Ronald S. Alepin - List of Reliance Materials**

Documents Produced by Acer



Microsoft TechNet: Windows Vista Enterprise Hardware Planning Guidance (© 2010 Microsoft Corporation), ACER00002635 – ACER00002637.

Documents Produced by/Discovery from Plaintiffs

Letter and Bill to Clay Wolph from Noguska LLC (Nov. 3, 2008), WOLPH000145 – WOLPH000146.

1

"Recommended minimum hardware requirements for Windows Vista," Article ID: 919183 ("Last Review: November 13, 2007 – Revision: 3.6"), "System Requirements for Vista," Wolph000323 – Wolph000324.

Patrick Thibodeau, "Buying a new PC? 'Windows Vista Capable' barely hits the mark: IBM'er says Vista's RAM sweet spot is 4GB," *ComputerWorld*, http://www.computerworld.com (February 20, 2007), WOLPH000325 – WOLPH000326.

"Microsoft Windows Vista: How much memory is enough?," PCstats.com, WOLPH000327 – WOLPH000336.

Deposition of Lora Wolph (April 7, 2010).

Deposition of Clay Wolph (April 6, 2010).

<u>Public and Other Sources/Personal Files</u>

Compare Windows Vista, http://windows.microsoft.com/en-us/windows-vista/products/compare (last visited November 19, 2010).

Windows Vista System Requirements, http://windows.microsoft.com/en-us/windows-vista/products/system-requirements (last visited November 16, 2010).

What is the Windows Experience Index?, http://windows.microsoft.com/en-US/windows-vista/What-is-the-Windows-Experience-Index (last visited November 16, 2010).

Microsoft Windows Vista: Hardware Requirements and Driver Availability, http://www.dell.com/content/topics/global.aspx/solutions/en/winvista_faqs_rel (last visited Nov. 16, 2010).

Advances in Memory Management for Windows, Microsoft Windows (Oct. 12, 2007).

Desktop and Presentation Impact on Hardware Design, presentation by Kam VedBrat, Lead Program Manager, Windows Client, Microsoft Corporation, Microsoft WinHEC 2006.

Graphics Memory Reporting through WDDM, Microsoft Windows (Jan. 9, 2006).

Memory Management: What Every Driver Writer Needs to Know (Feb. 28, 2005).

The Memory Manager in Windows Server 2003 and Windows Vista, presentation by Landy Wang, Software Design Engineer, Windows Kernel Team, Microsoft Corporation (2005).

REDACTED

Preventing low memory problems, available at http://windows.microsoft.com/en-US/windows-vista/Preventing-low-me... (last visited Oct. 9, 2010).

Windows Vista Enterprise Hardware Planning Guidance, Microsoft TechNet, available at http://technet.microsoft.com (last visited Oct. 5, 2010).

Windows Vista Features, available at http://windows.microsoft.com (last visited Oct. 9, 2010).

Windows Vista Rules for Enabling Windows Aero, With Guidelines for Troubleshooting, Microsoft Windows (Apr. 13, 2009).

Windows Vista System Requirements And WinSat presentation, Richard G. Russell, Microsoft WinHEC 2006.

Benchmark Test Results - Wolph Computer and eBay Computer.

"Vista system may need more memory, Dell CEO says," October 27, 2006 (Bloomberg), available at http://www.seattlepi.com/business/290154_msftvista27.html.

First Amended Class Action Complaint and Exhibits, *Wolph v. Acer America, Inc.* Doc. 59 (Oct. 1, 2009).

Declaration of Ronald S. Alepin, *Kelley v. Microsoft Corp.*, No. 2:07-cv-00475-MJP, Doc. 279 (Dec. 8, 2008).

Geek Squad Hardware Installation, http://www.geeksquad.com/services/computer/service.aspx?id=2927 (last visited Nov. 19, 2010).

FireDog: Upgrade my PC, http://www.firedog.com/upgrade-my-pc (last visited Nov. 19, 2010).

BestBuy Home Page, http://www.bestbuy.com.

Walmart Home Page, http://www.walmart.com.

<u>Discovery from Third Parties</u>

████████████████████████████████████████

Declaration of Grant Girard (September 13, 2010).

Documents from *Kelley v. Microsoft,* 2:07-cv-00475-MJP, No. 129, Exhibit A, Redacted Pursuant to Microsoft's Confidentiality Designations and the Court's Order Granting in Party and Denying in Part Motion to Seal, No. 129, entered on February 26, 2008 (various Bates numbers).

REDACTED

EMI System Requirements, GG000001.

Report of Ronald S. Alepin in Kelley at al v. Microsoft, No. C07-475 MJP, September 15, 2008.

Windows Logo Program 3.0: Windows Vista Logo Program Client System Requirements (Version 3.09) (December 22, 2006), MS-WOLPH 0001 – MS-WOLPH 0087.

REDACTED

**Exhibit C to Declaration of Ronald S. Alepin -**

1



2



3
REDACTED



4

REDACTED



REDACTED

# EXHIBIT 23

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| LORA AND CLAY WOLPH, on behalf of themselves and all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>ACER AMERICA CORPORATION, a California corporation,<br><br>　　　　Defendant. | CASE NO. CV-09-01314 JSW |

## DECLARATION OF TODD STEFAN IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

I, Todd Stefan, declare:

1.　　I am an individual residing in Los Angeles County, California.  I am making this declaration in support of the case entitled *Lora and Clay Wolph v. Acer America Corporation* (CV-09-01314-JSW).

2.　　As a result of my direct involvement in the matters set forth below, I have personal and firsthand knowledge of the facts set forth in this declaration, and I could and would testify competently to such facts if called as a witness.

3.　　I am the Vice President of Setec Security Technologies, Inc.  My job responsibilities entail providing litigation support to attorneys and project management of Setec's computer forensic and electronic discovery specialists who work in our business unit, Setec Investigations.  Setec Investigations ("Setec") specializes in the discovery, collection, investigation, and production of electronic information for investigating and handling computer-

1

related crimes and misuse.  In my role with Setec, I work with government entities, local, state, and federal law enforcement agencies, private attorneys, and corporations, and specialize specifically in managing computer forensic investigations and providing thorough litigation support solutions.  I have been involved in over 750 computer forensic investigations and electronic discovery engagements surrounding theft of intellectual property, trade secret misappropriation, financial fraud, email and Internet abuse, employee disputes, copyright infringement, industrial espionage, disputed dismissals, and software code reviews, spoliation, among other engagements.  I regularly provide MCLE trainings on the topics of computer forensics and electronic discovery to attorneys, draft newsletters and whitepapers regarding the technical and legal topics that pertain to computer forensics and electronic discovery, and am a member, frequent participant and speaker at various professional organizations, such as the High Technology Crime Investigation Association and Private Sector Terrorism Response Group.  In addition, I am a licensed private investigator in the state of California with the Bureau of Security and Investigative Services.

4.      Setec has participated in and led countless computer forensic investigations and electronic discovery efforts to facilitate the discovery of electronic evidence in support of criminal and civil lawsuits.  Setec is regularly designated as an expert and our team of computer forensic and electronic discovery specialists frequently provides expert witness testimony.

5.      Computer forensics is the process of preserving, identifying, analyzing, and documenting computer evidence stored in the form of magnetically encoded information (data) with the objective of uncovering relevant electronic information.  Thorough computer forensic analysis performed by a skilled examiner can result in the reconstruction of the activities of a computer user, identification of the chronological and contextual history of files, recovery of deleted information, and exploration of sensitive data, while producing information relevant to discovery.

6.      Paramount to the computer forensic process is the proper acquisition, preservation, and verification of collected data, which is predicated on strict adherence to industry accepted best-practices, United States Department of Justice methodologies, and legal guidelines.  Setec's computer forensic investigation guidelines were developed to best preserve evidentiary value and uncover electronic evidence in a forensically sound manner in order to prevent against writing to, manipulating, or altering data on hard drives.  The guidelines are based and expand upon the United States Department of Justice search and seizure manual, "Searching and Seizing Computers and Obtaining Electronic Evidence," and incorporate law enforcement's best practices for preserving and analyzing electronic evidence.  Setec employs well-defined and accepted computer forensic technology to assure hard drives can be accessed during the computer forensic acquisition process and subsequent computer forensic analysis can be performed, while assuring that the original media and data are not altered during these efforts.

7.      In support of the *Wolph v. Acer America Corporation* matter, Setec Investigations was provided with an Acer 4520-5458 laptop computer by Daniel L. Warshaw from Pearson, Simon, Warshaw & Penny, LLP, which I was informed was purchased by Mr. and Mrs. Wolph in or around April 2008.  Prior to the performance of any analysis efforts on this laptop, I assigned one of Setec's computer forensic specialists to forensically acquire the hard drive contained with this computer.

8.      The computer forensic acquisition of the hard drive contained within the Acer computer system in question entailed creating a bit-stream copy, which is a sector-by-sector/bit-by-bit copy of the hard drive.  A bit stream copy preserves not only the files and directory structures within a hard drive, but also preserves all of the latent data, which resides in the file slack and unallocated file space that normally contains deleted files.  To enable the computer forensic acquisition, an array of forensic technology was utilized, including Guidance Software's EnCase Forensic, the industry standard and most widely recognized computer forensic software

platform by state and federal courts.  To assure that the original data was not altered during the computer forensic acquisition process, Setec employed a hardware-based write protect device, the same technology employed by state and federal law enforcement agencies to prevent against writing to, manipulating, or altering data on suspect hard drives.  The computer forensic acquisition process concluded with the generation of a bit stream copy that was subjected to a mathematical verification process, utilizing an MD5 hashsum for authentication purposes, to demonstrate that the original source of the data was not altered and that a true forensic duplication was produced.

9.    With the computer forensic acquisition of the specific Acer computer system's hard drive in question completed, efforts transitioned to the analysis efforts.  The purpose of Setec's analysis efforts entailed evaluating the ability of the Acer laptop to function properly with the Windows Vista operating system that came preinstalled when this laptop was purchased.

10.    The Acer laptop provided to Setec by Mr. Warshaw in support of this matter was an Acer 4520-5458 model number Z03 that possesses a product number of LX.AMVOX.050, serial number of LXAMV0X050804040DE2500, and manufacture date of 0801.  At the time of purchase, this model Acer laptop contained two 512 megabyte RAM chips totaling 1 GB of RAM.

11.    The Acer laptop was purchased with the "Home Premium" version of Windows Vista.  However, I was informed that this laptop would not operate properly (i.e., was slow, freezing up, etc.) until one of the two 512 megabyte RAM chips  were replaced with a 2 gigabyte RAM chip, increasing the laptop's memory capacity to 2.5 gigabytes of RAM.  To evaluate this, I assigned one of Setec's computer forensic specialists to perform a series of tests and evaluation exercises.

12.     To evaluate the operating capabilities of the Acer laptop and the ability to utilize its features, the testing and evaluation exercises were performed when the laptop was operating with 1 gigabyte of RAM, such as when it was purchased, as well as with 2.5 gigabytes of RAM, such as after the Plaintiffs added more memory.  Furthermore, the tests and analysis efforts were performed with each of these memory configurations on a fresh installation of the "Home Premium" version of Windows Vista, as well as a forensic clone of the original hard drive that has been in use since the laptop was purchased by Mr. and Mrs. Wolph.

13.     The performance of the Acer laptop was assessed intuitively by running or attempting to run native applications that are integrated with Windows Vista and third party applications installed on the Acer laptop so that the speed, responsiveness, and stability, could be gauged.

14.     As a result of the evaluation exercises when only 1 gigabyte of RAM was present, such as when it was purchased by Mr. and Mrs. Wolph, the Acer laptop consistently would not operate properly when launching programs or attempting to engage in features of Windows Vista.  Specifically, the laptop would require an extended period of time to boot up, the execution of software programs would hang, crash, or refuse to load, and multiple applications could not be open and in use at the same time without the speed and responsiveness of the computer degrading to an unusable level.  Overall, the poor performance, slow speed, and inability to engage in functionality of Windows Vista prevented this laptop from being fully utilized.

15.     The results from the evaluation exercises depicted significant differences when equipped with 2.5 gigabytes of RAM as compared to 1 gigabyte of RAM.  Such differences include, but are not limited to, the following:

a. The laptop booted up noticeably faster when 2.5 gigabytes of RAM was present;

b. Applications (such as Internet Explorer, WordPad, Paint, and Media Center) loaded noticeably slower when only 1 gigabyte of RAM was present as opposed to 2.5 gigabytes of RAM.

c. With 1 gigabyte of RAM, some applications would crash or freeze during use when multiple applications were open simultaneously, such as Internet Explorer, WordPad, Paint, and Media Center.  In other words, the computer could not adequately handle multi-tasking.

16.    To further assess the abilities of the hardware within the Acer laptop purchased by Mr. and Mrs. Wolph, I installed a clean version of Windows XP on these computers and ran similar evaluation exercises on the computer with 1 gigabyte and 2.5 gigabytes of RAM.  As a result of these tests, I also found that the Acer laptop equipped with 1 gigabyte of RAM performed faster and more stable when running Windows XP than when running the "Home Premium" version of Windows Vista.  These results also support the conclusion that Windows Vista Home Premium requires more system memory to operate properly than Windows XP and problems with the Wolph's Acer computer arose from Acer's failure to equip the computer with sufficient system memory.

17.    The Plaintiffs installed and used a software program called EMI (Electro Meridian Imaging) on their Acer laptop.  All of the above testing was conducted with and without the EMI software installed on the Acer laptop.  The results of the testing and evaluation exercises were not impacted by the presence of the EMI software and I do not believe it would have caused the issues the Wolphs were having with their computer.

18.    I believe that the Wolph's Acer laptop was shipped with an insufficient quantity of memory which prevents this laptop from operating properly.  The "Home Premium" version of Windows Vista preinstalled on the Acer laptop contains specific features and core

functionalities, which cannot be employed appropriately and the entire laptop's use is hindered due to the shortcomings of the laptop hardware provided by Acer.

19.    If Acer had provided laptop hardware that exceeded 1 gigabyte of shared system memory, the deficiencies and shortcomings negatively impacting the operation of this laptop would not have existed.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on November 19, 2010, at Los Angeles, California.

_____
TODD STEFAN

820750.3

7